# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

DONALD GARRY,

              Plaintiff,

              v.                                    9:21-CV-172
                                                    (MAD/MJK)

DR. MCPHILLIPS,

              Defendant.

DONALD GARRY, Pro Se
TIMOTHY TRIPP, ESQ., Attorney for Defendant

MITCHELL J. KATZ, United States Magistrate Judge

TO THE HONORABLE MAE A. D'AGOSTINO, United States District Court Judge:

## ORDER and REPORT-RECOMMENDATION

In this pro se civil rights action, plaintiff alleges that he was denied constitutionally adequate medical care during his confinement as a pretrial detainee at the Schenectady County Jail ("SCJ"). Presently before this court is defendant Dr. McPhillips' motion for summary judgment. (Dkt. No. 63).

This matter has been referred to me for Report and Recommendation by United States District Court Judge Mae A. D'Agostino, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule ("Local Rule") 72.3(c). For the following reasons, this court recommends that Dr. McPhillips' motion for summary judgment be granted as to plaintiff's Fourteenth Amendment deliberate indifference claim.  The court further

1

recommends that the district court decline to exercise supplemental jurisdiction over the remainder of plaintiff's complaint, i.e. his state law negligence claim, and dismiss this claim without prejudice to plaintiff filing in state court.

## I.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 12, 2021 by filing a complaint and application to proceed *in forma pauperis*. (Dkt. Nos. 1, 2).  By Decision and Order dated April 30, 2021, Judge D'Agostino granted plaintiff's IFP application and accepted the complaint for filing, to the extent it asserted a Fourteenth Amendment medical indifference claim and state law negligence claim against Dr. McPhillips. (Dkt. No. 8). All remaining claims were dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. Issue was joined on September 7, 2021 by the filing of Dr. McPhillips' verified answer. (Dkt. No. 19).[1]

On November 13, 2023, Dr. McPhillips filed the instant motion for summary judgment (Dkt. No. 63), and on November 14, 2023, the clerk's office, sua sponte, mailed plaintiff a Notice of Due Date to Respond to Motion for Summary Judgment ("Notice") (Dkt. No. 64). The Notice enclosed a copy of the Notification of the Consequences of Failing to Respond to a Summary Judgment Motion and advised

---

[1] Although denominated as a verified answer, the pleading lacks a verification page. Fed. R. Civ. P. 11 does not require that the answer be verified.

2

plaintiff that pursuant to Local Rule 7.1(a)(1), his response to the summary judgment

motion was due on or before December 4, 2023, and warned him that his failure to

respond to the motion could result in his case being dismissed. (Dkt. No. 64).[2]

Plaintiff did not respond to the summary judgment motion by December 4, 2023

and no extension of time was requested. By text order dated December 12, 2023, the

court sua sponte granted plaintiff an extension of time until January 15, 2024 to

respond. (Dkt. No. 65). On January 16, 2024, plaintiff filed a letter motion requesting a

stay, an extension of time to respond to the summary judgment motion, and that counsel

be appointed for him. (Dkt. No. 67). The court issued a text order on January 18, 2024

denying plaintiff's request for a stay, granting plaintiff an additional extension of time

until April 1, 2024 to respond to the summary judgment motion, and denying, without

prejudice, his request for counsel. (Dkt. No. 68).

Plaintiff filed another letter motion (Dkt. No. 71) on March 27, 2024, requesting

an extension of six to eight weeks to respond to the summary judgment motion and for

the court to appoint a medical expert to assist him. By text order dated March 28, 2024,

---

[2] There is no evidence that counsel for Dr. McPhillips served plaintiff with a copy of the
"Consequences of Failing to Respond to a Summary Judgment Motion" document required by Local
Rule 56.1(a)and  56.2. Further, Defendant's Statement of Material Facts and Dr. Mendel's affirmation
fail, in numerous places, to properly cite to the record. Finally, defendant's Memorandum of Law does
not comply with Local Rule 7.1(b)(1), as it does not contain a table of contents and incorrectly cites to
New York State law in support of his motion pursuant to Fed. R. Civ. P. 56. Counsel is directed to
read and comply with the Local Rules.

the court, noting that plaintiff has already been afforded two extensions of time to respond to the summary judgment motion (Dkt. Nos. 65, 68), granted plaintiff an additional extension of time until April 30, 2024 to submit his response to the motion. (Dkt. No. 72). The court's March 28, 2024 text order also denied plaintiff's request for the appointment of a medical expert. (*Id.*).

On April 26, 2024, plaintiff filed a letter motion requesting another extension of time until May 21, 2024 to respond to the summary judgment motion. (Dkt. No. 75). By text order dated April 26, 2024, plaintiff's request for an extension was granted, and plaintiff was advised that no further extensions of time would be granted absent a showing of good cause. (Dkt. No. 76).

Plaintiff filed another letter motion on May 20, 2024 requesting an additional extension of time until July 2, 2024 to respond to the summary judgment motion. (Dkt. No. 77). The court denied plaintiff's request on May 21, 2024 and deemed the motion submitted. (Dkt. No. 78). The court noted that while the Second Circuit directs the District Court to provide generous accommodations to incarcerated pro se individuals, that mandate does have its limits. (*Id.*).

## II.   <u>FACTS</u>

Plaintiff's complaint asserts claims arising from his confinement as a pretrial detainee at SCJ. The following facts are set forth as alleged in the complaint or indicated in the exhibits attached thereto.

4

On June 1, 2019, plaintiff was involved in "an automobile accident" and was criminally charged with "driving while intoxicated." (Compl. at ¶ 13, Dkt. No. 1). Plaintiff "sustained serious physical injuries" from the incident, including "abrasions, contusions, lacerations, glass embedded in his face and head . . . and between the first and second metacarpels [sic] of his right hand, broken ribs on his right side[,] and a probable concussion." (*Id*. at ¶ 14). Plaintiff was transported to Albany County Medical Center and treated for his injuries. (*Id*. at ¶ 15). Due to "head trauma[,] [plaintiff's] memory of the events of the treatment are unclear." (*Id*.). Plaintiff does allege, however, that he "relie[d] on the discharge and treatment summary as detailed by prison staff to him." (*Id.*).

On June 2, 2019, plaintiff was transported from the hospital to "Arraignment Court" and from there, to SCJ where he was photographed and fingerprinted. (*Id*. at CM/ECF pg. 14). Plaintiff was examined by two members of "medical staff" at SCJ who "used twezzers [sic] to pick glass out[ ] [of his] face [and hand]" and cleaned his other injuries. (*Id.* at CM/ECF pg. 15).

"[A] couple of days" later, plaintiff "started noticing a lot of pain on [his] left side ribs[.]" (*Id.*). Plaintiff submitted sick call slips complaining of rib pain, headaches, and dizziness. (*Id*.). Plaintiff "was seen by medical staff several times about this pain." (*Id*.). "After a few medical visits[,]" plaintiff was seen by the Chief Medical Officer for the jail, defendant Dr. McPhillips. (*Id.*). At this point, plaintiff "was experiencing [sic] a

5

lot of pain in [his] rib area[,]" which he communicated to Dr. McPhillips. (*Id.*). Plaintiff

also informed Dr. McPhillips that he "was getting bad headach[es]" and "becoming

concerned" with these complications. (*Id.*). Plaintiff also told Dr. McPhillips that he still

had small pieces of glass in his cheek and around his eye. (*Id.*).

Dr. McPhillips informed plaintiff that he "looked over all [of plaintiff's] records

[sic] from Albany Medical[,] and there [was] no further need for any more medical

att[ention]." (*Id.*). Plaintiff asked Dr. McPhillips if he knew whether x-rays of his ribs

had been taken, to which Dr. McPhillips responded that he did not. (*Id.*). According to

plaintiff, Dr. McPhillips then told the escort officer that plaintiff was "all done here,"

and requested that the escort officer remove him. (*Id.* at CM/ECF pg. 16).

Days later, plaintiff filed a grievance regarding the treatment he received from

Dr. McPhillips. (*Id.*). Plaintiff then submitted "several sick calls"

regarding his condition, which, according to plaintiff, resulted in Dr. McPhillips

"yell[ing] at [him]." (*Id.*). At some point, plaintiff was prescribed Motrin for his

continued headaches. (*Id.*). Plaintiff advised the nurse who prescribed the Motrin that he

remained concerned about glass in his face. (*Id.*). The nurse told plaintiff to pick the

glass out with tweezers when he is released. (*Id.*).

In October 2019, plaintiff was taken into custody by the New York State

Department of Corrections and Community Supervision ("DOCCS"). (*Id.* at CM/ECF

pg. 16). Plaintiff received a "routine" chest x-ray during processing at Downstate

Correctional Facility, where, according to plaintiff, they "noticed [his] ribs were fractured and they needed to do a more thorough exam on the same ribs [he] was complaining about to the [SCJ] doctor." (*Id*. at CM/ECF pgs. 16, 18).

Dr. McPhillips' Memorandum of Law (Dkt. No. 63-14), Statement of Material Facts (Dkt. No. 63-1), and the Expert Affirmation of Dr. Lawrence Mendel (Dkt. No. 63-3) summarize what they allege are undisputed facts that support granting defendant's motion for summary judgment. Rather than discuss these facts at the outset, the court will address them to the extent necessary to address the issues raised in Dr. McPhillips' summary judgment motion.

## III.    <u>SUMMARY JUDGMENT</u>

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New*

7

*York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Jeffreys*, 426 F.3d at 554 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See*

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and … interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

### B. Local Rule 56.1

"While courts are required to give due deference to a plaintiff's pro se status, that status 'does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Jackson v. Moore*, No. 9:21-CV- 1001 (GTS/ATB), 2023 WL 4710869, at *2 (N.D.N.Y. Apr. 14, 2023) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)), report and recommendation adopted, No. 9:21-CV-1001 (GTS/ATB), 2023 WL 4711091 (N.D.N.Y. July 24, 2023). "Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion." *Id*. (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)).

Accordingly, courts in the Second Circuit have held that when a party moves for summary judgment against a pro se litigant, either the movant or the district court must provide the pro se litigant with notice of the consequences of failing to respond to the motion. *See Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620 (2d Cir. 1999). Courts in this district have routinely held that when such notice is provided and a pro se plaintiff fails to respond to a motion for summary judgment, the court may accept the defendant's factual assertions as true to the extent they are supported by the evidence in the record. *See*, *Jackson,* 2023 WL 4710869 at *2; *see also Price v. Oropallo,* 9:13-CV-563 (GTS/TWD), 2014 WL 4146276, at *5 (N.D.N.Y. Aug. 2014) ("An unopposed summary judgment motion may properly be granted 'only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.'") (quoting, *Champion,* 76 F.3d at 486); *Ahmed v. Frazer & Jones, Co.*, 5:13-CV-573 (GTS/TWD), 2015 WL 470648 (N.D.N.Y.  Feb. 4, 2015).

Furthermore, where a non-movant has failed to respond to a movant's "properly filed and facially meritorious memorandum of law" submitted in support of its motion for summary judgment, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). *Saraceni v. Retting*, No. 5:21-CV-0936 (GTS/TWD), 2024 WL 1329033, at *13 (N.D.N.Y. Mar. 28, 2024). Significantly, this rule applies even to pro se litigants, "especially ones who have received notice of the consequence of that failure to respond." *Ahmed*, 2015 WL

10

470648 at *2. Furthermore, a district court "has no duty to perform an independent review of the record to find proof of a factual dispute--even if that nonmoving party is proceeding pro se. (This is because the Court extends special solicitude to the pro se litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)." *Ahmed,* 2015 WL 470648 at *2; *see also Price*, 2014 WL 4146276 at *5.

## IV.    <u>DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS</u>

### A. Legal Standard

Plaintiff's deliberate-indifference claim based on conduct that occurred while he was a pretrial detainee is properly analyzed under the Fourteenth Amendment. *See Colon v. City of New York,* No. 8-CV-3142*, 2009 WL 1424169, at *5 (S.D.N.Y. May 21, 2009) (citing *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir. 1991)); *see also Geano v. City of New York*, 21-CV-301, 2024 WL 947439, *7 (S.D.N.Y. Jan. 4 2024) ("Genao's deliberate-indifference claim based on conduct that occurred while he was a pretrial detainee is properly analyzed under the Fourteenth Amendment.")

To state a claim for deliberate indifference to serious medical needs, a pretrial detainee must satisfy a two-pronged test. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 717 (S.D.N.Y. 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs*., 719

F.3d 127, 139 (2d Cir. 2013)). Second, the defendant must act with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

The objective prong requires "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'— that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on 'the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.'" *Revels v. Corr. Med. Care, Inc.*, No. 9:17-CV-0088 (MAD/TWD), 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay"); *Hunter v. City of New York*, 35 F. Supp. 3d 310, 320

(E.D.N.Y. Aug. 2014) ("Under the circumstances—where Plaintiff was ultimately diagnosed with a fractured rib, complained of pain at the time of his arrest and at each subsequent clinic visit, did not receive any medical treatment until five days after his arrest and was prescribed narcotic pain medication when he was eventually diagnosed with a fractured rib—Plaintiff's pain resulting from the fractured rib rises to the level of a serious medical condition." (collecting cases)).

"Regarding the subjective component, '[i]n Darnell, [the Second Circuit] clarified that deliberate indifference, in the context of a Fourteenth Amendment due process claim can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind.'" *Geano*, 2024 WL 947439, *8 (quoting *Charles v. Orange County*, 925 F.3d 73, 86, (2d Cir. 2019)) (citing *Darnell*, 849 F.3d at 33-34). Therefore, deliberate indifference under the Fourteenth Amendment, "can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'" *Charles*, 925 F.3d at 87 (quoting *Darnell*, 849 F.3d at 35 (emphasis and alterations in the original)).

Nevertheless, prison officials and medical officers have wide discretion in treating prisoners, and "determinations of medical providers concerning the care and

13

safety of patients are given a 'presumption of correctness.'" *Sonds v. St.Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (quoting *Perez v. The County of Westchester,* 83 F. Supp. 2d 435, 440 (S.D.N.Y. 2000)). "[D]isagreements over medications . . . forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a *Section 1983* claim." *Id.* Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is incarcerated. *Id.*; *see also Daniels v. Williams*, 474 U.S. 327, 333 (1986) (noting that negligence is not actionable under Section 1983); *Palacio v. Ocasio*, No. 02-CV-6726, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006), *aff'd*, 345 Fed. App'x 668 (2d Cir. 2009); *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000) (citations omitted) ("Mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm.").

## B. Analysis

### 1. Objective Prong

Plaintiff claims that Dr. McPhillips was deliberately indifferent by denying him a repeat chest x-ray for evaluation of rib pain. Plaintiff also alleges that he was not provided adequate and necessary medical care for complaints of headaches, and glass embedded in his face and hand. These allegations are belied by the record and plaintiff cannot demonstrate that he was actually deprived of adequate medical care or that the purported inadequacy was "sufficiently serious." *Salahuddin*, 467 F.3d at 279. As set

forth below, the documentary evidence, plaintiff's sworn deposition testimony, and Dr. Mendel's expert opinion all establish that the care provided to plaintiff by Dr. McPhillips at SCJ was reasonable, and, therefore, adequate under the Fourteenth Amendment.

On August 28, 2017, almost two years prior to his detention at SCJ, plaintiff presented to Ellis Hospital Emergency Department where he was diagnosed with an acute right sixth rib fracture and was prescribed Tramadol and Ibuprofen for pain. (Dkt. No. 67-3 at 3-4).[3] [4]

On June 1, 2019, plaintiff was involved in a motor vehicle accident and was transported to Albany Medical Center by Mohawk Ambulance Service where he underwent a full trauma workup. (Dkt. No. 63-9, pg. 18). Notably, plaintiff denied "any pain or discomfort" and was "able to ambulate roughly half a mile prior to apprehension." (*Id.*, pgs. 21, 46). On physical examination, plaintiff was not in acute

---

[3] All page references to the medical records submitted as exhibits are to the CM/ECF pagination system.

[4] Although plaintiff's deposition testimony denied ever having injured ribs prior to the June 1, 2019 motor vehicle accident (Dkt. No. 63-13 at 85), he admitted to counsel by telephone on May 9, 2023 that he was in fact diagnosed with a broken rib(s) at Ellis Hospital in 2018 resulting from a fight he was involved in at a gas station. Counsel sought to have plaintiff confirm his May 9, 2023 telephonic admission via a Notice to Admit dated June 20, 2023. (Dkt. No. 63-6). Having failed to respond to defendant's request for admission within thirty days of service, plaintiff is deemed to have admitted that he was transported to Ellis Hospital in 2018 after having been involved in a fight and diagnosed with a broken rib(s). Fed. R. Civ. P. 36(a)(3). "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Ci. P. 36(b). The Second Circuit permits admissions under Rule 36(a) to be used for purposes of summary judgment. *Donovan v. Carls Drug Co.*, 703 F.2d 650, 651 (2d Cir.1983), rejected on other grounds by *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34 (1988).

distress and had a right eye laceration with periorbital ecchymosis. (*Id.,* pg. 49). The remainder of plaintiff's physical examination was unremarkable. (*Id.*).

The undisputed documentary evidence establishes that plaintiff also underwent extensive imaging upon his examination at Albany Medical Center, including a head CT, spine CT, a CT of the chest, abdomen, and pelvis with contrast as well x-rays of the chest, knee, wrist, and right hand. (*Id.*). Dr. Chernoff's radiology report indicated that plaintiff did not suffer any "acute traumatic injury in the chest, abdomen or pelvis." (*Id.*, pg. 64.) Significantly, and central to the determination in this matter, Dr. Chernoff noted that while there was "no acute displaced fracture," "there [was] an old lateral right sixth rib fracture." (*Id.*). Upon discharge, the emergency room doctor noted that plaintiff "refus[ed] laceration repair of his right eye," that the "CT scan of the head, neck and chest abdomen and pelvis [were] normal," and that "X-rays of the right hand and right knee show[ed] no evidence of fracture." (*Id.*, pg. 33).

Plaintiff was thereafter transported to SCJ. During plaintiff's intake processing on June 2, 2019, Nurse Frederick noted:

> [Patient] seen at Albany Med [status post motor vehicle accident]…[Patient's] face covered in dried blood and pieces of glass, which were removed. Multiple abrasions to [right] forehead, eye area and nose/cheek. Bacitracin applied after cleansing with [normal saline]. [Patient] reportedly refused sutures to [right] eye laceration but after cleansing, no obvious area in need of suturing, [Patient] also with abrasion and three gauges to [right] hand; all cleansed, [antibiotics] ointment applied and hand wrapped. Also [complains of right] rib pain and [right] knee pain. No evidence of bruising noted to ribs, abdomen/chest. [Positive] bruising swelling noted to [right] knee and cold pack applied. Per Albany Med, CT head, neck, [chest, abdomen, pelvis][5] and x-rays of [right] hand/knee all negative.

---

[5] *See* https://pubmed.ncbi.nlm.nih.gov/31939701/ (last visited July 30, 2024) (noting acronym CAP to refer to imaging of the chest, abdomen, and pelvis).

(Dkt. No. 63-10, pg. 14).

During a follow up appointment with PA Dowling at SCJ on June 7, 2019, there was no indication that plaintiff complained of right rib pain. (*Id.*, pg. 14). PA Dowling also noted that plaintiff's facial and right-hand abrasions were to be treated topically twice daily. (*Id.*, pg. 11). On June 11, 2019, plaintiff complained to RN Frederick of "knee and head pain." (*Id.*, pg. 20). RN Frederick noted that plaintiff's facial abrasions "appeared well-healed," and prescribed Ibuprofen for pain. (*Id.*). At that time, plaintiff requested a chest x-ray due to a concern for a rib fracture. (*Id.*). RN Frederick referred plaintiff's request for a chest x-ray to Dr. McPhillips for further discussions. (*Id.*).

Plaintiff placed another medical sick call on June 14, 2019 complaining of, among other things, left-hand pain, and glass in his right-hand. (*Id.*, at 19). Noting some redness and swelling in plaintiff's right-hand and the potential for infection, Nurse LaBrake prescribed Bactrim and Motrin and referred plaintiff to see Dr. McPhillips. (*Id.*, pgs. 19-20). On June 16, 2019, plaintiff treated with RN Frederick, complaining of broken teeth and throbbing pain when he ate. (*Id.,* pg. 18). Significantly, plaintiff did not complain about rib pain or the effects of broken glass during this encounter.

Plaintiff next treated with Dr. McPhillips on June 17, 2019 complaining of headaches, rib pain and glass in his skin. (*Id*, pg. 18). Dr. McPhillips noted "small erythematous areas around and above" plaintiff's eyes and advised plaintiff that further x-rays of his ribs were not medically indicated because of the negative imaging studies

17

at Albany Medical Center. (*Id*.). According to Dr. Mendel, defendant's expert, "it was more than reasonable for Dr. McPhillips and the medical providers at SCJ to rely on the extensive imaging obtained from Albany Medical Center and the trauma workup and evaluation to conclude that repeat imaging was not indicated to assess for rib facture." (Dkt. No. 63-3 at ¶ 45). In fact, Dr. Mendel opined that "ordering unnecessary repeat imaging to reassess for a potential rib fracture, when it had already been done at Albany Medical Center, would subject the patient to further and unnecessary radiation." (*Id*.).

Plaintiff again complained of tooth pain on July 13, 2019, but did report any pain in his ribs or the effects of glass in his skin. (*Id.*, pgs. 17-18). Plaintiff was prescribed Ibuprofen and was referred for a dental consultation. (*Id., pg.* 18). Plaintiff placed a medical sick call on July 15, 2019, complaining of glass in his right cheek. (*Id.*, pg. 17). Nurse Miller performed an assessment and noted a small raised red area on plaintiff's right cheek. (*Id.*). Plaintiff denied any itching, burning or signs of infection. (*Id.*). Dr. McPhillips evaluated plaintiff and instructed him to continue the plan of care and to wait and see if the area extruded any additional glass. (*Id.*). Notably, plaintiff did not complain about rib pain during his July 15, 2019 encounter with Nurse Miller and Dr. McPhillips. Also, plaintiff did not report any rib pain or discomfort from glass at his September 3, 2019 and October 16, 2019 encounters with Dr. McPhillips and Nurse Miller. (*Id.*, pgs. 16-17).

In addition to the undisputed medical records from SCJ, plaintiff's deposition testimony, which he acknowledged as being true and accurate (Dkt. No. 63-13, pg. 104)[6], supports a determination that there are no genuine issues of material fact as to whether plaintiff received adequate medical from Dr. McPhillips while detained at SCJ. Specifically, plaintiff testified that Dr. McPhillips reviewed the records from Albany Medical Center with him and that based on his review of the same, further imaging of his right-side ribs was not clinically indicated. (*Id.*, pgs. 46-48). Plaintiff later testified that according to Dr. McPhillips, nothing could be done to treat his ribs even if they were broken. (*Id.*, pg. 72); *see also Id*., pg. 77 ("[Dr. McPhillips] did tell me that there's no need for an X-ray because even if the ribs are broken, there's nothing you can do."). Plaintiff further testified that his rib injuries "bothered [him] the whole month of June and half of July." (*Id.*, pgs. 89-90). Dr. McPhillips' statement to plaintiff is consistent with Dr. Mendel's opinion that even if an additional imaging series was positive for a rib fracture, Dr. McPhillips could not have done anything more for plaintiff since the "treatment for a rib fracture is rest." (Dkt. No. 63-3,  ¶ 51).

Plaintiff testified that he did not believe that the imaging conducted at Albany Medical Center was proper. (Dkt. No. 63-13, pg. 82). When asked how he arrived at that conclusion, plaintiff testified that someone at Downstate Correctional Facility told him after he was transferred there from SCJ. (*Id.*, pg. 84). According to plaintiff, an X-

---

[6] All page references to plaintiff's deposition transcripts are to the CM/ECF pagination system.

ray technician at Downstate Correctional Facility did not know that he had an imaging study, including a CT scan, performed at Albany Medical Center. (*Id.*, pg. 86). Nevertheless, plaintiff testified that in his opinion, it was a "mistake" for Dr. McPhillips not to have ordered me an X-ray" even though he testified earlier that his ribs stopped hurting in July 2019. (*Id.*, pgs. 90, 98).

Further, plaintiff's allegation that the X-ray technician at Downstate Correctional Facility "noticed [his] ribs were fractured and they needed to do a more thorough exam on the same ribs [he] was complaining about to the [SCJ] doctor" (Dkt. No. 1, at CM/ECF pgs. 16, 18) is belied by the record evidence and does not support his claim of deliberate indifference to serious medical needs. Notwithstanding his allegations, plaintiff testified at his deposition that the x-rays taken at Downstate Correctional Facility revealed a healed rib fracture (Dkt. No. 63-13, at pg. 89) which was confirmed by the October 21 and October 25, 2019 radiology reports generated from that imaging (Dkt. No. 1,  at CM/ECF pgs. 18-19). Again, plaintiff testified that he no longer experienced pain in his ribs as of July 2019, several months before he was transferred to Downstate Correctional Facility.

A February 3, 2023 imaging study from Ellis Hospital ordered after plaintiff complained of left rib pain from a motorcycle accident noted a "[r]ight posterior sixth rib [that] has an old, healed fracture, unchanged compared to 2018" also undermines his complaint of medical indifference. (Dkt. No. 63-12). The February 3, 2023 imaging

study is consistent with Dr. Chernoff's June 1, 2019 radiology report which noted "an old lateral right sixth rib fracture." (Dkt. No. 63-9, pg. 64). The right rib fracture noted on February 3, 2023 and by Dr. Chernoff is the one admitted to by plaintiff during his May 9, 2023 telephone call with Dr. McPhillips' counsel.

With respect to his complaint about glass being embedded in his skin, plaintiff testified that during his intake at SCJ, "they took their time to take the glass out with tweezers . . . [and] [t]hey cleaned up my eye and said there was no need for the sutures." (*Id.*, pg. 60). Plaintiff also testified that in addition to receiving antibiotics, the medical staff at SCJ spent "maybe two hours" cleaning his hand and facial wounds/abrasions. (*Id.*, pg. 64). Notably, plaintiff testified that he "[did not] know" what additional care and treatment he wanted for the glass in and around his face. (*Id.*, pg. 80). Fatal to plaintiff's claim regarding the glass in his hand and face is his testimony that "they attended to help me with the glass and making sure it didn't get infected." (*Id.*, pg. 86).

Based on the foregoing, plaintiff has failed to raise a triable issue of fact as to whether he suffered from a serious medical need due to a deprivation in care. There is no evidence that plaintiff had a broken rib, and in fact, the evidence confirms that plaintiff did not suffer any fractures because of the motor vehicle accident precipitating his medical care at SCJ. Otherwise, the injuries as established by the medical evidence before this court – headaches, lacerations, and soreness - are not, objectively speaking,

21

sufficiently serious to satisfy the objective component of the deliberate indifference inquiry. *See Jones v. Furman*, No. 02-CV-939, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (explaining that soreness, pain in and a lump behind ear, lump on back of head, abrasions on nose and knuckle, and bruising to back, ribs and legs do not constitute a serious medical condition); *Garcia v. Furnia*, No. 12-CV-924 (GTS/ATB), 2014 WL 4685104, at *4 (N.D.N.Y. Sept. 19, 2014) (finding no sufficiently serious medical need where the plaintiff suffered from "(1) body soreness; (2) a black eye; (3) scrapes and minor contusions; (4) a headache; (5) a loose tooth; (6) a 'wobbly' knee; and (7) blurriness in one eye"). Plaintiff has failed to establish that any delay in treatment, or failure to treat, his alleged conditions caused any symptoms of his underlying conditions to worsen or put him at an unreasonable risk of future harm. On the contrary, it is undisputed that plaintiff's pain and lacerations were reasonably treated with Ibuprofen and antibiotics, and that his complaints of pain resolved within two months, without further complication. Accordingly, summary judgment is recommended.

## 2. Subjective Prong

Even if plaintiff were found to have satisfied the objective prong, he cannot satisfy the subjective prong of a Fourteenth Amendment deliberate indifference claim. The record is clear that Dr. McPhillips treated plaintiff and responded to all his complaints. Namely, Dr. McPhillips followed plaintiff's complaints of pain and the

possibility of retained glass from his car accident, noting that plaintiff should continue

his plan of care which included pain medication and antibiotics. (Dkt. No. 63-10, at 14-

20). Dr. McPhillips' refusal to order an x-ray of plaintiff's rib was reasonably based on

his observation that extensive imaging and testing had been performed immediately

after the motor vehicle accident precipitating plaintiff's complaints of pain, and were

negative. Based on this record, plaintiff cannot show that Dr. McPhillips "'knew, or

should have known'" that his decision not to order an additional imaging study or

provide additional treatment to plaintiff's complaint of glass embedded in his skin

"'posed an excessive risk to health or safety.'" *Lloyd*, 246 F. Supp. 3d at 719 (quoting

*Darnell*, 849 F.3d at 33, 35). Accordingly, the court concludes that there is no genuine

dispute of material fact with respect to the *mens rea* prong of plaintiff's Fourteenth

Amendment deliberate indifference claim.

## V.    **SUPPLEMENAL JURISDICION**

In addition to his Section 1983 claim, plaintiff also alleges a state law negligence

claim against Dr. McPhillips. (Dkt. No. 1). A district court may decline to exercise

supplemental jurisdiction over a state law claim if the district court "has dismissed all

claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Courts deciding

whether to exercise supplemental jurisdiction must balance the so-called *Gibbs* factors

outlined by the Supreme Court in *United States v. Gibbs*, 383 U.S. 715, 726 (1966).

Those factors include the "values of judicial economy, convenience, fairness, and

comity." *Delaney v. Bank of America Corp.,* 766 F.3d 163, 170 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). The Supreme Court has instructed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

Here, in light of the court's aforementioned recommendation, judicial economy and comity weigh in favor of dismissing the remaining state law claim without prejudice so that plaintiff may, if he chooses, pursue it in an appropriate state court. The court's declination to exercise supplemental jurisdiction over plaintiff's state law claim is not a commentary on the validity of that claim one way or the other. Rather, the court's recommendation is based on an analysis that the resolution of plaintiff's state law claim is best made by a state court.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion for summary judgment (Dkt. No. 63) be **GRANTED** as to plaintiff's Fourteenth Amendment deliberate indifference claim against Dr. McPhillips, and plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE** as to this cause of action; and it is

**RECOMMENDED** that plaintiff's complaint (Dkt. No. 1) otherwise be **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE** to plaintiff filing his state law negligence claims in state court; and it is

24

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished

decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008)

(per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to

file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN</u>**

**<u>FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v.*

*Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*,

892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R.

Civ. P. 72, 6(a).

Dated: August 7, 2024

Mitchell J. Katz
U.S. Magistrate Judge

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 26 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges that the defendant violated his Eighth Amendment rights when he failed to protect plaintiff from another inmate. Presently before the court is defendant Correctional Officer ("C.O.") Moore's motion for summary judgment. (Dkt. No. 16). This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). For the reasons set forth below, this court will recommend granting defendant's motion and dismissing the complaint in its entirety.

**I. Background**

**A. Procedural History**
In this civil rights action, plaintiff alleges a constitutional violation occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the original complaint on September 10, 2021. (Dkt. No. 1). On October 25, 2021, the court issued a Decision and Order granting plaintiff's application to proceed in the action in forma pauperis ("IFP"), and conditionally dismissing the original complaint because it failed to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915 and 28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff leave to amend his complaint to "correct[ ] the pleading defects" identified with his original complaint. (*Id.* at 10). Plaintiff availed himself of the opportunity to amend, and the court received plaintiff's amended pleading on or about November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial review of the complaint, that plaintiff's amended complaint was accepted for filing and that the only active defendant was C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer to the amended complaint on April 14, 2022. (Dkt. No. 12). On December 15, 2022, defendant filed this instant motion for summary judgment (Dkt. No. 16), to which plaintiff responded on February 16, 2023 (Dkt. No. 20).

**B. Summary of Complaint**
The complaint alleges that on September 6, 2018, while plaintiff was confined in Clinton C.F., he was attacked by another inmate when they were released from their keep-lock cells at the same time. (Am. Comp. at 4). Although facility policies and procedures prohibited C.O. Moore from releasing the other inmate "until [plaintiff] was ... back in general population," C.O. Moore nevertheless released both inmates simultaneously, knowing that plaintiff did not have an escort at the time. *Id.* C.O. Moore also "knew there was a race war going on in [Clinton C.F.] with the bloods and the Spanish gangs and let [plaintiff] out of [his] cell with a known gang member posed [sic] a substantial risk of serious harm to [him]." *Id.* Although C.O. Moore observed the inmate run into plaintiff's cell and attack him, C.O. Moore "did nothing to prevent it from happening." Plaintiff was returned to keep-lock after the incident and remained there for an additional 70 days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at 18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1 at 31).

**II. Summary Judgment**
**\*2** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Rule 56(b) provides that a party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Thus, a party may move for summary judgment in lieu of an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l*

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 27 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

*Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3).[1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this motion. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

[1] Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:

(1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.

* * *

WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

(Dkt. No. 16 at 4).

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

**\*3** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 28 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

[2]     This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

[3]     The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

Prior to *Ross v. Blake*, *supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of

"special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 2016 WL 4572321 at *2.

**B. Analysis**

**\*4** Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance. [4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

2023 WL 4710869

**4**    Plaintiff testified that he filed the grievance "it was in like the same – I want to say around like the 22[nd] or so." (Pl.'s Dep. at 87-88).

Plaintiff acknowledged that he never followed up with respect to his grievance for the 70 days after the incident when he was confined on keeplock; but he alleges that he asked sergeants, officers, and counselors about the status of his grievance and they told plaintiff "they'll get back to you." (Pl.'s Dep. at 93-94). Plaintiff admitted that he did not retain any copies of the purported grievances relative to his complaints against C.O. Moore. (*Id.* at 88). [5]

**5**    Plaintiff alleges that he was told "it was a code 49 and that it had to go to the superintendent office." (Dkt. No. 20 at 3).

Plaintiff further testified that he not only understood the grievance process, but also that he participated in an orientation program at Clinton C.F. about how the grievance process works at the facility. (*Id.* at 85-86). He admitted that he filed "a couple" of grievances after the incident concerning other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the defendant did not exhaust administrative remedies with respect to the failure-to-protect claim against C.O. Moore. Given that an initial grievance was never filed, nor was the claim ever appealed to CORC, the question becomes whether plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). [6] Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.* ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact.") [7]

**6**    IGP Supervisors Gregory and Seguin stated Clinton C.F. had a fully functioning IGP program at all times relevant to the complaint. (Gregory Decl.

¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that he filed a grievance for an unrelated matter after the incident and received an unfavorable decision and appealed that decision. (Pl.'s Dep. 90-91).

**7**    I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g., Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), *report and recommendation adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report and recommendation adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

**\*5** Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20 at 2-3). Plaintiff does not offer any support for his claim other than his statement "officers talk like inmates talk. So knowing the incident, knowing I put in a grievance, they wanted to be nosey [sic], and they opened it and never let it get to where it was supposed to go once it was read." (Pl.'s Dep. at 89). During his deposition, plaintiff specifically stated that C.O. Moore was not the person who picked up the grievance. (Pl.'s Dep. at 88-89). Furthermore, plaintiff testified the alleged grievance was sealed, so the unnamed C.O. would have no way of knowing what conduct the grievance was referring to unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he allegedly attempted to submit a grievance relating to the claim in this action by leaving a sealed envelope for C.O.s to deliver. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to serving time in a Special Housing Unit ... [with the inmate] remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen Declaration ¶ 7), plaintiff acknowledged that keep-lock status is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative

Case 9:21-cv-00172-MAD-MJK Document 79 Filed 08/07/24 Page 30 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.[8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[8]     My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU.[9] *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y.

July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

[9]     In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 31 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

provided no documentation or minimal corroborative details. *See, e.g., Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him). [10]

[10]    District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at *4.

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning a the September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told

him "not to worry" with any documentary evidence. *See, e.g., Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

*7  For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed, [11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at *7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

[11]    "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at *2 (citing N.Y.C.R.R. § 701.6(g)(1)(i) (a)).

## IV. Eighth Amendment Failure to Protect Claim

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 32 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

### B. Analysis

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident. (Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at *7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released from their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 33 of 140

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4710869

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4711091
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

Officer MOORE, Corr. Fac. Ofcr.,
Clinton Corr. Fac., Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed July 24, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, 18-A-2746, Plaintiff, Pro Se, Five Points Correctional Facility, Caller Box 19, Romulus, New York 14541.

HON. LETITIA A. JAMES, Attorney General for the State of New York, RACHEL OUIMET, ESQ., Assistant U.S. Attorney, Counsel for Defendant, The Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

 **\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Dumar Jackson ("Plaintiff") against Correctional Officer Moore ("Defendant"), are (1) Defendant's motion for summary judgment, (2) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Defendant's motion be granted and Plaintiff's Complaint be dismissed, and (3) Plaintiff's Objection to the Report-Recommendation. (Dkt. Nos. 16, 21, 22.) Because Plaintiff's one-page (four-sentence) Objection fails to specifically challenge any portion of the Report-Recommendation, the Court need review that Report-Recommendation for only clear error.[1] After carefully reviewing the relevant filings in this action, the Court can find

no clear error in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein, and Plaintiff's Complaint is dismissed with prejudice.

[1]     When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 21) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 16) is **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** with prejudice.

**All Citations**

Slip Copy, 2023 WL 4711091

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Sheffer v. Fleury, N.D.N.Y., September 18, 2019

2014 WL 4146276
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chris PRICE, Plaintiff,

v.

J. OROPALLO, Sergeant, Upstate Corr. Facility;
Norman H. Bezio, Dir. of Shu, Inmate Disciplinary
Program, Nys Docs; and Phillip Battiste, Dir.
of Security Staff, Nys Docs, Defendants.

No. 9:13–CV–0563 (GTS/TWD).
|
Signed Aug. 19, 2014.

**Attorneys and Law Firms**

Chris Price, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Keith J. Starlin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Chris Price ("Plaintiff") against the three
above-captioned New York State correctional employees
("Defendants"), are Defendants' motion for summary
judgment, and United States Magistrate Judge Therese
Wiley Dancks' Report–Recommendation recommending that
Defendants' motion be granted. (Dkt.Nos.25, 28.) Plaintiff has
not filed an Objection to the ReportRecommendation, and
the deadline by which to do so has expired. (*See generally*
Docket Sheet.) After carefully reviewing the relevant filings
in this action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Dancks employed the
proper standards, accurately recited the facts, and reasonably
applied the law to those facts. (Dkt. No. 28.) To that analysis,
the Court would add only two points.

First, with regard to Plaintiff's claims against Defendants
Battiste and Bezio, the Court notes that the verified Complaint
does not allege facts plausibly suggesting, or adduce
admissible evidence establishing, that Plaintiff sent letters to
Battiste or Bezio at an appropriate address *and* by appropriate
means. (Dkt. No. 1, at ¶ 6.) In any event, even if he had
done so, the Complaint alleges facts plausibly suggesting, or
adduces admissible evidence establishing, that a response by
officials at his correctional facility followed the sending of
the letters. (*Id.*)

Second, as an alternative ground for the dismissal of the
Complaint, the Court accepts Defendants' failure-to-exhaust
argument because, even assuming Plaintiff was in fact told
that his complaint was not grievable, he filed the grievance
and knew he was "suppose[d] to ... receive[ ]" a response to it.
(Dkt. No. 1, at 4.) More important, he could have, and should
have, filed an appeal from his non-response (which he did not
do). 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within
the time limits may be appealed to the next step."); *see also
Smith v. Kelly,* 985 F.Supp.2d 275, 281–82 (N.D.N.Y.2013)
(collecting cases). Such an appeal could have proved fruitful,
given that the issue was indeed grievable. (Dkt. No. 25,
Attach. 5. at ¶ 3 [Hale Decl.].)

For all of these reasons, Defendants' motion is granted, and
Plaintiff's Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 28) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 25) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
***DISMISSED*** in its entirety.

**ORDER and REPORT–RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

*Pro se* Plaintiff Chris Price, an inmate currently confined
in the Auburn Correctional Facility, has commenced this
action pursuant to 42 U.S.C. § 1983 alleging Defendants

failed to protect him in violation of his Eighth Amendment rights by placing a member of a rival gang in his cell. (Dkt. No. 1.) Plaintiff has sued Corrections Sergeant Jon Oropallo ("Oropallo"); Phillip Battiste ("Battiste"), New York State Department of Corrections and Community Supervision ("DOCCS") Director of Security Staff; and Norman R. Bezio ("Bezio"), DOCCS Director of Special Housing/ Inmate Disciplinary Program *Id.* at 1.

 **\*2**  Defendants filed an Answer to Plaintiff's Complaint (Dkt. No. 12) and have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.) Plaintiff has not opposed the motion or sought additional time within which to do so. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be granted.

### I. BACKGROUND

While Plaintiff was confined at the Upstate Correctional Facility ("Upstate"), his membership in the Crips gang was known to prison officials. (Dkt. No. 1 at ¶ 7.) Plaintiff expressed concerns for his safety to officials at Upstate, at least in part because according to Plaintiff, Defendant Oropallo had previously forced him to fight with members of the Bloods, a rival gang. *Id.* at 6. In a Declaration submitted in support of Defendants' motion for summary judgment, Oropallo denies ever having forced Plaintiff to fight with another inmate. (Dkt. No. 25–4 at ¶ 4.)

The evidence shows that Oropallo did issue a misbehavior report on Plaintiff on December 8, 2011, after observing Plaintiff and his cell mate Williams fighting. (Dkt. No. 25–4 at ¶ 8 and p. 23.) [1] The fight investigation form reveals that Plaintiff did not want protection and neither he nor Williams wanted to press charges in connection with the fight. *Id.* at p. 24. Donald Uhler ("Uhler"), Deputy Superintendent of Security at Upstate, reviewed Plaintiff's security file and found no request by him for protective custody. (Dkt. No. 25– 3 at ¶ 10.)

[1]     Page numbers cited herein are those assigned by the Case Management/Electronic Case File (CM/ECF) system.

Plaintiff claims that as a result of being forced to fight members of the Bloods gang, he filed a grievance and began speaking with officials at Upstate regarding his safety in the fall of 2011. (Dkt. No. 1 at ¶ 6.) Plaintiff's file from Upstate contains a December 12, 2011, "To Whom it May Concern"

letter in which Plaintiff disclosed that he had been forced to fight on December 8, 2011, and had been threatened with a scalpel by members of the Bloods. (Dkt. No. 25–3 at ¶ 4 and p. 6.) In his December 12, 2011, letter Plaintiff indicated that he was writing to create a paper trail regarding safety issues he had raised with corrections officers and sergeants. (Dkt. No. 25–3 at p. 6.) Plaintiff wrote:

> I used to be a well known crip gang member. The bloods still label me as being a crip gang member. So to back myself up, I'm [writing] to all people that I think should be notified of my situation of safety. On the 8th of this month for this particular reasons I stated above, I was [threatened] and forced to fight. I fear for my life while I'm here [incarcerated]. I just wanna do the time that I have and hopeful[ly] get a reversal on my appeals. Are there any ways that, I can be bunked up with someone who isn't labeled a bloods gang member, because I was threatened with a scalpel. I notified the proper personnel and I wasn't taken serious [ly] until I started kicking the cell door I was in, I was taken out to be forced to fight in another cell. I fear I'm a get hurt or I'm a hurt someone. Can you help me? Thank you for your time and [patience].

 **\*3**  *Id.*

According to Uhler, Lt. Lumbard ("Lumbard") investigated the letter on December 21, 2011. *Id.* at ¶ 5. Lumbard reported that Plaintiff told him that he was a member of the Crips gang and had been having trouble with members of the Bloods gang. *Id.* at p. 5. When asked about being threatened with a scalpel, Plaintiff refused to provide any information. *Id.* Plaintiff did tell Lumbard that he was getting along well with his current cell mate, and that they had no issues. *Id.* Lumbard indicated that the cell block staff had been notified about the situation and advised to leave Plaintiff with his cell mate and, if possible, to move the cell mate with him when he was moved upstairs. *Id.*

Plaintiff was dissatisfied with the resolution of his grievance and claims to have written to Defendants Battiste and Bezio about his safety concerns. *Id.* Plaintiff was subsequently told by Upstate officials that the safety issues of which he had complained would be handled, and he would not have to worry about being placed in the same cell with known members of the Bloods. *Id.* Nonetheless, on August 9, 2012, inmate Adams, a member of the Bloods, was brought in to bunk with Plaintiff. (Dkt. No. 1 at ¶ 6 .) Plaintiff and Adams got into what both described as a gang related fight in the cell within minutes after the officer placing Adams in the cell left, and Plaintiff sustained a non-displaced fracture of his nose and a laceration on his nose which required stitches. *Id .;* Dkt. Nos. 25–3 at 12; 25–4 at 8–9; 26 at 8–12.

Prior to Adams being placed in the cell with Plaintiff, Oropallo had no personal knowledge or information that would have led him to believe that Adams was gang related or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had never told Oropallo he was in a gang, and nothing about the December 8, 2011, fight between Plaintiff and Williams led Oropallo to believe Adams would be a threat to Plaintiff. *Id.* at ¶ 10. Furthermore, the assignment of inmates for double cell housing was not within the scope of Oropallo's authority. *Id.* at ¶ 9.

DOCCS maintains an "enemies" list for inmates based upon information provided by the inmate and from his disciplinary record. *Id.* at ¶ 6. Uhler has explained in his Declaration that DOCCS does not recognize street gangs, and inmates frequently do not disclose gang affiliations to prison officials, although if there is information of gang affiliation, a notation might appear on the inmate's personal characteristics screen, his security file, or be made by a counselor during intake. *Id.* at ¶ 7. Uhler reviewed the DOCCS files on Adams and found no notations indicating that he was gang affiliated. *Id.* at ¶ 8; *see also* Adams' Personal Characteristics Form and Inmate Security Classification Form, neither of which identifies him as a member of the Bloods gang. *Id.* at pp. 9–10.

A misbehavior report was filed against Plaintiff as a result of the August 9, 2012, fight. (Dkt. No. 25–4 at 8.) Plaintiff was found guilty of violent conduct and assault and was given four months in the Special Housing Unit, loss of packages, commissary, ear phones, recreation, and good time, with two months suspended as an incentive for Plaintiff to improve his behavior. *Id.* at 5–6.

## II. APPLICABLE LEGAL STANDARDS

### A. General Legal Standards for Summary Judgment Motions

**\*4** Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[2] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[2]      Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable

2014 WL 4146276

inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U .S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). [3]

[3]  Copies of unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders,* 557 F.3d 76, 79 (2009) (*per curiam* ). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### B. Summary Judgment When a *Pro Se* Plaintiff Fails to Oppose the Motion

Plaintiff has not opposed Defendants' summary judgment motion. N .D.N.Y. L.R. 56.2 requires the moving party to notify a *pro se* litigant of the consequences of failing to respond to the summary judgment motion. [4] Where a party has been given satisfactory notice of the consequences of failing to respond to a motion for summary judgment, the nonmovant's failure to respond to the movant's statement of material facts will result in the facts set forth in the statement being accepted as true to the extent they are supported by the evidence in the record. [5] *See* L.R. 7.1(a) (3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

[4]  A Notice of the Consequences of Failing to Respond to a Summary Judgment Motion was served with Defendants' motion papers in this case. (Dkt. No. 25 at 3.)

[5]  *See* *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") (citation omitted).

**\*5**  A *pro se* plaintiff's failure to oppose a summary judgment motion does not mean that the defendant's motion is to be granted automatically. An unopposed summary judgment motion may properly be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (internal quotes and citations omitted).

A district court has no duty to perform an independent review of the record to find proof of a factual dispute where the nonmovant fails to respond to a summary judgment motion. *See* *Amnesty America. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2000). This is so even where a plaintiff is appearing *pro se* because even *pro se* plaintiffs must obey the Court's procedural rules. *See* *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Although not obligated to do so, the Court has elected to conduct a review of the entire record in this case. *See* *Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 292 (2d Cir.2000) (a court may, in its discretion, "choose to conduct an assiduous review of the record" even when a party has failed to file a statement of material facts). Because Plaintiff's Complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See* *Colon,* 58 F.3d at 872.

## III. ANALYSIS

### A. Administrative Exhaustion

Defendants argue that they are entitled to summary judgment based upon Plaintiff's failure to exhaust his administrative remedies with regard to Defendants' alleged failure to protect him from a Bloods gang member in violation of his Eighth Amendment rights. (Dkt. No. 25–6 at 5–6.)

1. *Exhaustion Under The Prison Litigation Reform Act*
The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997(e). The PLRA requires "proper exhaustion" of prison administrative remedies, which includes compliance with agency deadlines and procedural rules. *See* *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378,

165 L.Ed.2d 368 (2006). "[P]roper exhaustion ... means using all steps that the agency holds out and doing so properly (so that the agency addresses the issues on the merits)." *Id.* Exhaustion is mandatory, and an inmate cannot satisfy the PLRA's exhaustion requirement by filing an untimely or administratively defective grievance or appeal. *Id.* at 84–85.

The DOCCS Inmate Grievance Procedure ("IGP") has three stages which prison inmates must complete. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5; *see also Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). First a grievance complaint must be submitted to the Inmate Grievance Resolution Committee ("IGRC") for an initial determination within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a). Next, if the IGRC decision is adverse to the inmate, he has seven calendar days to appeal to the prison superintendent. *Id.* at § 701.5(c). If dissatisfied with the superintendent's decision, the inmate has another seven calendar days to appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* at § 701 .5(d).

 **\*6** An inmate must follow through on all three steps to complete the exhaustion process. *See Morrison v. Stefaniak,* 523 F. App'x 51 (2d Cir.2013) (summary order) (upholding dismissal of complaint because plaintiff failed to appeal IGRC's decision); *Belile v. Griffin,* No. 9:11–CV0092 (TJM/ DEP), 2013 WL 1776086, at \*3–4, 7, 2013 U.S. Dist. LEXIS 47137, at \*10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*4, 2010 U.S. Dist. LEXIS 32014, at \* 16 (N.D.N.Y. Mar.31, 2010). If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at \*4. *Hemphill* sets forth a three-part

inquiry for district courts. [6] First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688.

[6]    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense) (internal quotation marks omitted).

Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by conduct such as " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at \*5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at \* 12, 2008 U.S. Dist. LEXIS 124388, at \*44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly

suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question."). Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a nonexhaustion defense, the inmate's failure to exhaust may be justified. *Hemphill,* 380 F.3d at 686.

### 2. *Exhaustion Analysis*
**\*7** In his Complaint, Plaintiff has alleged that he asked to file a grievance with regard to the placement of a known Bloods gang member in his cell. (Dkt. No. 1 at ¶ 4.) According to Plaintiff, he was told by the grievance officer that the issue was not grievable and, as a result, never received a response to his grievance. *Id.* Jeffrey Hale ("Hale"), Assistant Director for the DOCCS IGP, has stated in his Declaration that the IGP is the appropriate vehicle for inmates to use to address issues regarding the person with whom they are housed and complaints against staff. (Dkt. No. 25–5 at ¶ 3.) Defendants have not, however, submitted evidence disputing Plaintiff's claim that he was told his complaint was not grievable.

Instead, Defendants have focused on a grievance filed by Plaintiff with regard to the medical care he received for the injuries he sustained in the fight with Adams and have relied upon Plaintiff's failure to appeal from the denial of that grievance as evidence of failure to exhaust the claim asserted in this lawsuit. (Dkt. Nos. 25–3 at ¶ 9 and pp. 11–13; 25–6 at 6.) In Grievance No. UST–50552, Plaintiff referenced the fight in his cell but only in the context of the fight as the cause of his broken nose. *Id.* at p. 11. Plaintiff's complaint was that it took five days for the medical staff at Upstate to send him out for x-rays. *Id.* The investigative report on the grievance references only the medical care given Plaintiff, and the grievance was denied solely on the grounds that there was no urgent need for an x-ray. *Id.* at p. 13. In short, the grievance has no direct relevance to Plaintiff's exhaustion of the failure to protect claim asserted in this lawsuit.

The relevant exhaustion issue on this motion is whether the allegation in Plaintiff's Complaint regarding his unsuccessful attempt to grieve the failure to protect issue is sufficient by itself to raise an issue of fact under any of the *Hemphill* considerations. A number of district courts in the Second Circuit have found either that the IGP is unavailable to an inmate who has been told by a prison official that his complaint was not grievable, or that the misinformation constitutes a special circumstance excusing exhaustion under

*Hemphill.* [7] *See, e.g., Partee v. Goord,,* No. 06–15528, 2007 WL 2164529(SAS), at \*4, 2007 U.S. Dist. LEXIS, at \*14 (S.D.N.Y. July 25, 2007) (excusing exhaustion requirement because plaintiff was told in reply to his grievance that his claim was outside the purview of the IGRC, and he reasonably understood this to mean his dispute was not grievable); *Lewis v. Cunningham,* No. 05–9243(GBD), 2007 WL 2412258, at \*2, 2007 U.S. Dist. LEXIS 62346, at \*5 (S.D.N.Y. Aug.23, 2007) (finding special circumstances justifying failure to exhaust remedies because a supervisor told plaintiff that filing a grievance was not the proper way to address a complaint, and to instead write a letter to the Chief Medical Officer at the Department of Health, which he did); *Jeffers v. Goord,* No. 9:99–CV–0335 (FJS/GHL), 2005 WL 928628, at \*6, 2005 U.S. Dist. LEXIS 39309, at \*16–17 (N.D.N.Y. Apr.4, 2005) ("[p]rison official may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue.").

[7]   Courts have noted that there is significant overlap in the three *Hemphill* considerations. *See, e.g., Barksdale v. Frenya,* No. 9:10–CV–00831 (MAD/ DEP), 2012 WL 4107805, at \*6 n. 11, 2012 U.S. Dist. LEXIS 134738, at \*21 n. 11 (N.D.N.Y. Sept.19, 2012) ("In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap."). A failure to exhaust as a result of being given false information on whether a complaint was grievable by a non-defendant could arguably fit within either the first or third consideration.

**\*8** Defendants' failure to submit evidence refuting or explaining Plaintiff's claim that he was told his complaint was not grievable leaves material issues of fact regarding the applicability of one or more of the *Hemphill* considerations. Therefore, the Court recommends that Defendants' request for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied without prejudice.

### B. Battiste and Bezio
The Eighth Amendment to the United States Constitution "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate

indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster,* 528 F. App'x 105, 106 (2d Cir.2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

To prevail on a failure to protect claim, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference. *Farmer,* 511 U.S. at 837. In order to establish deliberate indifference where a prison official has failed to protect an inmate from violence by another inmate, a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Hayes,* 84 F.3d at 620. Even assuming that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact on the issue of substantial risk of harm, the summary judgment record is devoid of evidence that Battiste and Bezio exhibited deliberate indifference to Plaintiff's safety in placing Adams in his cell.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919,

at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers,* 780 F.2d at 210). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [8]

[8]    The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

Plaintiff claims that he wrote to Defendants Battiste and Bezio with respect to his safety concerns with regard to sharing a cell with a Bloods gang member after he was dissatisfied with the response of Upstate officials to his complaints in the fall or winter of 2011. (Dkt. No. 1 at ¶ 6.) According to Plaintiff after he sent the letters to Battiste and Bezio he was told by Upstate officials that his safety issue had been addressed. *Id.*

Battiste and Bezio did not submit evidence regarding whether they received letters from Plaintiff and, if so, took any action in response. Instead, they rely upon an attorney's declaration stating upon information and belief that a search was made of records in the DOCCS Central Office and no correspondence to or from Plaintiff was found. (Dkt. No. 25–2 at ¶ 3.) The

source of counsel's information and belief appears to be the July 25, 2013, unsworn letter from a DOCCS senior attorney annexed as an exhibit. *Id.* at p. 4.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *see also Salahuddin,* 467 F.3d at 272–73 (movant bears the initial burden of showing through the production of admissible evidence that he is entitled to judgment as a matter of law). An attorney's affidavit that is not based upon personal knowledge and relies upon an attached letter not sworn as required by Rule 56(e) is not admissible evidence and not properly considered on a summary judgment motion. [9] *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986); *see also Sepanski v. Jani–King, Inc.,* No. 10–CV–518S, 2013 WL 4455412, at *2–3, *8, 2013 U.S. Dist. LEXIS 116437, at *8 (W.D.N.Y. Aug.16, 2013) (holding that three unsworn letters submitted by plaintiff could not be considered in connection with a motion for summary judgment).

[9]     Statements in Defendants' Statement Pursuant to Rule 7.1(a)(3) are deemed admitted on an unopposed summary judgment motion only to the extent they are supported by admissible evidence. *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("court may not rely solely upon statement of undisputed facts in determining whether movant has met this burden of showing the absence of a genuine issue for trial; court must be satisfied that the citation to evidence in the record supports the assertion). Paragraph 13 of Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25–1), stating that "[t]here is no evidence to demonstrate that Defendants Bezio or Battiste received correspondence from Plaintiff," relies upon an attorney's declaration that is not based upon personal knowledge and an unsworn letter, neither of which constitutes admissible evidence. *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

A movant's burden of demonstrating the absence of a question of material fact remains the same where the motion is unopposed. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is

presented.") (citation and internal quotation marks omitted). Defendants have not satisfied their burden of production with respect to Plaintiff's claim that he wrote to Battiste and Bezio regarding his concerns about Bloods.

**\*10** Nonetheless, because Plaintiff has not alleged facts in his Complaint showing that Battiste or Bezio had knowledge of, or personal involvement in, Adams being placed in a cell with him, or that they were aware of Adams' Bloods affiliation, he has failed to state an Eighth Amendment claim against the two supervisory officials for failure to protect him from the injuries he sustained in the fight with Adams. *See McKinnon,* 568 F.2d at 934 (personal involvement in constitutional deprivation is a prerequisite to an award of damages under § 1983); *Hayes,* 84 F.3d at 620 (defendant official must actually have known of and disregarded an excessive risk of harm to the plaintiff's safety to establish deliberate indifference).

Therefore, the Court recommends that Battiste and Bezio be granted summary judgment dismissing the Complaint as against them.

### C. Oropallo

Even assuming, *arguendo,* that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact, on the issue of substantial risk of harm, the evidence in the summary judgment record establishes that Defendant Oropallo did not know of and disregard an excessive risk of harm to Plaintiff's safety in connection with Adams being placed in Plaintiff's cell. *See Hayes,* 84 F.3d at 620. The prison files on inmate Adams contained no notations indicating that he was gang related. (Dkt. No. 25–3 at ¶ 8.) The DOCCS "enemies" list did not identify Plaintiff and Adams as enemies. *Id.* at ¶ 6. Moreover, Plaintiff's security file contained no requirements for protective custody. *Id.* at ¶ 10.

According to Oropallo, prior to the altercation between Plaintiff and Adams, he had no personal knowledge or information that would have led him to believe that Adams was gang affiliated or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had not told Oropallo he was in a gang before being placed in Plaintiff's cell. *Id.* at ¶ 10. Moreover, the assignment of inmates in double cell housing was not within Oropallo's authority. *Id.* at ¶ 9.

Since Plaintiff has failed to submit opposition to Defendants' motion, the Court can look only to his verified Complaint for evidence demonstrating that a genuine issue of material

fact exists as to whether Oropallo knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Id.* Mere allegations in Plaintiff's Complaint, especially conclusory allegations or conjecture and speculation, are insufficient to create a genuine issue of fact. *See Matsushita,* 475 U.S. at 585–86; *Kerzer,* 156 F.3d at 400.

None of the allegations in Plaintiff's verified Complaint contradicts Defendants' evidence that prison records did not identify Adams as a member of the Bloods gang, that Oropallo had no knowledge that Adams was a member of the Bloods gang at the time he was placed in Plaintiff's cell, and that Oropallo had no authority with regard to the assignment of inmates in double cells. Therefore, Plaintiff has failed to raise a question of fact as to whether Oropallo was deliberately indifferent to his safety, a necessary element of proof on an Eighth Amendment claim for cruel and inhuman punishment based upon a failure to protect. *See Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Oropallo's motion for summary judgment be granted.

**\*11 ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam); 28 U.S.C. § 636(b) (1); Federal Rules of Civil Procedure 72, 6(a).

Filed June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4146276

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 470648
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Yousif AHMED, Plaintiff,

v.

FRAZER & JONES COMPANY, Defendant.

No. 5:13–CV–0573 (GTS/TWD).
|
Signed Feb. 4, 2015.

**Attorneys and Law Firms**

Yousif Ahmed, Syracuse, NY, pro se.

Bond, Schoeneck & King, PLLC, Thomas G. Eron, Esq., Kerry W. Langan, Esq., of Counsel, Syracuse, NY, for Defendant.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment discrimination action filed *pro se* by Yousif Ahmed ("Plaintiff") against Frazer & Jones Company ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964, is Defendant's unopposed motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) For the reasons set forth below, Defendant's motion is granted.

**I. RELEVANT BACKGROUND**

**A. Summary of Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint claims that, in September of 2011, Defendant discriminatorily suspended then terminated his employment based on his race/color and national origin in violation of Title VII of the Civil Rights Act of 1964. (Dkt. No. 1.) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

**B. Undisputed Material Facts**

The following material facts were asserted and supported by Defendant in its Local Rule 7.1 Statement and not controverted by Plaintiff in any Local Rule 7.1 Response, despite the fact that he was twice given specific notice of the consequences of failing to so respond (and the fact that he previously received a courtesy copy of both the Court's Local Rules of Practice and *Pro Se* Handbook). (Dkt. No. 18, Attach. 3 [Def.'s Rule 7.1 Statement]; Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences]; Dkt. No. 3 [Notice of *Pro Se* Handbook and Local Rules].)

1. Defendant is a high-quality ductile and malleable iron foundry that has been in business for over 150 years in Syracuse, New York.

2. Plaintiff was hired on November 11, 2006, to work as a Hard Iron Sorter at Defendant's manufacturing facility in Syracuse, New York.

3. Plaintiff was a member of the Communication Workers of America, Local 81300 ("Union").

4. On September 2, 2011, Defendant suspended Plaintiff, pending investigation, for pushing and threatening a co-worker.

5. On September 6, 2011, Defendant terminated Plaintiff for his conduct on September 2, 2011.

6. Pursuant to the collective bargaining agreement between Defendant and the Union, the Union was promptly notified of Plaintiff's termination and represented him throughout the termination process.

7. On October 4, 2012, Plaintiff filed a complaint with the New York State Division of Human Rights ("Division") claiming that he was discriminated against because of an alleged disability.

8. On October 10, 2012, the Division dismissed Plaintiff's complaint for untimeliness because it was not filed within one year of the alleged discrimination.

9. Plaintiff's Division complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

10. On February 26, 2013, the EEOC issued a Dismissal and Notice of Rights.

11. The EEOC Dismissal and Notice of Rights stated that Plaintiff's charge was dismissed for lack of jurisdiction because the charge was not timely filed.

**\*2** 12. On April 28, 2014, Defendant was served with a Summons and Complaint, later filed by Plaintiff with this Court on May 17, 2013, alleging that Defendant discriminated against him based on his race/color and national origin.

#### C. Briefing on Defendant's Motion

Generally, in support of its motion for summary judgment, Defendant argues that Plaintiff's Complaint must be dismissed as untimely for the following reasons: (1) an individual may not maintain a cause of action pursuant to Title VII unless he has first filed a claim with the EEOC or an equivalent state agency within 300 days of the alleged discriminatory act; (2) a discriminatory termination is considered a "discrete act"; (3) here, Plaintiff was terminated on September 6, 2011, 300 days after which was July 2, 2012; and (4) however, he did not file with the Division until October 4, 2012. (Dkt. No. 18, Attach. 1 [Def.'s Memo. of Law].)

Plaintiff did not file an opposition memorandum of law (or any opposition paper), despite having been twice given specific notice of the consequences of failing to do so (Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences] ); and the deadline by which to do so expired more than seven-and-a-half months ago (*see generally* Docket Sheet).

## II. RELEVANT LEGAL STANDARD

Because Defendant, in its memorandum of law, accurately summarizes the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard. (Dkt. No. 18, Attach. 1, at Part I [Def.'s Memo. of Law].) To that summary, the Court would add only two brief points.

First, implied in the burden-shifting standard referenced by Defendant is the fact that, where a nonmoving party fails to adequately respond to a properly supported Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se*.[1] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond

to the motion for summary judgment.)[2] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[3] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's properly supported Statement of Material Facts to have been admitted where the nonmoving party has failed to properly respond to that statement[4]—even where the nonmoving party is proceeding *pro se* in a civil rights case.[5]

[1]   *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

[2]   *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

[3]   *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

[4]   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

[5]   *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

Second, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in a properly filed memorandum of law (submitted in support of a motion for summary judgment), the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested ...."); *Rusyniak v.. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL2473509, at \*2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Again, this rule applies even to *pro se* litigants, especially ones who have received notice of the consequence of that failure to respond.[6]

6      Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Federal Exp.,* No. 12–1475, 2014 WL 4412333, at *6 (2d Cir.2014)* ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

## III. ANALYSIS

**\*3**   After carefully considering the matter, the Court finds, for the reasons stated in Defendant's memorandum of law, that Defendant has met its modest burden of showing the facial merit of its argument that Plaintiff's Complaint must be dismissed as untimely. (*See, supra,* Part I.C. of this Decision and Order.)

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 18) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED.***

*The Clerk is directed to enter judgment for Defendant and close this action.*

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 470648

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   3

2024 WL 1329033
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Linda SARACENI, Plaintiff,

v.

Charles P. RETTING, Commissioner, Department
of Treasury (Internal Revenue Services), Defendant.

5:21-CV-0936 (GTS/TWD)
|
Signed March 28, 2024

**Synopsis**
**Background:** Former Internal Revenue Service (IRS)
employee, pro se at time of complaint and later retaining
counsel, brought action against Commissioner of the
Department of Treasury, asserting claims for constructive
discharge and failure to accommodate in violation of
the Rehabilitation Act, and retaliation and hostile work
environment under both Title VII and Rehabilitation Act,
arising from incident that occurred prior to employee's
retirement from IRS. Commissioner moved for summary
judgment.

**Holdings:** The District Court, Glenn T. Suddaby, J., held that:

[1] conduct of group manager was not so objectively hostile or
abusive to rise to level of severity required to establish hostile
work environment;

[2] conduct of area manager and other circumstances during
interactive process did not rise to level of hostile work
environment;

[3] allegedly harassing conduct of group manager and area
manager was neither related to or motivated by either
employee's gender or disability, as was required for claims for
hostile work environment and constructive discharge;

[4] employee's harassment complaint against group manager
and area manager did not constitute protected activity, for
purpose of employee's claims for retaliation;

[5] no portion of group manager's allegedly harassing conduct
constituted adverse employment action against employee, for
purpose of claims for retaliation;

[6] employee's transfer to temporary reassignment during
interactive process did not constitute adverse employment
action against employee, for purpose of claims for retaliation;
and

[7] employee's choice to submit retirement paperwork before
completion of interactive process represented withdrawal
from process that rendered failure to accommodate claim
invalid.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (34)

**[1]    Summary Judgment    Statement of facts**

The requirements of a party opposing summary
judgment in filing a response to the moving
party's statement of material facts is not a mere
formality; rather this requirement and other local
rules governing summary judgment are essential
tools intended to relieve the district court of
the onerous task of hunting through voluminous
records without guidance from the parties.
U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

**[2]    Summary Judgment    Statement of facts**

A proper response to a movant's statement
of material facts, as required by the local
rules governing summary judgment, streamlines
the summary judgment analysis by allocating
responsibility for flagging genuine factual
disputes on the participants ostensibly in the
best position to do so: the litigants themselves.
U.S.Dist.Ct.Rules N.D.N.Y., Rule 56.1(b).

**[3]    Summary Judgment    What Constitutes
"Material" Fact**

Factual disputes that are irrelevant or
unnecessary will not be counted as material for
purposes of a motion for summary judgment.
Fed. R. Civ. P. 56(a).

**[4]**   **Summary Judgment** 🔑 Response or Other Opposition

Where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Fed. R. Civ. P. 56(a).

**[5]**   **Summary Judgment** 🔑 Response or Other Opposition

When a non-movant willfully fails to respond to a motion for summary judgment, the fact that there has been no such response does not by itself mean that the motion is to be granted automatically; rather, the court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. Fed. R. Civ. P. 56(a); U.S.Dist.Ct.Rules N.D.N.Y., Rule 7.1(b)(3).

**[6]**   **Summary Judgment** 🔑 Response or Other Opposition

When a non-movant fails to oppose a legal argument asserted by a movant in a motion for summary judgment, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a modest burden. Fed. R. Civ. P. 56(a); U.S.Dist.Ct.Rules N.D.N.Y., Rule 7.1(b)(3).

**[7]**   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

To prove a hostile work environment claim under Title VII or the Rehabilitation Act, a plaintiff must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[8]**   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

The showing of a hostile work environment under Title VII or the Rehabilitation Act has both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[9]**   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

On a claim for hostile work environment under Title VII or the Rehabilitation Act, the objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[10]**   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

In the determination of the objective hostility of a work environment on a claim for hostile work environment under Title VII or the Rehabilitation Act, factors considered as part of the totality of

the circumstances include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the victim's job performance. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[11]   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

On a claim for hostile work environment under Title VII or the Rehabilitation Act, a plaintiff must demonstrate that the discriminatory conduct occurred because of his protected status and also that a specific basis exists for imputing the conduct that created the hostile work environment to the employer. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[12]   **Civil Rights** 🔑 Weight and Sufficiency of Evidence

**Civil Rights** 🔑 Discrimination by reason of handicap, disability, or illness

Although facially neutral incidents can be considered as part of the totality of the circumstances in the consideration of a claim for hostile work environment under Title VII or the Rehabilitation Act, there must be some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[13]   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

Conduct of group manager, who became former Internal Revenue Service (IRS) employee's first-line supervisor following reorganization of division containing group in which employee worked, was not so objectively hostile or abusive to rise to level of severity required to establish hostile work environment under Title VII and Rehabilitation Act; although employee alleged that manager's conduct caused her stress that impacted her ability to concentrate on or complete work, manager's alleged conduct amounted to only rudeness or excessive criticism of employee's work, specifically manager supposedly subjected employee's work to extra scrutiny, made sarcastic and snide remarks, accused her of harassing group's lead reviewer, and consistently told her she was doing things wrong that she was not. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[14]   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

Rudeness and excessive criticism of a plaintiff or her work are not sufficient to establish a hostile work environment under Title VII and the Rehabilitation Act. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[15]   **Civil Rights** 🔑 Constructive discharge

A case of constructive discharge under the Rehabilitation Act can be regarded as an aggravated case of hostile work environment under Title VII or the Act. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[16]   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

2024 WL 1329033

**Civil Rights** 🔑 Harassment; work environment

Conduct of area manager, as former Internal Revenue Service (IRS) employee's second-line supervisor, and other circumstances during interactive process for employee's request for reassignment accommodations related to her disability did not rise to level of hostile work environment for purpose of employee's claims under Title VII and Rehabilitation Act, where manager's refusal to accept employee's suggestions for various temporary accommodations did not change conditions of her employment, which remained same until employee accepted temporary reassignment, employee's removal from reassignment after only one day was based on employee's own apprehension about position being good for her health, and nothing indicated that manager had control over work employee was assigned in reassignment. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[17]   **Civil Rights** 🔑 Constructive discharge

**Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

Allegedly harassing conduct of former Internal Revenue Service (IRS) employee's supervisors, specifically group manager and area manager, was neither related to or motivated by either employee's gender or disability, as was required for claims for hostile work environment and constructive discharge under Title VII and Rehabilitation Act; employee's assertions of gender bias were based primarily on conduct that was facially neutral, specifically, employee described group manager as being "aggressive" to entire group and described area manager as having reputation as "bully," and employee's assertions that harassment was intended to cause stress as means of worsening her disabilities so that she would retire was conclusory and speculative. Civil Rights Act of 1964 § 701, 42

U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[18]   **Civil Rights** 🔑 Hostile environment; severity, pervasiveness, and frequency

**Civil Rights** 🔑 Harassment; work environment

A subjective belief or feeling based merely on personal perception that conduct is rooted in a protected category is insufficient to sustain a hostile work environment claim under Title VII and the Rehabilitation Act. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[19]   **Civil Rights** 🔑 Practices prohibited or required in general; elements

To establish a prima facie case of retaliation under both Title VII and the Rehabilitation Act, a plaintiff must show that (1) she was engaged in protected activity under the law supporting her claim, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[20]   **Civil Rights** 🔑 Adverse actions in general

On a claim for retaliation under both Title VII and the Rehabilitation Act, an "adverse employment action" is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[21]   **Civil Rights** 🔑 Activities protected

Requests for accommodations for a disability is considered a "protected activity" in the context

of a claim for retaliation under both Title VII and the Rehabilitation Act. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[22]    **Civil Rights** 🔑 Retaliation claims

Once a prima facie case of retaliation is established under Title VII and the Rehabilitation Act, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its employment action against the plaintiff. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[23]    **Civil Rights** 🔑 Retaliation claims
    **Civil Rights** 🔑 Retaliation claims

If an employer demonstrates a legitimate, nondiscriminatory reason for its adverse employment action in response to a plaintiff's prima facie case of retaliation under both Title VII and the Rehabilitation Act, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[24]    **Civil Rights** 🔑 Activities protected
    **Public Employment** 🔑 Protected activities
    **United States** 🔑 Exercise of rights; retaliation

Former Internal Revenue Service (IRS) employee's harassment complaint against supervisors, specifically group manager and area manager, as it related to their conduct surrounding review of employee's case work did not constitute "protected activity" of which IRS would have been aware, for purpose of employee's claims for retaliation under Title VII and Rehabilitation Act, as

nothing indicated that complaint was made with reasonable belief that it was challenging conduct prohibited by law; emails leading up to filing of complaint discussed employee's feelings regarding group manager's decision to disregard review arrangement she had with prior supervisor and indicated employee's belief that it violated IRS' policies regarding general workplace bullying and harassment, not Title VII or Act. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[25]    **Civil Rights** 🔑 Activities protected
    **Public Employment** 🔑 Protected activities
    **United States** 🔑 Exercise of rights; retaliation

Former Internal Revenue Service (IRS) employee's request for accommodations related to her disability constituted "protected activity," as was required to establish prima facie case of retaliation under Rehabilitation Act, where such request was based on employee's reasonable belief that she was asserting need for accommodations for her medical conditions that was protected by law. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

[26]    **Civil Rights** 🔑 Harassment; work environment
    **Public Employment** 🔑 Exercise of Rights; Retaliation
    **United States** 🔑 Exercise of rights; retaliation

No portion of group manager's allegedly harassing conduct, after becoming group supervisor following reorganization of division containing group in which former Internal Revenue Service (IRS) employee worked, constituted adverse employment action against employee, for purpose of claims for retaliation under Title VII and Rehabilitation Act, even if manager's conduct, which allegedly included increased criticism of employee's work, caused employee stress, where conduct did not materially alter terms and conditions of

employee's employment. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[27]** **Civil Rights** 🔑 Public Employment

**Public Employment** 🔑 Exercise of Rights; Retaliation

**United States** 🔑 Exercise of rights; retaliation

Former Internal Revenue Service (IRS) employee's transfer from regular duties with review group to temporary reassignment as field agent as result of interactive review process for employee's request for accommodations for her disability did not constitute adverse employment action against employee, for purpose of claims for retaliation under Titler VII and Rehabilitation Act, where employee's unsubstantiated belief that area manager's conduct throughout process was done to harass her was insufficient to constitute adverse action, employee was not required to accept temporary reassignment to position that materially altered conditions of her employment, and employee's voluntary acceptance of reassignment did not amount to constructive discharge. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[28]** **Civil Rights** 🔑 Constructive discharge

**Civil Rights** 🔑 Adverse actions in general

Although a plaintiff who voluntarily transfers positions is not precluded from establishing a prima facie case of retaliation under Title VII and Rehabilitation Act, she may face a higher bar in doing so, and must show that the transfer amounted to a constructive discharge. Civil Rights Act of 1964 § 701, 42 U.S.C.A. § 2000e et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[29]** **Civil Rights** 🔑 Accommodations in general

Failure-to-accommodate claims brought under the Rehabilitation Act are subject to the same definition of an "individual with a disability" and same prima facie standard as claims brought under the ADA. Americans with Disabilities Act of 1990 § 2, 42 U.S.C.A. § 12101 et seq.; Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[30]** **Civil Rights** 🔑 In general; elements of accommodation claims

To state a prima facie case for failure to accommodate under the Rehabilitation Act, a plaintiff must show that (1) she is a person with a disability under the meaning of the Act, (2) her employer was both covered by that statute and had notice of her disability, (3) she could perform the essential functions of the job at issue with reasonable accommodation, and (4) her employer has refused to make such accommodations. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[31]** **Civil Rights** 🔑 Impairments in general; major life activities

**Civil Rights** 🔑 Particular conditions, limitations, and impairments

Consideration of former Internal Revenue Service (IRS) employee's major life activity of function of her immune system would not constitute qualifying disability for purposes of claim for failure to accommodate under Rehabilitation Act; even though employee's medical impairments were autoimmune disorders that were exacerbated by stress, accommodation was sought only in context of enabling employee to perform her job without undue exacerbation of symptoms, and no symptoms of immune-system impairment rose to level that required any accommodations in performance of her work other than when she was subjected to the stress of being supervised by specific supervisor, that is group manager. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990 § 3, 42 U.S.C.A. § 12102(2)(B).

**[32]** **Civil Rights** 🔑 Particular conditions, limitations, and impairments

Former Internal Revenue Service (IRS) employee was only rendered unable to perform demands of her job within review group under supervision of new group manager and was otherwise able to perform despite her medical conditions, and thus employee did not fall within definition of "individual with a disability" for purposes of claim for failure to accommodate under Rehabilitation Act; employee sought to be accommodated related to alleged inability to perform job as result of stress, which exacerbated her underlying medical conditions, caused by manager's actions as supervisor, employee did not require accommodation under previous supervisor, and employee would have been able to perform same work if she was permitted to do so in another department or under different supervisor. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[33]** **Civil Rights** 🔑 Requesting and choosing accommodations; interactive process; cooperation

Former Internal Revenue Service (IRS) employee's choice to submit retirement paperwork before completion of interactive process on employee's request for accommodations for her disability represented withdrawal from process that rendered failure-to-accommodate claim under Rehabilitation Act invalid; multiple conferences were held regarding potential interim accommodations during process while employee and IRS were waiting for occupational health assessment to be completed, employee accepted interim reassignment though she was not required to, process continued as IRS continued to work with employee, failure to provide employee with requested accommodations did not render attempts to accommodate her bad faith, and employee submitted retirement paperwork before assessment was complete. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**[34]** **Civil Rights** 🔑 Requesting and choosing accommodations; interactive process; cooperation

An employee who withdraws from the interactive process to provide accommodations cannot later allege a failure to accommodate under the Rehabilitation Act. Rehabilitation Act of 1973 § 2, 29 U.S.C.A. § 701 et seq.

**Attorneys and Law Firms**

GEORGIA A. LAWRENCE, ESQ., SOUTHWORTH PC, Counsel for Plaintiff, 1100 South Peachtree Street NE, Suite 200, Atlanta, GA 30309.

STEVEN W. WILLIAMS, ESQ., SMITH, SOVIK, KENDRICK & SUGNET, P.C., Co-counsel for Plaintiff, 250 South Clinton Street, Suite 600, Syracuse, NY 13202-1252.

KAREN FOLSTER LESPERANCE, ESQ., CARLA B. FREEDMAN, OFFICE OF THE UNITED STATES ATTORNEY, Counsel for Defendant, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207-2924.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this employment discrimination action filed by Linda Saraceni ("Plaintiff") against Charles P. Retting in his capacity as Commissioner of the Department of Treasury (Internal Revenue Service) ("Defendant"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. Nos. 32.) For the reasons set forth below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**

Generally, in her *pro se* Complaint, [1] Plaintiff collectively asserts seven claims, some of which are based on the

same theory but brought pursuant to different statutes. (Dkt. No. 1.) First, Plaintiff claims that Defendant violated the Rehabilitation Act by misleading her about reasonable accommodation options and failing to reasonably accommodate her disability in a manner that was so intolerable that she was compelled to retire and was therefore subjected to a constructive discharge (hereinafter Claim One). (*Id.* at ¶¶ 78-83.)

[1]    Although Plaintiff drafted and filed her Complaint in a *pro se* capacity, she has since retained counsel, and her counsel was involved in the drafting of her papers related to the current motion. (Dkt. Nos. 1, 12, 13, 14, 15, 33.)

Second, Plaintiff claims that Defendant retaliated against her in her violation of Title VII and the Rehabilitation Act for both filing a harassment complaint that she reasonably believed was opposing sex harassment (as to Title VII) and disability harassment and making requests for reasonable accommodations related to her disability (as to the Rehabilitation Act) (hereinafter Claims Two and Three, respectively). (*Id.* at ¶¶ 84-91.)

Third, Plaintiff claims that Defendant subjected her to a hostile work environment in the form of unwelcome conduct that was severe and/or pervasive and/or would have dissuaded a reasonable person from engaging in protected activity based upon her disability in violation of the Rehabilitation Act, and in retaliation for her protected activity in violation of Title VII and the Rehabilitation Act (hereinafter Claims Four, Five, and Six, respectively). (*Id.* at ¶¶ 92-100.)

Fourth, Plaintiff claims that Defendant failed to accommodate her disability in violation of the Rehabilitation Act (hereinafter Claim Seven). (*Id.* at ¶¶ 101-06.)

**B. Undisputed Material Facts on Defendant's Motion for Summary Judgment**

[1]    [2]    Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the

onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 525 F.Supp.3d 305, 320 (N.D.N.Y. 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019) [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 525 F.Supp.3d at 320 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018) [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

**\*2**    Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendant, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1. Plaintiff began working for the IRS in 1985 as a field agent.

2. After 22 years as a field agent, Plaintiff became a Senior Reviewer in the pension plan division of the IRS' Mandatory Review Group. [2]

[2]    Plaintiff purports to admit this fact in part and deny it in part; however, her denial amounts to little more than the addition of non-material or extraneous facts. *See LaFever v. Clarke*, 525 F. Supp. 3d 305, 326 (N.D.N.Y. 2021) (Hurd, J.) (noting that a response to the movant's Statement of Material Facts is not the proper place to add additional facts); *Boger v. New York State Office of Parks, Recreation & Historic Preservation*, 17-CV-0289, 2019 WL 2766897, at *2 (N.D.N.Y. July 2, 2019) (D'Agostino, J.) (disregarding the party's introduction of immaterial facts and legal argument when responding to asserted facts). This asserted fact is therefore deemed to be admitted.

3. In 2018, Plaintiff was a GS-13 Senior Reviewer, meaning that she was a Grade 13 on the General Services pay scale for federal employees. [3]

[3]    Plaintiff disputes Defendant's characterization of her as a GS-13 Senior Reviewer, asserting that she was more properly characterized as being at the level of GS-0512-13. (Dkt. No. 33, Attach. 6, at ¶

3.) It is not clear that this distinction is material to the issues to be determined in this case.

4. In her role as a Senior Reviewer, Plaintiff was responsible for reviewing and correcting pension plan audit cases conducted by field agents that were "unagreed," working with IRS counsel to make changes and perfect the cases for their eventual use in tax court. [4]

[4]     The Court agrees with Plaintiff that Defendant's characterization of her job duties is perhaps slightly different that her testimony on which Defendant relied. (Dkt. No 32, Attach. 5, at 19-21.) The asserted fact has therefore been altered to more closely track Plaintiff's testimony on this matter.

5. From the time she joined the Mandatory Review group until February 2018, David Boyd was Plaintiff's direct supervisor.

6. The employees in the mandatory review group all had different duty stations. David Boyd's duty station was in Nashville, Tennessee, along with several other members of the mandatory review team. Others were located in Florida, New York City, and Dallas, Texas, and Plaintiff was located in Syracuse, New York. Plaintiff was the only member of the Mandatory Review group located in Syracuse. The IRS maintained an office in Syracuse, but Plaintiff worked from home most of the time.

7. At a town hall meeting with impacted employees in early February 2018, the IRS announced a reorganization of the Employee Plans Division. Some divisions were eliminated or consolidated, and some managers were moved. As part of this reorganization, George Brim became the manager of the Mandatory Review group.

8. There were concerns and speculation amongst some employees including Plaintiff that the Employee Plans Division may get rid of the Mandatory Review group, or that the mandatory reviewers may be sent to field groups or be given multiple duties.

**\*3** 9. On February 12, 2018, a retirement specialist with the IRS sent Plaintiff an email confirming the submission of Plaintiff's retirement paperwork for a retirement date of June 30, 2018. [5]

[5]     Plaintiff disputes this asserted fact but, rather than showing the asserted fact is actually disputed,

she admits that she received such an email after submitting her paperwork, and merely adds facts to the effect that her submission of retirement paperwork at that time was the result of an accident on her part. (Dkt. No. 33, Attach. 6, at ¶ 9.) The Court takes note of this additional fact, which does not appear to be disputed, for the purposes of context, but finds that the asserted fact is also not disputed and has been deemed to be admitted.

10. On February 20, 2018, Plaintiff emailed the retirement specialist and indicated that she would not be retiring on June 30, 2018. She noted, however, that "[i]t is something I am considering due to health concerns and the ageing of my mother and the reorganization of my unit."

11. The changes made in the reorganization became effective and George Brim became the manager of the Mandatory Review group and Plaintiff's first-line supervisor effective February 17, 2018.

12. Michael Sanders, who was then the Area Manager for the Mid-Atlantic region, became Plaintiff's second-line supervisor.

13. At some point in February 2018, Mr. Brim and Mr. Sanders met with Mr. Boyd and other members of the Mandatory Review group for two days in Nashville, Tennessee.

14. Plaintiff was not present for the meeting in Nashville.

15. On March 14, 2018, Plaintiff emailed Mr. Brim stating that she was finishing a "30 day letter package" that was a "typical representation of the cases that we get here in mandatory review," and asked if he would like to review it. He agreed and she sent it to him for his review on March 15.

16. The 30-day package that Plaintiff sent to Mr. Brim on March 15, 2018, was the first such package that Mr. Brim was reviewing since moving to Mandatory Review.

17. Mr. Brim called Steven Shearer and asked if he would also look at the 30-day letter package to provide feedback to Mr. Brim, given that it was his first time reviewing one.

18. Mr. Shearer was a lead reviewer, and one of his responsibilities in that role was to review 30-day packages.

19. Mr. Brim emailed the 30-day package to Mr. Shearer on Friday, March 16, 2018, and told Mr. Shearer that he "[a]ppreciate[d] the mentoring."

20. On Monday, March 19, 2018, Mr. Brim sent his proposed feedback on the 30-day package to Mr. Shearer and asked Mr. Shearer for his thoughts.

21. On Thursday, March 22, 2018, Mr. Shearer sent his feedback to Mr. Brim, and they discussed by telephone on Friday, March 23.

22. On March 23, 2018, Mr. Brim sent Plaintiff his comments and edits to the 30-day package and included "a write-up of my review of the work done."

23. The write-up provided comments and a rating for each of Plaintiff's critical job elements and was intended to let Plaintiff know how Mr. Brim would have evaluated her work if he was scoring it as a case review.

24. In this non-evaluative review, Mr. Brim provided a rating for four critical job elements; he rated her work as "fully successful" for one element, "exceeds fully successful" for two elements, and "outstanding" for one element.

 **4** 25. Later that night, Plaintiff sent Mr. Shearer an email stating, "You reviewed my case for George and gave him input."

26. Mr. Shearer responded on Saturday, March 24, acknowledging that Mr. Brim had asked him to look at it, and he also stated that Mr. Brim had reviewed it himself before Mr. Shearer had sent Mr. Brim his suggested edits. [6]

---

[6]    Plaintiff admits this asserted fact in part and denies it in part, but, again, her denial is less a denial than the addition of other facts. (Dkt. No. 33, Attach. 6, at ¶ 26.) *See LaFever*, 525 F. Supp. 3d at 326; *Boger*, 2019 WL 2766897, at *2. Further, Plaintiff does not cite any record evidence in support of this supposed denial. (*Id.*) The asserted fact is therefore deemed to be admitted.

27. Mr. Shearer point out that Mr. Brim's write-up was dated before Mr. Shearer's conversation with Mr. Brim, to which Plaintiff responded, "That is really underhanded and we both know that it is not true."

28. Less than 24 hours after receiving Mr. Brim's feedback to her 30-day package, Plaintiff emailed the IRS retirement specialist, stating that she "may be retiring after all. Unfortunately, I am dealing with some harassment/bullying issues that I had hoped would have worked themselves out ... but they did not. The stress from this is literally making me ill. Can we set up a time to talk so we can go over my paperwork."

29. Also on March 24, Plaintiff emailed William Dolce, the Area Manager for the Northeast Area. In that email, she stated that it was "quite clear from the way we are being treated that they have no intention to keep this group [Mandatory Review] intact." She stated that she was putting in her retirement papers as she was eligible to retire at the end of June, but asked if Mr. Dolce could let her know if he had any positions coming available in his area.

30. On the evening of March 25, Plaintiff emailed Mr. Brim saying that she had been ill all weekend and would be taking sick leave on Monday.

31. At 10:00 p.m. that night, Plaintiff sent Mr. Brim a two-page email with the subject line "Clarification of the IRS/ Harassment/Bullying Policy," with a copy to Mr. Sanders, who was the area manager and Mr. Brim's supervisor.

32. In that email, Plaintiff stated that it was "clearly evident" that Mr. Shearer had provided Mr. Brim with his notes/input on her 30-day package, "and while you as Group Manager have every right to use the Lead Reviewer to review my work I think it is dishonest to not tell me that."

33. Plaintiff also stated that her prior supervisor, Mr. Boyd, had put in place an arrangement in which Mr. Shearer did not review Plaintiff's work. Plaintiff contended that Mr. Boyd had told Mr. Brim about this arrangement during the transition meeting in Nashville.

34. Attached to that email was Mr. Brim's write-up of his review of the work done on the 30-day package, which Plaintiff referred to throughout the email as a "Random Case Review," with Plaintiff's comments and responses embedded.

35. Plaintiff stated that, if Mr. Brim shared her embedded comments and responses in the attachment with Mr. Shearer, she would deem that to be "unethical" and would consider it "a separate and additional act of harassment and that your intention is to promulgate such harassment in the workplace."

**\*5** 36. Plaintiff opined that Mr. Brim's actions in asking Mr. Shearer to review her 30-day package made clear to her that Mr. Brim had "no intentions" of "respect[ing] [her] right to work in an environment free of fear of reprisal or verbal harassment or bullying."

37. Plaintiff demanded that Mr. Brim provide her with a written explanation of why Mr. Brim did not "honor the arrangement" she had with her prior supervisor.

38. Approximately 30 minutes later, at 10:30 p.m., Plaintiff sent another email to Mr. Brim with a copy to Mr. Sanders.

39. In the second email, Plaintiff criticized Mr. Brim for what she deemed to be a "Random Case Review." She stated that she was "shocked and dismayed," that it was unfair of Mr. Brim to write up a review of her work, and that the Review was "mean spirited and unprofessional."

40. Plaintiff told Mr. Brim that his review of her 30-day letter package resulted in a "complete loss of trust" between her and Mr. Brim.

41. Plaintiff again stated that it was "dishonest" and an act of harassment/bullying to have Mr. Shearer review her 30-day package.

42. Plaintiff was on sick leave on Monday, March 26.

43. Plaintiff obtained a doctor's note on March 26, which stated that she would be out of work until April 12 due to unspecified "medical reasons."

44. On March 27, Mr. Brim spoke to Plaintiff on the telephone. He explained that, because this was the first 30-day letter he had reviewed, he wanted review and feedback from Mr. Shearer. He apologized for not having made clear that his write-up of her 30-day letter was non-evaluative and would not count towards her annual appraisal rating. [7]

[7]   Plaintiff disputes this fact, but, again, this denial is essentially the assertion of unrelated facts. (Dkt. No. 33, Attach. 6, at ¶ 44.) *See LaFever*, 525 F. Supp. 3d at 326; *Boger*, 2019 WL 2766897, at \*2. This asserted fact is deemed to be admitted.

45. After the phone call, Mr. Brim reiterated these points in an email to Plaintiff and also responded to some of her concerns about the non-evaluative review of her 30-day package.

46. Also on March 27, Plaintiff forwarded to Sean O'Reilly (who was the Acting Director of the Employee Plans Division) the two Sunday night emails she had sent to Mr. Brim and Mr. Sanders.

47. In her email to Mr. O'Reilly, Plaintiff stated that the agreement she had with her prior supervisor to not have Mr. Shearer review her work was an "accommodation" put into place to address harassment/verbal abuse/bullying by Mr. Shearer.

48. Plaintiff told Mr. O'Reilly that her new manager was not honoring this accommodation, so she asked him for an explanation as to why the IRS policy on harassment and bullying was not being upheld.

49. Plaintiff also stated that she had contacted her union representative, Equal Opportunity Employment ("EEO"), and "a Civil Service Attorney."

50. Plaintiff further stated that the stress caused by this was aggravating her health issues, leaving her "no option but to retire much earlier than planned."

51. Mr. O'Reilly responded the following morning, March 28, stating that he would speak to the Area Manager (Mr. Sanders) and work on a "path forward."

52. Mr. Sanders informed Mr. O'Reilly that he had a scheduled call with Plaintiff later that morning and would update Mr. O'Reilly after the call.

**\*6** 53. Mr. Sanders had a lengthy call with Plaintiff later that morning.

54. During that call, she asked if she could be moved into a different group but continue to do mandatory review work, and Mr. Sanders responded no.

55. It was not possible for Plaintiff to continue to do mandatory review work in a different group, because Mr. Brim was the only manager who had program oversight responsibility over mandatory review. Plaintiff's mandatory review work could not be managed, supervised, and reviewed by a manager who did not have program oversight responsibility.

56. Also on March 28, Plaintiff again emailed Mr. Dolce, the Northeast Area Manager.

57. In a lengthy two-page email, Plaintiff explained to Mr. Dolce her concerns with the reorganization and new management of the Mandatory Review group, namely the widespread fear and concern that the Mandatory Review group would be disbanded, as well as rumors that no one in the Mid-Atlantic area was allowed to receive "all 5's" on their annual appraisals (with five being the highest rating in a given category).

58. Later the same day, Plaintiff emailed Mr. Dolce again, informing him about her conversation with Mr. Sanders and his rejection of her request to do mandatory review work in another group.

59. In the same email, Plaintiff also informed Mr. Dolce that she had spoken to the Anti-Harassment Unit that morning, that a formal harassment inquiry is a process that would "go one step above Sean O'Reilly," that everyone would be interviewed, and that it would "make the Service look bad," be bad for morale, and be "a waste of Government time, money, and effort if there is a means to settle this where all parties feel accommodated." She concluded by stating that she had to sign the formal harassment inquiry by Friday if she was going to, and invited a discussion if "there is an alternative way to work this out."

60. Mr. Dolce forwarded all three of Plaintiff's emails to Mr. Sanders and Mr. O'Reilly.

61. On or about March 28, Plaintiff filed a formal harassment complaint against Mr. Brim and Mr. Sanders.

62. On April 6, 2018, Plaintiff extended her sick leave an additional two weeks and provided a doctor's note that simply stated "unable to work 3/29-4/26/18" with no further information.

63. On May 16, 2018, a Management Inquiry into Plaintiff's allegations of harassment was completed, and a report was generated dated May 21, 2018.

64. This Inquiry found that Plaintiff's harassment allegations were not substantiated.[8]

---

[8]     Plaintiff disputes the asserted fact, but, rather than being a proper dispute, Plaintiff adds facts and

arguments regarding why she believes the inquiry into her harassment complaint was biased. (Dkt. No. 33, Attach. 6, at ¶ 64.) This asserted fact is therefore deemed to be admitted.

65. On or about June 14, 2018, Cathy Jones contacted Plaintiff by phone and informed her that the Management Inquiry was complete, and that the allegations of harassment had not been substantiated.

66. On June 15, 2018, Plaintiff provided another doctor's note stating that she was "unable to work due to medical illness 6/15-6/29/2018."

**\*7** 67. Also on June 15, Mr. Brim was copied on an email from Human Resources to Plaintiff acknowledging receipt of her retirement application package.

68. Mr. Brim forwarded the email to Plaintiff on June 17 to ask if she was retiring and, if so, if she had selected a date.

69. Plaintiff did not respond to this email. Mr. Brim forwarded the email to her again on July 6, 2018, asking for her retirement date. Plaintiff responded by stating that she had tentatively filed her paperwork to retire effective August 31, 2018, but that she was "working with Cin Dee Dunn on some options."

70. On July 12, 2018, Plaintiff emailed Mr. Brim regarding various items "in preparation for retirement," such as returning documents and equipment.

71. Also on July 12, Plaintiff submitted a "Request for Reasonable Accommodation" seeking to be moved to either Classifications or EPCU (other groups within the IRS) to do her mandatory review work within those groups.

72. The Acting Manager assigned a case number and assigned the case to Carol Minters as Reasonable Accommodation Coordinator ("RAC"). Ms. Minters arranged a call with Plaintiff to discuss the process. Ms. Minters also requested supporting medical documentation, which Plaintiff provided.

73. On July 18, 2018, Ms. Minters discussed the request and the process with Mr. Brim, Mr. Sanders, and Mr. O'Reilly. During the meeting, it was determined that the Department of Health and Human Services would be asked to complete a Federal Occupational Health ("FOH") assessment.

74. On July 30, 2018, Mr. Minters held a first joint meeting to discuss the reasonable accommodations request. In attendance at the meeting were Ms. Minters, Mr. Sanders, Plaintiff, and Plaintiff's union representative Lisa Bates.

75. Mr. Sanders explained that Plaintiff's request to do mandatory review work in Classifications or EPCU was not feasible because he does not have control over Classifications or EPCU. He asked whether Plaintiff could be a revenue agent as an alternative accommodation.

76. Ms. Minters explained that the goal of the interactive process was to find an effective accommodation that would allow Plaintiff to perform her job and that reassignment would be considered only as a last resort.

77. During the meeting, it was determined that the Department of Health and Human Services would be asked to complete a FOH assessment.

78. Also during that meeting, there were discussions about potential interim accommodations that could be put in place while the FOH assessment was being conducted, which was expected to take approximately six weeks.

79. No interim accommodations were agreed upon at the meeting. Mr. Sanders inquired as to whether Plaintiff would want to move to Mr. Dolce's group as a revenue agent because of her previous communications with Mr. Dolce.

80. However, Plaintiff had raised concerns about her ability to travel and/or drive long distances, which caused Mr. Sanders to be concerned about whether that would be an appropriate accommodation for her.

81. Ms. Minters gathered the necessary releases, forms, and information and submitted the request to FOH on August 13, 2018.

82. Also on August 13, Mr. Sanders provided Ms. Minters with information required for the FOH assessment. In an email, he also offered to meet with Plaintiff for 15-30 minutes to offer her a temporary reassignment to a position as a revenue agent in the Northeast Area until further guidance was received from FOH.

**\*8** 83. Another joint meeting was conducted on August 15 with Plaintiff, Ms. Bates, Ms. Minters, and Mr. Sanders.

84. Ms. Minters suggested as a temporary accommodation that Plaintiff sit down with Mr. Brim and attempt to work out their issues.

85. It was also discussed that Plaintiff could stay in her position until the FOH assessment was completed and, if during that time Mr. Brim engaged in behavior that caused her stress, Ms. Bates could intervene and address the behavior with Mr. Brim.

86. During this meeting, Mr. Sanders again offered that Plaintiff could be moved to a position as a revenue agent as an interim accommodation.

87. On August 15, 2018, Plaintiff agreed to a temporary reassignment as an interim accommodation as a field agent, to be effective August 20, 2018. [9]

[9]
> The Court agrees with Plaintiff that the undisputed evidence establishes that, although Plaintiff had verbally expressed assent to a reassignment as a field agent, she had not yet been informed that the assignment would specifically be in the Northeast Area under Mitchell Waters. (Dkt. No. 32, Attach. 41, at 2; Dkt. No. 32, Attach. 43, at 3; Dkt. No. 32, Attach. 46, at 2.) The asserted fact has been modified to reflect this undisputed evidence.

88. Later that day, Plaintiff emailed Mr. Brim to ask where to send her cases because she would be moving to a different group.

89. Plaintiff took sick leave on August 16, 2018.

90. On August 17, 2018, Plaintiff emailed Mr. Dolce and Mr. Waters stating, "I guess I will be filing my retirement papers ... It would be stupid to waste your time and the Service[']s time and money to start a job that I will not stay in."

91. Mr. Waters had a telephone call with Plaintiff on August 17, in which she reiterated her intent to retire.

92. On Saturday, August 18, 2018, Plaintiff sent Mr. Waters and Mr. Dolce a lengthy email in which she claimed that she had not actually accepted the interim assignment that Mr. Sanders had offered her, that she had "no desire" to be a field agent, and that she wanted to continue to work at home on her claims cases, but be placed in Classifications or EPCU. She asked if Mr. Waters saw a way for her to utilize her skills

in mandatory review and claims without becoming a field agent. She indicated that she would retire if being a field agent "was her fate." She stated that she had previously submitted paperwork to retire as of August 31, 2018, and had emailed her retirement specialist the prior day to inquire whether she could still be processed out by August 31 if she sent the signed forms by overnight mail on Monday. She stated that she might need to move her retirement date to September 30, 2018.

93. Ms. Minters, upon seeing Plaintiff's emails from August 17 and August 18, discussed them with her manager and they determined they would notify management that Plaintiff believed the interim accommodation may cause her harm. Management agreed to maintain the status quo, forego the interim accommodation, and wait for the FOH assessment.

94. On August 22, 2018, Plaintiff was informed that she would stay in mandatory review until the FOH assessment was completed.

**\*9** 95. After being informed of this, Plaintiff sent Mr. Brim and Mr. Sanders an email, copying Ms. Minters, in which she said, "Do not bother to send my cases back to Philly. I will be off for the next week on medical leave and then I am done."

96. That night, Plaintiff sent an email to the Mandatory Review group (excluding Mr. Brim), stating that "tomorrow will be my last day working for the IRS. I will be on medical leave through 8/31/2018."

97. Plaintiff submitted a doctor's note that she was unable to work.

98. On August 27, 2018, Plaintiff's reasonable accommodation representative emailed Mr. Sanders and requested a call "to discuss what interim accommodations are still available to [Plaintiff]."

99. On August 30, 2018, Plaintiff accepted a temporary interim assignment to the Northeast Area as a field agent, supervised by Mr. Waters.

100. On September 12, 2018, Plaintiff again submitted her retirement papers with an effective date of September 30, 2018, and informed Mr. Waters by email that she would be retiring at the end of the month.

101. Ms. Minters followed up with FOH on September 19, 2018.

102. The Department of Health and Human Services completed the FOH assessment on September 21, 2018.

103. The FOH assessment concluded that stress and anxiety exacerbate Plaintiff's medical conditions, that Plaintiff "finds working for her current manager stressful and anxiety-provoking," and that "working for a different manager would remove the stress of working for her current one."

104. However, the FOH assessment concluded that this was a "work relationship" issue, which would be "appropriately addressed as an administrative matter, rather than through the disability process." [10]

> [10]    Plaintiff disputes this asserted fact but her denial is merely a disagreement with the conclusions of the assessment, not one supported by evidence disputing the asserted fact. (Dkt. No. 33, Attach. 6, at ¶ 104.) This asserted fact is therefore deemed to be admitted.

105. On September 25, 2018, Ms. Minters received the FOH report from the Department of Health and Human Services and provided a copy to Plaintiff and a redacted copy to management.

106. Ms. Minters attempted to schedule a joint meeting to discuss the FOH report but was informed that Plaintiff had retired effective September 29, 2018.

107. Plaintiff did indeed retire effective September 29, 2018.

108. On December 12, 2018, Plaintiff contacted an EEO counselor to initiate the pre-complaint process.

109. On April 4, 2019, Plaintiff filed a formal complaint of discrimination.

110. On August 8, 2019, the Department of Treasury issued a Final Agency Decision, finding no discrimination.

111. On September 12, 2019, Plaintiff filed an appeal with the Merit Systems Protection Board.

112. On October 8, 2019, her appeal was dismissed without a hearing.

## C. Parties' Arguments on Defendant's Motion for Summary Judgment

### 1. Defendant's Memorandum of Law

Generally, in his motion for summary judgment, Defendant makes three arguments. (Dkt. No. 32, Attach. 1.) First, Defendant argues that he is entitled to summary judgment on Plaintiff's claims based on a hostile work environment and constructive discharge because the undisputed evidence shows that she did not suffer any conduct that was sufficiently severe and pervasive to alter the terms and conditions of her employment or to compel a reasonable person to resign, and because there is no evidence to show that any conduct directed at her by Defendant occurred because of her gender, disability, or protected activity. (*Id.* at 10-18.)

 **\*10** Second, Defendant argues that he is entitled to summary judgment on Plaintiff's retaliation claims for two reasons: (a) her complaint about harassment does not constitute protected activity because the alleged harassment was not based on her gender or disability and the undisputed evidence establishes that even Plaintiff did not view it as motivated by her disability or gender at the time she made the complaint, and (b) she has not established the existence of an adverse employment action because the conduct she was subjected to did not change the material terms or conditions of her employment or create an environment that reasonably necessitated her choice to resign from her employment. (*Id.* at 18-20.)

Third, Defendant argues that he is entitled to summary judgment on Plaintiff's remaining failure-to-accommodate claim because Plaintiff has not shown either that (a) her medical conditions constitute a disability that Defendant was required to accommodate because it was only her interactions with her specific manager, not anything about her work, that allegedly exacerbated her medical conditions, or (b) that she was denied any accommodation (much less a reasonable one) given the undisputed fact that she voluntarily retired from her relevant job while the interactive process was still ongoing (i.e., before the FOH assessment regarding any reasonable accommodation was completed). (*Id.* at 20-25.) Defendant also argues that he was not required to provide Plaintiff with a new supervisor as a reasonable accommodation. (*Id.* at 22-23.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff makes six arguments. (Dkt. No. 33.) First, Plaintiff argues that the applicable standard for Title VII and Rehabilitation Act claims involving federal government employees was altered by the Supreme Court's decision in *Babb v. Wilkie*, 589 U.S. 399, 140 S.Ct. 1168, 206 L.Ed.2d 432 (2020), such that "any hint of discrimination, regardless of other legitimate reasons, may constitute a violation of 42 U.S.C.A. § 2000e-16(a)." (*Id.* at 2-3.)

Second, Plaintiff argues that she has raised at least a genuine dispute of material fact regarding the existence of conduct by Defendant that was so severe and pervasive as to alter the terms and conditions of her employment based on evidence that her supervisors continuously harassed her in the form of extra scrutiny, demeaning and criticizing her work, shouting, making snide remarks, engaging in intimidating behavior, and making false accusations against her. (*Id.* at 3-5.) She further argues that Mr. Brim engaged in such conduct despite being aware that her medical conditions were exacerbated by stress, and that the failure to engage in a good-faith interactive process to assess reasonable disability accommodations also represents an action that altered the terms and conditions of her employment. (*Id.*) She also argues that Defendant retaliated against her after she requested accommodations by placing her in positions that were inconducive to her medical restrictions, misleading her regarding her options, and making false accusations and threats against her in a manner that required her to retire in order to protect her health. (*Id.*)

Third, Plaintiff argues that there is at least a genuine dispute of material fact as to whether the harassment she suffered was based on her gender and/or disability because the evidence shows that (a) Mr. Brim and Mr. Sanders "exhibited an apparent bias against women, with Brim frequently upsetting female employees while treating male colleagues with respect," (b) Mr. Brim called Plaintiff "unhinged," a word that she asserts is "indicative of sexist stereotyping," (c) other women who Mr. Brim and Mr. Sanders managed experienced similar harassing treatment, and (d) Defendant, through Mr. Brim and Mr. Sanders, knew of her medical condition (and the fact that it was exacerbated by stress) but placed her in stressful situations and failed to provide reasonable accommodations to alleviate that stress. (*Id.* at 5-8.) Plaintiff also argues that it is inappropriate to consider

her gender or disability in isolation, but they should instead be viewed intersectionally. (*Id.* at 7-8.)

**\*11** Fourth, Plaintiff argues that her own testimony that the harassment might "possibly" be based on her gender creates a genuine dispute of material fact as to whether her complaints of harassment constitute protected activity, and that it is well settled that requesting reasonable accommodations is a protected activity. (*Id.* at 8.)

Fifth, Plaintiff argues that the evidence creates at least a genuine dispute of material fact regarding her failure-to-accommodate claim because (a) there is no per se rule that a new supervisor cannot be a reasonable accommodation and Defendant's failure to even consider it as an option was a violation of the requirement to engage in an interactive process, and (b) Defendant generally failed to engage in a good-faith interactive process by denying interim positions proposed by the Plaintiff and instead offering her an interim position that was not conducive to her disabilities before subsequently taking even that interim position away from her without explanation. (*Id.* at 9-12.)

Sixth, Plaintiff argues that there is at least a genuine dispute of material fact as to whether she was constructively discharged from her job due to intolerable working conditions including denials of her requests for time off, disregarding her medical documentation and leave requests, and frustrating the interactive process, all of which left her with no viable option to protect her health other than retiring. (*Id.* at 12-13.)

### 3. Defendant's Reply Memorandum of Law

Generally, in his reply to Plaintiff's opposition, Defendant makes five arguments. (Dkt. No. 37.) First, Defendant argues that much of Plaintiff's "evidence" to defeat summary judgment should be disregarded because it is little more than conclusory assertions of fact without citation to record evidence, and her responses to Defendant's Statement of Material Facts in large part fails to comply with this Court's Local Rules. (*Id.* at 3-6.)

Second, Defendant argues that *Babb* does not clearly apply to this case, because it involved only claims brought under the Age Discrimination in Employment Act ("ADEA"), a statute that is not at issue here. (*Id.* at 6-8.)

Third, Defendant argues that he is entitled to summary judgment on Plaintiff's hostile-work-environment and constructive-discharge claims because (a) Plaintiff has not provided any explanation as to why the cases cited in his opening memorandum do not undermine her claims and offers no contrary authority to support her conclusory assertions, and (b) she offers no evidence to raise even a genuine dispute of fact that the complained-of conduct was because of her gender or disability and her examples of how Mr. Brim treated other women are all facially neutral. (*Id.* at 8-10.)

Fourth, Defendant argues that he is entitled to summary judgment on Plaintiff's retaliation claims (whether the Court applies the standard from *Babb* or the more typical Title VII causation standard) because she has not produced any evidence from which a reasonable factfinder could conclude that she made her harassment complaints with the belief that she was reporting conduct protected by Title VII or the Rehabilitation Act (i.e., that the conduct was based on her gender or disability) and she has not shown a sufficiently hostile work environment following the making of those reports or her request for accommodations that would constitute an adverse action. (*Id.* at 10-11.)

**\*12** Fifth, Defendant argues that he is entitled to summary judgment on Plaintiff's failure-to-accommodate claim because (a) Plaintiff has not provided any argument to oppose Defendant's assertion that she does not have a disability as relevantly defined, (b) she has not provided any evidence or authority to show that a new supervisor is a reasonable accommodation, and (c) she does not meaningfully dispute that she retired before the completion of the interactive process and therefore was never actually subjected to a formal denial of the accommodations she requested. (*Id.* at 11-12.)

## II. LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

**[3]** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [11] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that

are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [12]

[11]   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[12]   Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[4]   Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

[5]   Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-

movant's failure to respond to the motion does is lighten the movant's burden.

**\*13**   For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [13]

[13]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[6]   Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [14] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue,* 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[14]   *See, e.g., Beers v. GMC,* 97-CV-0482, 1999 WL 325378, at \*——, 1999 U.S. Dist. LEXIS 12285, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at \*3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert

testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Constructive-Discharge and Hostile-Work-Environment Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law. *See, supra* Parts I.C.1 and 3. To those reasons, the Court adds the following analysis.

**[7]** **[8]** **[9]** **[10]** "To prove a hostile work environment claim, 'a plaintiff must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Johnson v. City of Troy*, 20-CV-1279, 2023 WL 2587945, at *5 (N.D.N.Y. Mar. 21, 2023) (D'Agostino, J.) (quoting *Legg v. Ulster Cnty.*, 979 F.3d 101, 114 (2d Cir. 2020)). "This showing has both objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also 'subjectively perceive that environment to be abusive.' " *Legg*, 979 F.3d at 114 (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)). "The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective ... of a reasonable person in the plaintiff's position, considering all the circumstances [including the social context in which particular behavior occurs and is experienced by its target." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012). "Factors considered as part of the totality of the circumstances include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance.' " *Johnson*, 2023 WL 2587945, at *5 (quoting *Legg*, 979 F.3d at 114-15.)

**\*14** **[11]** **[12]** A plaintiff must also "demonstrate that the conduct occurred because of his protected status ... and also that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Johnson*, 2023 WL 2587945, at *5 (quoting *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020)). Although facially neutral incidents can be considered as part

of the totality of the circumstances, there must be "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

**[13]** As to whether the conduct of Mr. Brim created a hostile work environment, Plaintiff asserts that she perceived the following conduct to be harassing: Mr. Brim subjected her work to extra scrutiny, demeaned and criticized her work, nitpicked small mistakes in her work, called her "unhinged," made sarcastic and snide remarks, yelled at her or spoke to her in an intimidating manner, accused her of harassing Mr. Shearer, asked co-workers about Plaintiff, and "consistently [told] her she was doing things wrong that she was not." (Dkt. No. 1, at ¶ 26; Dkt. No. 32, Attach. 5, at 130-31, 148-50.) She additionally testified at her deposition that she felt Mr. Brim subjected her to harassment and bullying through allowing Mr. Shearer to review her work by "not honoring something that was covering a situation where I had been hurt in the past," lied to her about the Mr. Shearer's involvement in reviewing her case, and disregarded her feelings and value as a reviewer. (Dkt. No. 32, Attach. 5, at 87-88, 105.) Plaintiff further testified that Mr. Sanders harassed her by being rude, rejecting her interim reasonable accommodations suggestions, and thwarting attempts to place her into an interim position that would not cause her stress. (*See generally,* Dkt. No. 32, Attach. 5, at 151-76.)

**[14]** However, rudeness and excessive criticism of a plaintiff or her work are not sufficient to establish a hostile work environment. *See Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (finding that allegations of supervisor making negative statements about plaintiff to others, being impatient and using harsh tones, physically distancing herself from plaintiff, declining to meet with plaintiff, requiring plaintiff to recreate work, replacing plaintiff at meetings, wrongfully reprimanding plaintiff, increasing plaintiff's schedule, and being sarcastic did not rise to the level of a hostile work environment); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (finding that allegations of wrongful exclusion from meetings, excessive criticism of her work, refusal to answer work-related questions, imposition of arbitrary duties, throwing books, and sending rude emails were insufficient to show a hostile work environment); *Kenny v. Catholic Charities Cmty. Servs. Archdiocese of New York*, 20-CV-3269, 2023 WL 1993332, at *21 (S.D.N.Y. Feb. 14, 2023) (noting that "a supervisor's rudeness to an employee does not equate to a hostile work environment under Title VII"). Although Plaintiff argues

that Mr. Brim's conduct caused her stress that impacted her ability to concentrate on or physically complete her work, even if a factfinder were to accept as true all of Plaintiff's assertions regarding this conduct, this conduct is simply not so objectively hostile or abusive to rise to the level of severity required to establish a hostile work environment.

**\*15** **[15]** Moreover, "[a] case of 'constructive discharge ... can be regarded as an aggravated case of ... hostile work environment.' " *Pistello v. Bd. of Educ. Of Canastota Cent. Sch. Dist.*, 808 F. App'x 19, 24 (2d Cir. 2020) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 146, 124 S.Ct. 2342, 159 L.Ed.2d 204 [2004]). Because Plaintiff has not shown the existence of conditions as a result of Mr. Brim's conduct that were pervasive or severe enough to constitute a hostile work environment, she has also failed to adduce evidence to support the higher burden on her constructive discharge claims. *See Pistello*, 808 F. App'x at 24 ("Because Pistello failed to show that the School District's actions were severe or pervasive enough to support a claim of retaliatory hostile work environment, she also has failed to show that her 'working conditions [were] so intolerable that a reasonable person would have felt compelled to resign.' "); *accord, Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

**[16]** That being said, Plaintiff's deposition testimony regarding the actions of Mr. Sanders during the interactive process suggests an alternative basis for finding the existence of a hostile work environment that requires examination. Specifically, Plaintiff provided the following testimony: (1) although there was a conference call about her reasonable accommodations request, Plaintiff did not consider it to be a good-faith interactive process; (2) during the conference call with the reasonable accommodations coordinator, Mr. Sanders, and the president of Plaintiff's union, Plaintiff made multiple "very reasonable" suggestions for interim accommodations, including reassignment to Classifications or EPCU or continuing in Mandatory Review with a union intermediary between her and Mr. Brim but Mr. Sanders "just kept saying that's not going to happen"; (3) at the end of the conference call on July 30, Mr. Sanders offered her an interim position to go to a field group, and although she accepted that, he immediately "took it back," only to reoffer the same position later at the second conference in mid-August, which she again accepted; (4) Mr. Sanders did not tell her where the position would be or with what group and she had not even formally accepted that position in writing when Mr. Brim told her to "turn over all [her] stuff" from Mandatory Review

and she did not like the manner in which that was done or the way in which she was being treated; (5) after one day in the field agent position, Mr. Sanders "took [her] out of that position"; (6) her former manager, Mr. Boyd, emailed her to inform her that, even before the interactive process had begun or a conference call had been held, Mr. Sanders had intended to make the "temporary" assignment as a field agent permanent, and that such reassignment was "all [she is] going to get"; (7) her new manager, Mr. Waters, also told her that the reassignment to the field group was permanent; and (8) she finalized her retirement after she was again placed back in the field agent position but was provided with assignments that required extensive travel. (Dkt. No. 32, Attach. 5, at 155-59, 164-77.) She acknowledges that the interim accommodation was to be for the six weeks before the FOH assessment was expected to be completed, and that she would have been able to apply for any vacancies for open positions if the FOH found she was entitled to reassignment, whether or not the field agent position had been made permanent. (*Id.* at 157-58, 173.) In her EEO investigative affidavit, Plaintiff further stated that Mr. Sanders "refused all of [her suggestions for interim accommodations] stating he did not have the authority to do them" and that he lied about an open position in Classifications being unavailable for her. (Dkt. No. 32, Attach. 8, at 11-12.)

**\*16** By contrast to Plaintiff's testimony, the deposition testimony of Mr. Sanders indicates the following: (1) he had no involvement in the decision to assign Plaintiff to Mr. Waters' group or in the work that she was assigned when she was transferred to that group; (2) Plaintiff accepted the field agent position when it was offered to her, but it was "pulled from her based upon the decision made by the [reasonable accommodations coordinator] until the FOH report was received" based on an email from Plaintiff, and she was placed back into Mandatory Review; (3) the assignment to the field group position was an interim one; (4) he did not look into an open position in Classifications because "I couldn't do anything of that nature. I would have to wait for the [reasonable accommodations coordinator] or the FOH report to come back before we could do something like that"; and (5) he was not the deciding official on her reasonable accommodation request. (Dkt. No. 32, Attach. 7, at 34-35, 40-41, 45-49.) Further, in the EEO affidavit of Ms. Minters, the reasonable accommodations coordinator, she stated that (1) the suggestion of moving Plaintiff to the field agent position as an interim accommodation was made by Mr. Sanders during a meeting on August 15, which was formally offered to Plaintiff on August 18, and which she accepted;

(2) Plaintiff informed Ms. Minters on that same day that she "felt her health maybe [sic] harmed with [the] interim accommodation, such that Ms. Minters and management agreed that it would be better to wait until the FOH report returned; and (3) by the time the FOH report was returned on September 25, Plaintiff had already put in her retirement for September 29. (Dkt. No. 32, Attach. 30, at 5-6.) Meeting notes from the July 31 conference call (as memorialized in an email to the participants) document that, during that initial call, Mr. Sanders stated that he could not move Plaintiff to Classifications or EPCU because "he has no control over" those groups and instead suggested a position as a revenue agent; at that time Ms. Minters indicated she wanted to request an FOH assessment. (Dkt. No. 32, Attach. 39, at 2-3.)

In an email dated August 1, 2018, the day after that call, Mr. Sanders emailed Ms. Minters requesting the minutes and stating that "[a]fter further consideration, I'm not in favor of placing Linda back in the field as a temporary or long-term solution based on her comments about not being able to drive long term and how the medicine impacts her driving." (Dkt. No. 32, Attach. 40, at 4-5.) However, after clarification from Plaintiff that she was not limited in her ability to drive short or long distances, on August 13, 2018, Mr. Sanders told Ms. Minters that he was "fine" with offering Plaintiff a "temporary accommodation as a Revenue Agent in the Northeast Area until further guidance is received from the FOH report." (Dkt. No. 32, Attach. 39, at 2; Dkt. No. 32, Attach. 40, at 2.) In an email dated August 17, 2018, Mr. Sanders stated that "[p]er our conversation on Wednesday, August 15, 2018, you've accepted the temporary interim accommodation to be reassigned to the Northeast Area as a field agent. You will be reporting to Mitchell Waters, Group 7609, with an effective date next Monday, August 20, 2018," to which Plaintiff responded, "Thank you Mike. Everything is in the mail!" (Dkt. No. 32, Attach. 41, at 2.) However, on that same date, Plaintiff sent multiple emails, including two to Mr. Waters, in one of which she stated, "I guess I will be filing my retirement papers .... It would be stupid to waste your time and the Services['] time and money to start a job that I will not stay in," and then had a phone call with Mr. Waters, in which he noted she reemphasized her plans to retire, but he told her he was looking forward to working with her and suggested they talk more the following week. (Dkt. No. 32, Attach. 45, at 2; Dkt. No. 32, Attach. 46, at 2.) In another email to Mr. Waters on August 18, 2018, Plaintiff stated that she had not formally agreed to the interim assignment at the time Mr. Sanders stated she had, that she had no idea if that position "is meant to be a permanent change or not," and that she has no desire

to be a field agent again, both because of her career goals and her health concerns. (Dkt. No. 32, Attach. 47, at 2-3.) Then, in light of emails she received from Plaintiff, Ms. Minters told Mr. Sanders on August 21, 2018, that she recommended that "the interim temporary accommodation to a Revenue Agent position may not be an effective accommodation and may need to be on hold or pull [sic] until the FOH report is returned." (Dkt. No. 32, Attach. 48, at 2.) On August 22, 2018, Mr. Sanders informed the relevant individuals that Plaintiff would be staying in her position as a Mandatory Reviewer and continue to report to Mr. Brim. (Dkt. No. 32, Attach. 49, at 2.) The same day, Plaintiff informed Mr. Brim, Mr. Sanders, and Ms. Minters that "I will be off for the next week on medical leave and then I am done." (Dkt. No. 32, Attach. 50, at 2.) On August 30, 2018, Defendant again offered an interim accommodation to Plaintiff as a field agent in Mr. Waters' group, which Plaintiff accepted with her signature on the same date. (Dkt. No. 32, Attach. 54, at 2.) Plaintiff submitted her retirement on September 12, 2018, with an effective date of September 29, 2018. (Dkt. No. 32, Attach. 55, at 3-4.)

**\*17** Although there certainly are issues of fact given the difference between Plaintiff's testimony and the other evidence regarding when certain events happened or who initiated them, the Court finds that such issues do not prevent the granting of this motion. Specifically, even if a factfinder were to accept that it was Mr. Sanders rather than Ms. Minters who made the choice to withdraw the temporary assignment in mid-August (or that he had intended such assignment to be permanent), the evidence does not support a finding that these actions rose to the level of a hostile work environment. Importantly, Mr. Sanders' refusal to accept Plaintiff's suggestions for various temporary accommodations did not change the terms or conditions of her employment; those circumstances instead remained entirely the same, and the Court has already found that the conditions of her Mandatory Review work do not amount to a hostile work environment.

Further, as to the first reassignment to Mr. Waters' group, although there appears to be some dispute as to whether Plaintiff formally accepted that reassignment (Plaintiff herself testified at her deposition that she did accept it contrary to her emails from the relevant time), it is undisputed that she was removed from that position after a day and returned to Mandatory Review based on her own communications with her union representative, Mr. Waters, and Ms. Minters in which she expressed apprehension about that position being good for her health. (*See e.g.*, Dkt. No. 32, Attach.

46; Dkt. No. 32, Attach. 47; Dkt. No. 32, Attach. 48; Dkt. No. 32, Attach. 53.) Removing her from that position in an effort to address her own stated concerns can hardly be considered to be abusive or offensive, especially as, again, the conduct to which she was being subjected in the Mandatory Review position does not rise to the level of a hostile work environment, as discussed above. However, she then accepted the same position again on August 30, 2018, choosing to be in that position rather than staying in Mandatory Review. (Dkt. No. 32, Attach. 54, at 2.) Plaintiff offers no evidence to support any speculation that Mr. Sanders had control over the work she was assigned in that field agent position (which undisputedly was in a different area under a different manager), and the other evidence instead clearly establishes that he did not. (Dkt. No. 32, Attach. 7, at 34-35.) These circumstances simply do not rise to the level of a hostile work environment, particularly because her assignment to the field agent position was, before the time the FOH report was completed, undisputedly temporary in nature (given that a favorable FOH determination would have entitled her to other options), whether Plaintiff believed it to be or not at the time.

[17] Moreover, and perhaps more importantly, notwithstanding any possible genuine dispute of material fact regarding the impact of Mr. Sanders' conduct, Plaintiff's claims for hostile work environment and constructive discharge fail because there has been no evidence produced to raise a genuine dispute of material fact as to whether the allegedly harassing conduct was in any way related to or motivated by either her gender or disability. As to Mr. Brim, Plaintiff testified multiple times that it appeared women in the group were treated worse than men, that "it was the women in our group that he was upsetting and picking on," and that he was simply more respectful and considerate of male employees, providing a few examples where Mr. Brim made female employees cry or overly stressed as a result of his conduct towards them. (Dkt. No. 32, Attach. 5, at 62-64, 69-83, 90-91.) However, she also testified that Mr. Brim had been "aggressive" to the whole group on their first call (a group that also included male employees), that there was a belief among the group that Mr. Brim's objective was to get rid of the Mandatory Review group altogether, that she did not know whether Mr. Brim had written similar comments on reviews of work by men but rather only that she did not believe he would, and that Mr. Brim had not made any overt misogynistic, sexist, or derogatory remarks regarding women, but that her perception of how women were treated made her believe that his conduct towards her was based on her gender. (Dkt. No. 32, Attach. 5, at 62-64, 69-83, 90-91, 114, 125.)

As to Mr. Sanders, Plaintiff testified at her deposition that she knew from others that Mr. Sanders "hasn't been nice to a lot of people," that he's "done a lot of things to people," that he has a reputation as a "bully," that he intimidated, yelled at, and made another female employee cry such that she filed a grievance against him and had to be moved from under his supervision, and that he threatened to withhold a future promotion from another female employee unless she refrained from doing something he did not want her to do. (Dkt. No. 32, Attach. 5, at 34-35, 40-42.)

**\*18**  **[18]**  As can be seen from the record evidence, Plaintiff's assertions of gender bias are based primarily on conduct that is entirely facially neutral, and she has offered nothing other than her own belief based on her own perception and a few anecdotes from four female coworkers that Mr. Brim and Mr. Sanders treated women worse than men. Yet Plaintiff also admits that Mr. Brim was aggressive with all members of the Mandatory Review group on one call and that she has no knowledge of what his review comments for the work of male employees was like. A subjective belief or feeling based merely on personal perception that conduct is rooted in a protected category is insufficient to sustain a hostile work environment claim. *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 120 (S.D.N.Y. Sept. 27, 2022) (noting that "it is well established that [a] plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination" and finding that the plaintiff offered nothing but conclusory assertions that race-neutral incidents somehow showed that those incidents occurred because of her protected characteristics) (internal quotation marks omitted) (collecting cases); *Joseph v. New York City Dep't of Corrs.*, 10-CV-1265, 2011 WL 1843162, at *8 (E.D.N.Y. May 13, 2011) ("Joseph's subjective feelings of discrimination, unattached from any inference that his employers discriminated against Haitians, does not make out a hostile work environment claim against Defendants."). Further, she offers nothing but speculation and conclusory assertions that continued harassment by Mr. Brim and Mr. Sanders was intended to cause her stress as a means of worsening her disabilities so that she would retire.

Because there is no material evidence to support Plaintiff's assertion that the relevant conduct was because of her gender and/or disability, no reasonable factfinder could conclude that she was subjected to a hostile work environment under either Title VII or the Rehabilitation Act, and therefore her claims related to both hostile work environment and constructive discharge must be dismissed. *See Buczakowski v. Crouse*

*Health Hosp., Inc.*, 18-CV-0330, 2019 WL 6330206, at \*8 (N.D.N.Y. Nov. 26, 2019) (Kahn, J.) (noting that, like a hostile work environment claim, a constructive discharge claim also requires a showing that the discharge occurred under circumstances giving rise to an inference of discrimination based on a protective characteristic); *accord, Shim-Larkin v. City of New York*, 16-CV-6099, 2023 WL 6519581, at \*12-13 (S.D.N.Y. Aug. 18, 2023).

For all of the alternative above-stated reasons, the Court grants summary judgment to Defendant on Plaintiff's First, Fourth, Fifth, and Sixth Claims that are premised on a hostile work environment and/or constructive discharge.

### B. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law, *see, supra* Parts I.C.1 and 3. To those, the Court adds the following reasons.

**[19]    [20]    [21]**  Plaintiff also asserts claims of retaliation under both Title VII and the Rehabilitation Act related to the same conduct by Mr. Brim (to the extent of his behavior towards her after she complained about his treatment and filed a grievance against him) and Mr. Sanders that forms the basis for her hostile-work-environment and constructive-discharge claims. To establish a prima facie case of retaliation under both Title VII and the Rehabilitation Act, a plaintiff must show that "(1) she was 'engaged in protected activity' under the law supporting her claim; (2) 'the employer was aware of that activity;' (3) the employee suffered a 'materially adverse action'; and (4) there was a 'causal connection between the protected activity and that adverse action.' " *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 543 (N.D.N.Y. 2021). An adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Sears-Barnett*, 531 F. Supp. 3d at 543 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014)). Requests for accommodations for a disability is considered a protected activity. *Sears-Barnett*, 531 F. Supp. 3d at 544.

**[22]    [23]**  "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Croons v. New York State Office of Mental Health*, 18 F. Supp. 3d 193, 208 (N.D.N.Y. 2014) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d

Cir. 2013)). "If the employer demonstrates a legitimate, nondiscriminatory reason, then 'the burden shifts ... back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.' " *Croons*, 18 F. Supp. 3d at 208 (quoting *Summa*, 708 F.3d at 125).

**\*19    [24]    [25]**  The Court agrees with Defendant that Plaintiff has not established that her harassment complaint against Mr. Brim and Mr. Sanders related to their conduct surrounding the review of her 30-day packet constitutes protected activity of which Defendant would have been aware, because there is no evidence to even raise a genuine dispute of material fact regarding whether such complaint was made with a reasonable belief that it was challenging conduct prohibited by Title VII or the Rehabilitation Act. *See Wright v. Martin, Harding and Mazzotti, LLP*, 22-CV-0515, 2022 WL 19795849, at \*4 (N.D.N.Y. July 19, 2022) (Lovric, M.J.) (noting that, to sustain a claim for retaliation, a plaintiff must show that "she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under [the relevant statutes]); *see also Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (finding challenges to demotion insufficient to substantiate protected activity because those challenges did not include anything to indicate the plaintiff was protesting the action as being based on discrimination). Plaintiff herself admits that she does not know whether Mr. Brim's review and conduct were based on her gender or disability; she has stated that she did not believe at the time she received the 30-day review from Mr. Brim that it was related to her gender (and indeed there were concerns among the Mandatory Review group at that time that Mr. Brim had been sent to get rid of all of the members of the group), that she cannot provide any evidence that she believed any conduct by Mr. Sanders was based on her protected characteristics, and that she only came to speculate regarding the basis of their conduct later. (Dkt. No. 32, Attach. 5, at 69-72, 114.) Indeed, her emails leading up to the filing of the harassment complaint discuss in great detail her feelings regarding Mr. Brim's decision to disregard the review arrangement she had with Mr. Boyd previously, but nothing in those emails even suggests that she believed any of the relevant conduct was related to her gender or disability; rather, she specifically states she believed it violated the IRS' policies regarding general workplace bullying and harassment, not Title VII or the Rehabilitation Act. (Dkt. No. 32, Attachs. 18, 20, 22, 25.) Nevertheless, Plaintiff's later request for accommodations related to her disability does constitute sufficient protected activity to sustain her claim pursuant to the Rehabilitation

Act because it is undisputed that such request was based on Plaintiff's reasonable belief that she was asserting a need for accommodations for her medical conditions that was protected by law.

**[26]** Defendant argues also that Plaintiff has not established that she suffered any legally sufficient adverse employment action because the allegedly harassing conduct did not change the terms or conditions of her employment, even if they caused her stress, for the same reasons her hostile work environment and constructive discharge claims are insufficient. (Dkt. No. 32, Attach. 1, at 19-20.) This argument is persuasive as to Mr. Brim's conduct, no portion of which materially altered the conditions of her employment. *See Ziyan Shi v. New York Dep't of State, Division of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (finding an increase in workload that was not heavily disproportionate to similarly situated employes, the issuance of a counseling memorandum without any other adverse consequence, yelling and screaming at plaintiff, and failing to include him on an email all did not constitute adverse actions).

**[27]** **[28]** It is also persuasive as to Mr. Sanders' conduct throughout the interactive review process, namely denying her requests to be moved to Classifications or EPCU (or other suggestions that would have made her time in mandatory review more tolerable) as an interim accommodation and instead having the only reassignment option offered be a field agent position in Mr. Waters' group, and rescinding that accommodation in mid-August before offering it again in late August. Although Plaintiff testified that she believes that it was Mr. Sanders who rescinded the offer of that position after the first time she accepted in in mid-August in an effort to harass and retaliate against her, the other evidence substantiates that it was Ms. Minters in her capacity as the reasonable accommodations coordinator that recommended that Plaintiff be removed from the field agent reassignment as a result of Plaintiff's own emails expressing her dissatisfaction and concerns about her ability to perform such position in light of her medical impairments. (Dkt. No. 32, Attach. 48, at 2.) Plaintiff's unsubstantiated belief that not only was Mr. Sanders solely responsible for that decision but also that he did so to harass her is insufficient to create a genuine dispute of material fact. Further, regarding the second reassignment to that position at the end of August 2018, although the reassignment did materially alter the terms and conditions of her employment in that she was being made to do different duties (some of which, like the expected travel to locations across the country to conduct case audits) could

be considered to be significantly disadvantageous to Plaintiff, it is undisputed that Plaintiff was not required to accept that reassignment as an interim accommodation, and was indeed counseled by her union representative that she did not need to accept that if she did not want it. (Dkt. No. 32, Attach. 45, at 2.) Although it is true that "[a] plaintiff who voluntarily transfers is not precluded from establishing a prima facie case of retaliation ... she may face a higher bar in doing so," and must show that the transfer amounted to a constructive discharge. *Mulligan v. Town of Hempstead*, 21-CV-0964, 2024 WL 84829, at *8 (E.D.N.Y. Jan. 8, 2024) (citing *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 444 (2d Cir. 1999); *Chanval Pellier v. British Airways, Plc.*, 02-CV-4195, 2006 WL 132073, at *5 (E.D.N.Y. Jan. 17, 2006); *Davis v. New York State Dep't of Corrs., Attica Corr. Facility*, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014)). Because the Court has already found that the conditions of her work surrounding both Mandatory Review and the field agent position do not rise to the level of a hostile work environment or a constructive discharge, Plaintiff has not shown that the temporary reassignment, which she voluntarily accepted rather than remaining in Mandatory Review while the FOH assessment was ongoing, was an adverse action.

**\*20** For the above reasons, the Court grants summary judgment to Defendant on Plaintiff's Second and Third Claims.

## C. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Failure-to-Accommodate Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. *See, supra* Parts I.C.1 and 3. To those reasons, the Court adds the following analysis.

**[29]** **[30]** Failure-to-accommodate claims brought under the Rehabilitation Act are subject to the same definition of an "individual with a disability" and same prima facie standard as claims brought under the Americans with Disabilities Act ("ADA"). *Tull v. New York City Housing Auth.*, 722 F. App'x 75, 77 (2d Cir. 2018) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 53 (2d Cir. 2002)). To state a prima facie case for failure to accommodate, a plaintiff must show that (1) she is a person with a disability under the meaning of the Rehabilitation Act, (2) her employer was both covered by that statute and had notice of her disability, (3) she could perform the essential functions of the job at issue with reasonable accommodation, and (4) her

employer has refused to make such accommodations. *Bey v. City of New York*, 999 F.3d 157, 165 (2d Cir. 2021) (quoting *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015)).

Defendant argues that Plaintiff cannot establish the requirements of this claim because (1) the undisputed evidence fails to show that she had a disability as defined under the Rehabilitation Act, (2) her request for a new supervisor was not a reasonable accommodation, and (3) Defendant did not actually deny her request for accommodation given that Plaintiff chose to retire before the completion of the interactive process. (Dkt. No. 32, Attach. 1.)

[31]   As to whether Plaintiff has a qualifying disability for the purposes of her asserted claim, the Second Circuit recently reiterated that, under the ADA, a condition that is alleged to substantially limit the major life activity,[15] which in this case is most properly that of working, must do more than leave the plaintiff "unable to perform only a single, specific job" or *work under a specific supervisor*, but rather must instead "affect[ ] the ability to 'perform a class ... or broad range of jobs.' " *Woolf v. Strada*, 949 F.3d 89, 93-95 (2d Cir. 2020) (quoting 29 C.F.R. § 1630) (emphasis added). Although this case was decided related to the ADA, as was discussed above, the standards regarding who qualifies as an individual with a disability is the same under the ADA and under the Rehabilitation Act. *See Freeman v. Kirisits*, 818 F. App'x 34, 40 (2d Cir. 2020) (noting that the Rehabilitation Act defines the term "individual with a disability" by reference to the ADA, and applying the holding of *Woolf* to a claim under the Rehabilitation Act as to his ability to work); *accord Thomas v. New York State Off. for People With Developmental Disabilities*, 21-CV-6577, 2024 WL 641266, at *4-5 (W.D.N.Y. Feb. 15, 2024).

[15]   The relevant statute defines "major life activities" as activities such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). A major life activity can also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and

reproductive functions." 42 U.S.C. § 12102(2)(B). The only of these listed activities that appears implicated in this case (other than working) is the function of Plaintiff's immune system, as her medical impairments are autoimmune disorders that are exacerbated by stress. (Dkt. No. 1, at ¶ 39.) However, consideration of that major life activity would not constitute a disability under the circumstances for the same reasons that will be discussed below related to the major life activity of work, namely because (a) the accommodation was sought only in the context of enabling her to perform her job without an undue exacerbation of her symptoms, and (b) it was the stress caused by her specific supervisor that caused the symptoms of her medical impairments to manifest; she admits that she did not experience symptoms of immune-system impairment at a level that required any accommodations in the performance of her work other than when she was subjected to the stress of being supervised by Mr. Brim. (Dkt. No. 32, Attach. 56, at 4.)

**\*21**   [32]   Here, Plaintiff was seeking to be accommodated related to her alleged inability to perform her position as a Senior Mandatory Reviewer as a result of the stress (which exacerbated her underlying medical conditions) caused by Mr. Brim's actions as her supervisor. She does not provide any evidence showing that the work she was performing caused her symptoms or difficulties, only Mr. Brim's actions; in fact, she admits that she did not experience significant, work-impacting difficulties that required accommodation under her previous supervisor, but rather that the need for accommodation arose when Mr. Brim became her supervisor and reviewed her assignment with the assistance of Mr. Shearer, thus starting the alleged harassment. (Dkt. No. 32, Attach. 56, at 4.) She also has stated that she could perform that same work if she was permitted to do it in another department under a different supervisor, or that she would be capable of performing a similar type of claim-review work for other departments. Because Plaintiff was able to perform her job as a Senior Mandatory Reviewer despite her medical conditions, and it was only having to work with Mr. Brim as a supervisor that rendered her unable to perform the demands of that job, Plaintiff cannot show that she is an "individual with a disability" based on the principle in *Woolf*. *See Freeman*, 818 F. App'x at 40 (finding the plaintiff had not sufficiently alleged he was substantially limited in the major life activity of work because his allegations of being disabled applied to work only in the E1 unit due to the "loud and noisy atmosphere" of that

unit); *Thomas*, 2024 WL 641266, at *5 (finding the plaintiff did not have a disability under the Rehabilitation Act for a failure-to-accommodate claim because her PTSD symptoms limited her from working only specifically at one group home, but nowhere else).

 [33]  [34]  Moreover, as to whether Plaintiff was denied an accommodation, the Court notes that it is undisputed that Defendant began the interactive process and held multiple conferences with Plaintiff regarding potential interim accommodations while it was waiting for the FOH assessment to be completed. That Plaintiff was offered and accepted an interim accommodation that was other than the ones she requested does not transform Defendant's actions into a denial of accommodations altogether, particularly because such interim accommodation was intended only to be a stop-gap until the FOH assessment was completed, and was not a final decision on Plaintiff's accommodation request. It is undisputed that, dissatisfied with the interim accommodation offered and with Defendant's actions, Plaintiff announced her intent to retire from employment with Defendant before the FOH assessment was completed. "[A]n employee who withdraws from the interactive process cannot later allege failure to accommodate." *Noel v. BNY-Mellon Corp.*, 10-CV-9143, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011); *see also Maira v. Sti-Co Indus., Inc.*, 20-CV-0447, 2021 WL 1229598, at *8 (W.D.N.Y. Feb. 24, 2021), adopted by 2021 WL 1226431 (W.D.N.Y. Mar. 31, 2021) ("An employee who is responsible for the breakdown in the interactive process may not later assert a claim for a failure to accommodate."); *Durick v. New York City Dep't of Educ.*, 202 F. Supp. 3d 277, 290 (E.D.N.Y. 2016) (noting that "Plaintiff cannot unreasonably discontinue a process through which she could have been accommodated and then use the abandoned request as the basis for a failure to accommodate claim" in a situation where, during the interactive process, the plaintiff "abandoned [her] request by failing to attend the medical examination [which was part of the interactive process] and instead choosing to retire two days later").

To the extent that Plaintiff argues that it was Defendant who first acted in bad faith and broke the interactive process, this argument fails for two reasons. First, Plaintiff's characterization of the attempts to be moved to another position within the IRS as being an attempt to frustrate the interactive process is not consistent with the undisputed record, which, as was discussed extensively above related to Plaintiff's hostile-work-environment claims, shows that, not only did Plaintiff accept the offered interim accommodation

of reassignment of a field agent position (despite being informed by her union representative that she was not required to accept it), but Defendant continued to work with her by removing her from that reassignment after she expressed health concerns related to the reassignment to multiple individuals, and then again offered her that reassignment when she later reasserted a need to not be in Mandatory Review pending the outcome of the FOH assessment, an offer which Plaintiff again accepted. That Defendant did not provide Plaintiff with one of the specific interim accommodations she requested while waiting for the FOH assessment does not render its attempts to accommodate her disability bad faith. Second, even if there was anything disingenuous in providing Plaintiff with a temporary transfer to a field agent position rather than one of her requested interim accommodations, that temporary transfer was not the end of the interactive process. Rather, the matter was referred for an FOH assessment to determine whether and/or what accommodations were warranted under the circumstances. It was Plaintiff who chose to submit her retirement paperwork and inform Defendant that she was retiring at the end of September 2018 before the FOH assessment was completed based on her belief that the reassignment would be permanent, despite the fact that she also admitted at her deposition that a favorable FOH determination would have entitled her to apply for other open positions. Given that there is no evidence to substantiate a finding that the external FOH assessment was somehow biased, unfair, or predetermined, Plaintiff's choice to submit her retirement paperwork before the completion of the interactive process and any actual denial of her request for accommodation represents a withdrawal from the interactive process and renders her failure to accommodate claim invalid. [16]

[16]   This is the case even though the FOH assessment ultimately concluded that the difficulties Plaintiff experienced with Mr. Brim were a personnel matter rather than a disability matter. There is no evidence to suggest that the outcome of that assessment was predetermined, or that Plaintiff had any reason to believe that the FOH assessment would find as it did such that she would have reasonably believed that continuing with the process would have been futile. Nor does the fact that the FOH assessment results were provided a few days before her retirement actually became effective alter the Court's conclusion, because Plaintiff had made clear to various management personnel and the members of the Mandatory Review team at

various times throughout August and September 2018 that she was not intending to continue working for Defendant due to her dissatisfaction with the interim accommodations, and the official retirement process had begun by September 12, 2018, approximately two weeks before the results of the FOH assessment. (Dkt. No. 32, Attachs. 45, 46, 47, 50, 51, 55.)

**\*22** For all of these reasons, the Court grants summary judgment to Defendant on Plaintiff's Seventh Claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 32) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

--- F.Supp.3d ----, 2024 WL 1329033

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1424169
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Teofilo COLON, Plaintiff,

v.

CITY OF NEW YORK, Department of Correction
Commissioner Martin F. Horn, Prison Health Services,
Inc., Michael Catalano, C.E.O. of Prison Health Services,
Inc., Dohmh Medical Director Trevor Parks, Dohmh
Program Director Rebecca Pinney, Dohmh Deputy
Commissioner Louise Cohen, Dr. Jean Richard, Bellevue
Hospital Center, Dr. Diah Douglas, Dr. Sheel Sharma,
Dr. Steven Lee, Dr. Michael Hall, "John Doe" Medical
Providers Prison Health Services, "John Doe" Medical
Providers Bellevue Hospital Center, Defendants.

No. 08 Civ. 3142(HB).
|
May 21, 2009.

West KeySummary

1    **Constitutional Law** 🔑 Medical Treatment
     **Prisons** 🔑 Health and Medical Care

    A pretrial detainee's thumb fracture was not
    sufficiently serious to form the predicate for
    a claim of deliberate indifference to serious
    medical need under the Due Process Clause
    of the Fourteenth Amendment. Although the
    detainee complained of some pain, swelling,
    discomfort, and reduced range of motion in
    his thumb following his injury during an
    altercation with another inmate, his complaints
    were not sufficiently severe to produce death,
    degeneration, or extreme pain. About one month
    after his injury, medical records noted that the
    detainee reported no pain issues at all. Two
    months later, a physician observed that there was
    no tenderness to palpation or instability at the
    thumb, there was no nerve damage in the thumb,
    and there was no motion in the fracture when
    pressure was applied. U.S.C.A. Const.Amend.
    14.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

**\*1** This action arises out of allegations that Plaintiff Teofilo
Colon ("Plaintiff" or "Colon") suffered an injury to his left
thumb while he was a pretrial detainee at Rikers Island, and
that he received improper medical care in response to that
injury. Specifically, Colon brought this action alleging (1)
deliberate indifference to serious medical needs in violation
of the United States Constitution, pursuant to 42 U.S.C.
§ 1983;[1] (2) medical malpractice; (3) constitutional tort
in violation of §§ 5, 6 and 12 of the New York State
Constitution; (4) negligence; and (5) negligent hiring as to
the City of New York ("City") and Prison Health Services,
Inc. ("PHS") and its medical staff. Defendants[2] move for
summary judgment on each of Plaintiff's claims. For the
reasons set forth below, Defendants' motion for summary
judgment on Colon's deliberate indifference claim is granted,
and the remaining state law claims are dismissed without
prejudice for lack of supplemental jurisdiction.

1    In his First Amended Complaint, Colon's deliberate
     indifference claim is stated in two independent
     causes of action—one for violation of 42 U.S.C.
     § 1983 (First Cause of Action), and another for
     deliberate indifference to serious medical need
     (Second Cause of Action). These are, in substance,
     one cause of action for alleged violation of Colon's
     constitutional rights.

2    The Defendants in this matter may be roughly
     categorized into two groups. First, Colon has
     sued individuals and entities who allegedly were
     involved, in a direct or supervisory position,
     in his treatment at Rikers Island Correctional
     Facility ("Rikers"). These Defendants are the
     City, Commissioner Horn, Michael Catalano,
     Trevor Parks, Rebecca Pinney, Louise Cohen,
     Jean Richard and various "John Doe" medical
     providers of PHS. Colon also named defendants
     who were involved in his treatment at the New York
     Health and Hospitals Corporation ("NYCHHC"),
     sued here as "Bellevue Hospital Center." These

2009 WL 1424169

Defendants are NYCHHC, Dr. Diah Douglas, Dr. Sheel Sharma, Dr. Steven Lee, Dr. Michael Hall, and several "John Doe" medical providers. These groups of defendants will be hereinafter referred to as the "City Defendants" and the "Bellevue Defendants," respectively.

## I. FACTUAL BACKGROUND [3]

3    The facts of this case are largely undisputed. Unless otherwise noted, this Factual Background is based on Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 and Responses to Defendants' Statements ("Rule 56.1 Statement"). To the extent Plaintiff argues that the Bellevue Defendants' motion for summary judgment should be denied as procedurally deficient for failure to submit its own Rule 56.1 Statement, the Court notes that the Bellevue Defendants did submit a statement of material facts on which their motion is based, in numbered paragraphs with citations to the record, as required under Local Rule 56.1. To deny their motion out of hand because this statement of facts was submitted in the form of an affidavit rather than a Rule 56.1 Statement would honor form over substance. "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir.2001). While the affidavit submitted in support of the Bellevue Defendants' motion did not comply with the letter of Rule 56.1, it certainly did serve this salutary purpose. Moreover, Plaintiff has alleged no prejudice as a result of the failure to submit a Rule 56.1 Statement. Accordingly, I decline Plaintiff's invitation to dispose of the Bellevue Defendants' motion on this procedural defect. *See, e.g., Photopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 n. 2 (2d Cir.2003) (noting that failure to comply with Rule 56.1 was excused because relevant facts were apparent from parties' submissions and no evidence of prejudice from the defect was shown); *Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 333 (E.D.N.Y.2006) (concluding plaintiff was not prejudiced, despite defendant's failure to submit a Local Rule 56.1 Statement, where the "relevant facts were readily apparent from the facts section of the memorandum of law").

Colon was incarcerated as a pretrial detainee in the custody of the New York City Department of Correction at Rikers from September 12, 2006 to October 15, 2007. Throughout his confinement at Rikers, Colon was provided medical and mental health treatment through the New York City Department of Health and Mental Hygiene ("DOHMH"), Division of Health Care Access and Improvement, Correctional Health Services ("CHS"). In 2007, PHS held the contract to provide administrative and managerial support for the contract under which medical services were provided to inmates at all New York City jails except for the Vernon C. Bain Center. The medical services at Rikers are provided under a contract with Prison Health Services Medical Services, P.C. (the "P.C."). For an inmate to receive specialized medical treatment not available at Rikers, such as Colon required, he must be sent to Bellevue Hospital for either admission or treatment at a specialty outpatient clinic.

Colon's claims all arise from allegedly improper medical treatment he received at Rikers and/or Bellevue Hospital after he injured his left thumb on February 19, 2007 during an altercation with another inmate. The incident occurred at approximately 9:40 p.m. on February 19; within hours, at approximately 1:10 a.m. on February 20, 2007, Plaintiff was seen at the AMKC Clinic by a nurse, who applied a cold compress to Plaintiff's thumb and referred him to a physician or physician's assistant for further evaluation. Plaintiff was seen by a physician's assistant at approximately 4:40 a.m. on February 20. The physician's assistant observed swelling and redness at the metacarpophalangeal joint on Plaintiff's left thumb and ordered a stat left hand x-ray and Motrin, and referred Plaintiff to Urgicare. The Urgicare physician asked Plaintiff questions about his injury; the doctor's notes indicate that Plaintiff described a history of injuries to his left hand "years ago." The physician observed swelling, redness and tenderness in Plaintiff's left hand, but with no deformity. Upon review of Plaintiff's x-ray, the physician described his injury as a "thumb base fracture." The report of the x-ray further indicated that Plaintiff had a "dorsally displaced transverse fracture of the base of the 1st metacarpal," and that the fracture was not dislocated. The physician applied a thumb spica splint to the injury and made an appointment for Plaintiff to see a hand specialist at the Bellevue Hand Clinic ("BHC"). By two days later, on February 22, Plaintiff had

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 75 of 140
Colon v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 1424169

been scheduled for two separate appointments at the BHC, one on February 27 and one on March 6.

**\*2** Colon was transported from Rikers and appeared for his appointment at Bellevue on February 27 and his left thumb was x-rayed by Bellevue technicians. A BHC radiologist interpreted the x-ray as reflecting a "Rolando fracture" of the base of the left first metacarpal. At his March 6 appointment, Colon's thumb spica splint was changed, and he was scheduled to undergo hand surgery at the Bellevue Hand Service. The surgery would consist of a closed reduction percutaneous pinning ("CRPP") or open reduction internal fixation ("ORIF") of the left thumb. Plaintiff reported no pain issues during his March 6 appointment. The surgery was initially scheduled for March 13, 2007 and was to be performed by Defendant Sheel Sharma, M.D. ("Dr.Sharma"). The surgery ultimately was not performed on the scheduled day due to an emergency requiring the Bellevue Hand Surgery Service. After having been admitted to the hospital in preparation for the surgery, Colon remained at Bellevue until March 16, 2007. His medical chart indicates that he declined to remain at the BHC after the surgery could not be performed on either March 15 or March 16. When Plaintiff was discharged on March 16, his surgery was rescheduled to take place on March 22, 2007 and was to be performed by Defendant Steven K. Lee, M.D. ("Dr.Lee"). Dr. Sharma testified at his deposition that Plaintiff had a window of approximately six weeks for surgery before the fracture would heal.

Plaintiff was admitted once again to Bellevue on March 21, 2007 in preparation for his surgery scheduled for the next day; however, the surgery did not take place as scheduled because the fluoroscope—a radiological imaging machine used for visualizing bones during the procedure—had malfunctioned and required service. Plaintiff alleges that the fluoroscope had been malfunctioning for approximately a year and that it was in obvious need of repair or replacement. The fluoroscope was repaired on March 22, 2007. Plaintiff was discharged from the BHC on March 23, 2007. No specific date was set for the surgery to take place, but his Discharge Instruction Sheet indicated that he was to return to the BHC in two weeks.

Pursuant to this instruction, Plaintiff was scheduled for appointments at the BHC for April 3 and April 10, but these appointments were cancelled. It is unclear from the record why the April 3 appointment was cancelled; the April 10 appointment was cancelled because Rikers clinicians were informed the BHC was closed on that day. Attempts were

made in the interim to reschedule Plaintiff's appointment, and the appointment ultimately was scheduled for April 17, 2007. In the meantime, on April 12, 2007, non-party Dale Wilker, Esq. of the Prisoners' Rights Project emailed a complaint on Plaintiff's behalf stating that Plaintiff complained that "PHS has not sent him back [to the BHC] for surgery which is overdue." Upon receiving Mr. Wilker's email, Defendant Trevor Parks, M.D. ("Dr.Parks") immediately alerted Defendant Jean Richard ("Dr.Richard") so that Dr. Richard could investigate.[4] Dr. Richard then arranged for Plaintiff to be seen in the AMKC Clinic. Plaintiff was seen that same day by non-party Dr. Sein Than, who examined Plaintiff and wrote a consultation request for follow-up at the BHC. The appointment at the BHC was scheduled for May 1, 2007. As a result, Plaintiff had two scheduled appointments at the BHC, one for April 17 and one for May 1.

| 4 | Dr. Parks is the President and Medical Director of the P.C. and is responsible for employing physicians and generally supervising the medical care provided to inmates at Rikers. Dr. Parks' job description does not include the direct provision of medical treatment to inmates, and he did not personally provide Plaintiff with any medical treatment. Dr. Richard is the Site Medical Director of the AMKC Clinic, in which role he supervises physicians who provide direct care to inmates. Dr. Richard does not generally have any direct contact with patients. |

**\*3** On April 17, Plaintiff attended his appointment at the BHC and was seen by Defendant Michael Hall, M.D. ("Dr.Hall"), who examined Plaintiff's thumb under a fluoroscope after removing the thumb spica splint. Dr. Hall observed that there was no tenderness to palpation or instability at the thumb, and it was neurovascularly intact. There was also no motion of the fracture when pressure was applied. Plaintiff was instructed to perform range of motion exercises and another thumb spica splint was applied. The note written at or after the examination indicated that Plaintiff "will call back, no appt for now." Dr. Hall testified that his examination of Plaintiff's thumb on April 17 indicated that the fracture had healed on its own. Thus, no additional appointment or surgery was scheduled.

On May 29, 2007, Plaintiff requested follow-up at the BHC because of pain in his left thumb. He was seen at Rikers by non-party Dr. Nason on June 8, 2007, and she wrote him a consultation request to be seen at the BHC. The BHC

appointment was scheduled for June 26, 2007. On June 22, 2007, in preparation for his June 26 appointment, Plaintiff's left thumb was x-rayed at the BHC. The x-ray showed a healed fracture and preserved joint spaces. On June 25, apparently unaware that Plaintiff had a BHC appointment scheduled for the next day, Mr. Wilker sent another email on Plaintiff's behalf inquiring why Plaintiff still had not undergone surgery. Mr. Wilker's email assumed that Plaintiff's thumb had not been properly reset and casted, but as noted, Plaintiff's April 17 examination at the BHC revealed that the fracture was aligned.

The next day, on June 26, Plaintiff appeared as scheduled for his BHC appointment and was examined by Dr. Lee, whose notes indicated that Plaintiff had lost the normal contour in his thumb knuckle joint (or MCP), but Plaintiff felt no pain in the joint. As Dr. Lee testified at his deposition, the MCP is not the area that Plaintiff injured in February 2007; rather, Plaintiff had injured the base of his left thumb, where Dr. Lee's note indicated a lack of abnormality as of June 26. Dr. Lee scheduled a follow-up appointment within two weeks, on July 10, to discuss Plaintiff's surgical options and treatment plan. Dr. Lee testified that his review of the June 22, 2007 x-ray indicated that there was no need for immediate action for treatment of Plaintiff's left thumb. In the interim before his July 10 appointment at the BHC, Plaintiff was again seen by Dr. Nason on Rikers on July 6, 2007.

When Plaintiff returned to the BHC on July 10, the examining doctor again observed a loss of contour of the left thumb knuckle, and noted that Plaintiff continued to experience some loss of mobility and pain along the dorsal surface of his thumb. The doctor's notes indicate that Plaintiff was instructed to return in two weeks for possible surgery to fuse the joint, but that it was also explained to Plaintiff that the surgery could decrease his range of motion. Plaintiff returned to the BHC on July 16 and was seen by Dr. Lee, who ordered a CT scan to assess whether the February 2007 fracture had an articular component that required operative management. The CT scan was performed on July 20 and indicated that plaintiff had a "healed impacted fracture of the proximal metaphysis of the first metacarpal with slight lateral subluxation at the first carpometacarpal joint with no evidence of nonunion or complication." As to the loss of MCP, the CT scan revealed "degenerative changes in the MCP joint evidenced by subchondral cysts and sclerosis" and for the first time, the joint appeared to be "medially subluxed (or shifted out of position)." An MRI was recommended to assess for radial collateral ligament injury. On July 31, 2007, at the

BHC, Plaintiff was offered an MRI to evaluate whether he had injury to his ligaments as a result of the knuckle having shifted out of place, but Plaintiff refused the MRI and instead agreed to return to the BHC on an as-needed basis to manage any pain. Plaintiff never requested any follow-up at the BHC after July 31, 2007.

**\*4** On October 15, 2007, Plaintiff was discharged from Rikers into the custody of the New York State Department of Correctional Services ("DOCS"). He complained of pain in his left thumb for the first time while in DOCS custody on May 13, 2008, over nine months after his last appointment at the BHC. He underwent an x-ray on June 24, 2008, which indicated a healed fracture at the base of his left thumb, and mild degenerative change at the IP joint of the thumb. The x-ray report indicated that "no action is required at this time." The DOCS chart does not reflect that any medical personnel advised Plaintiff that his February 2007 injury had healed with arthritis. At his deposition on December 5, 2008, Plaintiff demonstrated that the site of pain was the knuckle of his left thumb.

The City Defendants, the Bellevue Defendants and Plaintiff all retained separate experts in this matter to assess the extent of Colon's injuries and to assess the care he received at Rikers and the BHC. The City Defendants' expert, hand surgeon Dr. Steven Green, examined Colon on December 9, 2008. When asked to describe his symptoms, Colon told Dr. Green that he had spasms in the thumb/index finger web space when wringing out clothes; a weak pinch; difficulty rolling cigarette paper; difficulty squeezing a tube of toothpaste; was unable to do pushups and had difficulty lifting weights; experienced pain when using a baseball glove or bat; had difficulty palming a basketball, opening a jar or holding a large bottle or cup; pain when playing cards or dominoes; pain while holding a book and difficulty when trying to use a mop. From his examination and review of Colon's x-rays, Dr. Green concluded that Colon did sustain an extra-articular fracture of the base of the left thumb, but this fracture was not a Rolando fracture because it did not disrupt the articular surface of the joint. The fracture was observed to have healed with some dorsal angulation, which resulted in stiffness of the MCP joint. Dr. Green concluded that Plaintiff's functional complaints are related to a lack of mobility in the MCP joint, and not related to the fracture at the base of the thumb. The Bellevue Defendants' expert, board-certified plastic surgeon Dr. Michael Fiorillo, did not examine Colon's injuries personally, but he reviewed the various documents in connection with this matter, including medical charts

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 77 of 140
Colon v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 1424169

and radiological films from both Rikers and the BHC. Dr. Fiorillo's report concludes that, within a reasonable degree of medical certainty, the management of Colon's left thumb fracture was at all times within good and acceptable medical and surgical practice, and that there was no unreasonable delay or denial of access to medical care with respect to Colon's injury. Plaintiff's own expert, orthopedic surgeon John J. Leppard III, characterized the surgery that had originally been scheduled for Colon, but which he never received, as "elective," and acknowledges that the fracture ultimately healed spontaneously without reduction. Upon examination of Colon's thumb on April 1, 2009, Dr. Leppard observed what he described as a "cosmetic" deformity of the left thumb, and evidence of difficulty firmly grasping wide objects, moderate tenderness to firm palpation, occasional cramping at the base of the thumb and a loss of some degree of motion, but no numbness or problems with the rest of Colon's fingers. Dr. Leppard observed that Colon completed the exam without complaint or pain. From this exam, Dr. Leppard concluded that Colon had a healed mal-union of a proximal left thumb fracture with residual flexion deformity, and resultant loss of balance, strength and stability of soft tissue. He opined that future surgery "may be offered based on the degree of complaints and the patient's desires in the future."

## II. LEGAL STANDARD

**\*5** A motion for summary judgment must be granted if the moving party shows that "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.,* 375 F.3d 196, 200 (2d Cir.2004). Rather, he "must come forward with evidence sufficient to allow a reasonable jury to find in [his] favor." *Brown v. Henderson,*

257 F.3d 246, 252 (2d Cir.2001); *see also* *Fed.R.Civ.P. 56(e)* ("When a motion for summary judgment is made and supported as provided in [the] rule, ... the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial."). The facts must be presented in a form that would be admissible at trial. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

## III. DISCUSSION

### A. *Deliberate Indifference to Serious Medical Need*
Colon claims that the City Defendants and the Bellevue Defendants were deliberately indifferent to his serious medical needs in failing to provide adequate treatment for his fractured thumb. Reduced to its essentials, Colon's contention that he suffered a constitutional violation is premised on his never having received surgery on his thumb, which he contends caused him disfigurement, lack of mobility and pain. To succeed in an action brought under § 1983, Colon must show that there has been a denial of a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 687 U.S. 42, 48 (1988). Thus, section 1983 "is not itself a source of substantive rights. It merely provides 'a method for vindicating federal rights elsewhere conferred,' " such as in the U.S. Constitution. *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

Because Colon was a pretrial detainee at the time he was injured, his claim for deliberate indifference is properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Bryant v. Mafucci,* 923 F.2d 979, 983 (2d Cir.1991). The standard to be applied is identical to the deliberate indifference standard for prisoners under the Eighth Amendment's prohibition against cruel and unusual punishment. *See, e.g., City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit "often applie[s] the Eighth Amendment deliberate indifference test to pretrial detainees bringing action under the Due Process Clause of the Fourteenth Amendment"). In *Estelle v. Gamble,* 239 U.S. 97, 101 (1976), the Supreme Court held that

"deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." To prove deliberate indifference to serious medical needs, a plaintiff must prove two elements, one objective, the other subjective: (1) that the alleged deprivation is, objectively, "sufficiently serious"; and (2) that the official in question had a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). That is, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' " *Cain v. Jackson,* 05 Civ. 3914(LAP)(MHD), 2007 U.S. Dist. LEXIS 55090, 2007 WL 2193997 (S.D.N.Y. July 27, 2007) (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

### 1. Objective Prong

**\*6** Under the objective prong of the deliberate-indifference analysis, Colon must show that his medical condition was "sufficiently serious." *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (finding a deprivation is sufficiently serious when it presents a "condition of urgency, one that may produce death, degeneration, or extreme pain"); *see also Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (sufficiently serious deprivation is one that denies "the minimal civilized measure of life's necessities"). As the Second Circuit has recognized, "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003). However, numerous cases have set forth an illustrative list of factors that guide the analysis, including (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment," (2) whether the medical condition significantly affects daily activities, and (3) whether the plaintiff suffers from "the existence of chronic and substantial pain." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted); *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2000) ("[A] serious medical need exists where the failure to treat a prisoner's injury could result in further significant injury or the unnecessary and wanton infliction of pain.") (internal quotation marks omitted). "Trivial or insignificant conditions do not fall within the scope of [constitutional] protection. Rather, the Eighth Amendment 'contemplates a condition of urgency that may result in degeneration or extreme pain.' " *Wright v. New York State Dep't of Corr. Servs.,* 06 Civ. 03400(RJS)(THK), 2008 U.S. Dist. LEXIS 106507, at \*44 (S.D.N.Y. Oct. 14, 2008),

*adopted by,* 2008 U.S. Dist. LEXIS 96647 (S.D.N.Y. Nov. 24, 2008) (quoting *Chance,* 143 F.3d at 702); *see also Evering v. Reilly,* No. 98 Civ. 6718, 2001 WL 1150318, at \*9 (S.D.N.Y. Sept.28, 2001) ("It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need."). Yet, an inmate is not required to demonstrate that he "experiences pain that is at the limit of human ability to bear, nor ... that his or her condition will degenerate into a life-threatening one." *Brock,* 315 F.3d at 163.

Courts in this Circuit, as well as in other jurisdictions, consistently have found that a broken finger is not sufficiently serious as a matter of law. *E.g., Revenell v. Van der Steeg,* 05 Civ. 4042(WHP), 2007 U.S. Dist. LEXIS 17868, at \*10 (S.D.N.Y. Mar. 14, 2007) ("Most courts have held that a broken finger does not constitute a serious medical need."); *Magee v. Childs,* 04–CV–1089 (GLS)(RFT), 2006 U.S. Dist. LEXIS 14571, at \*12, 2006 WL 681223 (N.D.N.Y. Feb. 27, 2006) ("[M]any courts have held that a broken finger does not constitute a serious injury."); *Henderson v. Doe,* 98 Civ. 5011, 1999 U.S. Dist. LEXIS 8672, at \*6–7, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (holding that "conditions that have failed to meet [the 'sufficiently serious'] standard include ... a broken finger"); *Rivera v. S.N. Johnson,* 1996 U.S. Dist. LEXIS 14192, at \*6–7 (W.D.N.Y. Sept. 20, 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."); *see also Jackson v. Fernauld,* 104 Fed. Appx. 443 (5th Cir.2004) (affirming summary judgment on § 1983 claim based on failure to treat broken thumb); *Sherrer v. Stephens,* 50 F.3d 496 (8th Cir.1994) (granting summary judgment where broken index finger was insufficient to sustain deliberate indifference claim); *Terry v. City of Danville,* No. 89–0039–D, 1989 U.S. Dist. LEXIS 18037 (W.D.Va. Oct. 13, 1989) (granting summary judgment on claim based on improper treatment of broken thumb); *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252–53 (D.Me.1988) (finding broken finger was not sufficiently serious to support a claim for deliberate indifference).

**\*7** Here, it is clear that Colon's thumb fracture is not sufficiently serious to form the predicate for a claim of deliberate indifference to serious medical need under § 1983. To be sure, Colon complained of some pain, swelling, discomfort and reduced range of motion in his thumb following his injury in February 2007. However, these kinds of complaints are surely not sufficiently severe to "produce

2009 WL 1424169

death, degeneration, or extreme pain," *Hathaway,* 37 F.3d at 66, or to deny "the minimal civilized measure of life's necessities," *Trammell,* 338 F.3d at 161. Indeed, as soon after his injury as March 6, 2007, at his appointment at the BCH, it was noted that Colon reported no pain issues at all. In his April 17, 2007 appointment, Dr. Hall observed that there was no tenderness to palpation or instability at the thumb, that there was no nerve damage in the thumb, and that there was no motion in the fracture when pressure was applied. Several appointments later, on June 26, Plaintiff was again examined and informed Dr. Lee that he felt no pain in his thumb joint. When he was examined by the City Defendants' expert, Dr. Green, Colon described several symptoms that indicated some difficulty performing everyday tasks (such as wringing out clothes, using a mop, or squeezing a tube of toothpaste), but nothing that indicates that he suffered from any deprivation that rises to the level of a constitutional violation. Accordingly, I find that Plaintiff has failed to raise a genuine issue of material fact as to the objective prong of the deliberate indifference analysis.

### 2. Subjective Prong

Even if Colon had established a genuine issue of material fact with respect to the objective seriousness of his injury, summary judgment nonetheless is appropriate because he cannot sufficiently establish that any of the Defendants has acted with the requisite "culpable state of mind" to prove his § 1983 claim for deliberate indifference to medical needs. "An official acts with the requisite deliberate indifference when the official 'knows of and disregards an excessive risk to inmate health or safety.' " *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The Second Circuit has found that this state of mind is analogous to the standard of recklessness in criminal law. *See Smith,* 316 F.3d at 184 (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2000) (*per curium* )).

To meet this standard of culpability, a defendant's actions must be more than mere negligence or medical malpractice; rather, plaintiffs must show that the defendant acted with a reckless disregard for the risk presented. *Stevens v. Goord,* 535 F.Supp.2d 373, 384 (S.D.N.Y.2008) (citing *Farmer,* 511 U.S. at 835); *see also Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation simply because the victim is a prisoner."). A plaintiff "need not show that a prison official acted or failed to act believing that harm

would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842–43; *Wright,* 2008 U.S. Dist. LEXIS 106507 at *45 (to show deliberate indifference, "a prisoner must show more than negligence, but less than conduct undertaken for the very purpose of causing harm"); *cf. McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) (requiring conduct that "shocks the conscience" or a "barbarous act") (citing *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970)). It is well-established that mere disagreement over choice of treatment does not rise to the level of a constitutional violation. *Estelle,* 429 U.S. at 105–06; *Chance,* 142 F.3d at 703; *Adams v. Perez,* 08 Civ. 4834(BSJ)(MHD), 2009 U.S. Dist. LEXIS 15447, at *9–10, 2009 WL 513036 (S.D.N.Y. Feb. 27, 2009) ("It is well established that a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 313 (S.D.N.Y.2001) ("[D]isagreements over ... diagnostic techniques ..., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a § 1983 claim."). Nor can deliberate indifference be established where an inmate "might prefer a different treatment" or feels he did not receive the level of medical attention he desired.[5] *Chance,* 143 F.3d at 703. So long as the "treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to" a constitutional claim. *Id.* However, medical decisions that are "contrary to accepted medical standards" may constitute deliberate indifference where a physician is shown to have "based his decision on something other than sound medical judgment." *Stevens,* 535 F.Supp.2d at 385.

5    Indeed, the "Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ... the essential test is one of medical necessity and not one simply of desirability." *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986).

**\*8** It should be noted, as numerous courts in this Circuit have recognized, that "prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Sonds,* 151 F.Supp.2d at 311. Federal courts are therefore "generally hesitant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* Indeed, in view

of courts' reticence to become enmeshed in claims of mere medical malpractice or negligence, in the § 1983 inquiry medical providers are given a "presumption of correctness." *Id.* (citing *Perez v. County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000)).

In this case, the record evidence indicates that, far from having his medical needs ignored, Colon indeed received significant medical attention for several months following his February 2007 thumb injury. Within approximately three and one-half hours after his thumb was injured, Plaintiff was seen by a nurse in the AMKC Clinic, who applied a cold compress and referred him to a physician's assistant. But a few hours later, the physician's assistant ordered a stat x-ray and referred Plaintiff to Urgicare. That same day, a referral was written for Plaintiff to be seen by a hand specialist at the BHC. Thereafter, Plaintiff was seen by doctors at both the BHC and Rikers on no fewer than thirteen occasions, and was given numerous examinations, x-rays and CT scans. Indeed, on July 31, Plaintiff was offered to have an MRI taken to assess for radial collateral ligament injury in his thumb, but Plaintiff refused the MRI and instead agreed to return to the BHC on as-needed basis. On several occasions, the possibility of surgery was discussed, and indeed the surgery was scheduled and cancelled at least twice. However, both of these cancellations—one because an emergency required the BHC Hand Service, and the other because a necessary piece of equipment had malfunctioned—were out of the control of the treating physicians.

* * *

Accordingly, the record evidence reveals no genuine issue of material fact as to either the objective or subjective prongs of the deliberate indifference analysis, and I find that no reasonable jury could find that Colon suffered a constitutional violation as a result of the treatment he received for his fractured thumb. Because Colon cannot show deliberate indifference on the part of any of his medical providers, he likewise raises no issue of fact as to whether any supervisor should have prevented or corrected a constitutional violation. *See, e.g., Wright,* 2008 U.S. Dist. LEXIS 106507, at *57 (citing *Hernandez v. Keane,* 341 F.3d 137, 14405 (2d Cir.2003)); *see also Ramos v. Artuz,* No. 00 Civ. 0149,

2003 U.S. Dist. LEXIS 2261, 2003 WL 342347 (S.D.N.Y. Feb. 13, 2003) (granting summary judgment to a doctor on supervisory liability claim because doctor's subordinate had committed no constitutional violation). Consequently, summary judgment is appropriate on Colon's constitutional claim as to all Defendants.

**B.** *Supplemental Jurisdiction*

**\*9** All of Plaintiff's remaining causes of action allege violations of state law, i.e., negligence, medical malpractice, negligent hiring and constitutional tort under New York law. Where a plaintiff lacks a valid federal claim, a district court has the discretion to decline to exercise supplemental jurisdiction over his pendent state-law claims. *E.g., Matican v. City of N.Y.,* 524 F.3d 151, 154–55 (2d Cir.2008) (citing *Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006)); *Klein & Co. Futures, Inc. v. Board of Trade,* 464 F.3d 255, 262 (2d Cir.2006) ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining jurisdiction over the remaining state-law claims.") (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *see also* 28 U.S.C. § 1367(c)(3). Here, summary judgment is granted on Plaintiff's single federal cause of action, and I decline to exercise supplemental jurisdiction over Colon's remaining state-law claims, and they are dismissed without prejudice.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED. The Clerk of this Court shall enter judgment in favor of the Defendants, close all open motions and remove this matter from my docket.

**IT IS SO ORDER.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1424169

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 947439

2024 WL 947439
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gabino GENAO, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

21-cv-00301 (AT) (VF)
|
Signed January 4, 2024

**Attorneys and Law Firms**

Gabino Genao, Stormville, NY, Pro Se.

Caroline McGuire, Department of Justice, Washington, DC, Erin Teresa Ryan, Eun Jee (Esther) Kim, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendant City of New York.

Caroline McGuire, Department of Justice, Washington, DC, Eun Jee (Esther) Kim, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendants Sonya Harvey, DOC Commissioner Brann, ESU Capt. Moise, ESU Officer Nwosu, ESU Officer Freemantle, Cohall, ESU Captain McCarthy.

## REPORT AND RECOMMENDATION

VALERIE FIGUEREDO, United States Magistrate Judge

**\*1 TO: THE HONORABLE ANALISA TORRES, United States District Judge**
Plaintiff Gabino Genao, proceeding pro se and in forma pauperis, is presently incarcerated at Attica Correctional Facility. Genao brings this action against Defendants the City of New York (the "City"), Warden Sonya Harvey, Cynthia Brann, the Commissioner of the New York City Department of Corrections, Captain Moise, Officer Nwosu, Officer Freemantle, Captain Cohall, and Captain McCarthy (collectively, "Defendants")[1] pursuant to 42 U.S.C. § 1983, alleging violations of his federal constitutional rights. Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, I respectfully recommend that Defendants' motion be **GRANTED in part** and **DENIED in part**.

1   The individual defendants, other than Warden Harvey and Commissioner Brann, are referred to by their title and last name only. Neither Genao nor the City have provided the first names of those individuals.

## BACKGROUND[2]

2   The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents.

Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," Brandever v. Port Imperial Ferry Corp., No. 13-CV-2813 (KBF), 2014 WL 1053774, at \*3 (S.D.N.Y. Mar. 13, 2014) (citation omitted), and "[a] nonmoving party's failure to respond to a R. 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (citation omitted).

Here, Defendants filed and served their Local Civil Rule 56.1 Statement of Undisputed Material Facts (see ECF No. 96), but Genao failed to respond as required by the local rules. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. See Brandever, 2014 WL 1053774, at \*3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the moving party's statement of facts, "there [were] no material issues of fact"). In his written opposition, however, Genao does contest certain of Defendants' purported undisputed facts. See ECF No. 117 ("Pl.'s Mem."). In light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citations omitted), the Court, "in its discretion," has opted to "conduct an assiduous review of the record," and

if Genao has contested any fact in Defendants' Rule 56.1 Statement by pointing to admissible evidence, the Court has deemed those facts to be disputed, Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted); Cherry v. Byram Hills Cent. Sch. Dist., No. 11-CV-3872 (ER), 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions) (citation and internal quotation marks omitted). However, where factual assertions in Plaintiff's opposition do not contain citations to the record or are not supported by evidence in the record, the Court disregards them. See Berry v. Marchinkowski, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015). Therefore, unless otherwise noted, the facts recounted herein reflect the undisputed, material facts contained in Defendants' Local Civil Rule 56.1 Statement of Facts ("R. 56.1 Statement"). See ECF No. 96.

### A. Factual Background

**\*2** On December 16, 2020, Genao was incarcerated in the custody of the New York City Department of Corrections ("DOCs"), and housed in Manhattan Detention Center "9 South, Cell 4." R. 56.1 Statement ¶ 2. On December 16, 2020, at approximately 2:15 p.m., Genao started a fire in the food slot on his cell door. Id. ¶¶ 3, 5, 7. The food slot is a "space in the door where [Genao] can pass things in and out of the cell." Id. ¶ 8; see also ECF No. 97-3 ("Genao Dep.") at 214-15.

The fire burned for about one minute before Officer Nwosu "opened the food slot and extinguished [it]." R. 56.1 Statement ¶¶ 9-10; see also Genao Dep. at 213, 215. Genao was then rear-handcuffed and removed from his cell.[3] R. 56.1 Statement ¶¶ 11-12.

[3]    Neither Genao nor Defendants identify which Corrections Officer rear-handcuffed Genao. The parties, however, do not dispute that Captain McCarthy was the supervisory captain during the incident. See R. 56.1 Statement ¶¶ 33-34; see also Genao Dep. at 226.

Genao was taken to "decontamination" and then to the medical clinic, all within an hour of the incident. Id. ¶¶ 13, 15-16; see also Geno Dep. at 220. Genao was taken to the clinic because he "couldn't breathe" and had stomach pains. R. 56.1 Statement ¶ 17; Genao Dep. at 221. At the clinic, Genao denied experiencing "[shortness of breath], cough, sputum, dizziness, and lightheadedness"; his chief complaints were "burning of his throat and stomach." R. 56.1 Statement ¶¶ 20-21; see also ECF No. 97-4 ("Genao's Medical Records") at DEF 910, 912. At the clinic, Genao was assessed for exposure to smoke and OC spray, as well as gastric irritation. R. 56.1 Statement ¶ 22; Genao's Medical Records at DEF 913. Genao never sought medical treatment for having been rear-handcuffed. R 56.1 Statement ¶ 23; see also Genao Dep. at 221-222; Genao's Medical Records at DEF 910, 912-13. Following treatment, Genao was taken back to his cell. R. 56.1 Statement ¶ 24; see also Genao Dep. at 222.

### B. Procedural History

Genao commenced this action on January 12, 2021, against Warden Harvey, Captain Moise, Officer Nwosu, Officer Freemantle, Captain Cohall, and Captain McCarthy asserting claims for excessive force, deliberate indifference to medical needs, unconstitutional conditions of confinement, violations of 18 U.S.C. §§ 1001 and 242, and a claim of municipal liability against the City and Commissioner Brann.[4] See ECF No. 2 ("Compl."). Defendants filed an Answer on August 6, 2021. See ECF No. 29. On April 25, 2022, the case was redesignated to the undersigned.

[4]    Genao does not assert any claim against Commissioner Brann other than a municipal liability claim. See Compl. at 12. However, municipal liability under Section 1983 "does not extend to individuals." Fate v. Petranker, No. 19-CV-05519 (PMH), 2020 WL 3640007, at *7 (S.D.N.Y. July 6, 2020) (citation omitted). Accordingly, I recommend that Genao's municipal liability claim against Commissioner Brann be dismissed. Id.

Defendants filed their motion for summary judgment on May 8, 2023, see ECF No. 95; ECF No. 98 ("Defs.' Mem."). Genao submitted an opposition in two parts. He submitted exhibits to his opposition on October 4, 2023, ECF No. 114; and then on October 18, 2023, he submitted his written opposition, ECF No. 117 ("Pl.'s Mem."). On November 20, 2023, Defendants submitted their reply brief in further support of their motion. See ECF No. 121 ("Defs.' Reply"). And on December 28, 2023, Genao submitted—without leave from the Court—a sur-reply.[5] See ECF No. 123 ("Pl.'s Sur-Reply.").

5    While sur-replies are not permitted without court authorization, see, e.g., Preston Hollow Cap. LLC v. Nuveen Asset Mgmt. LLC, 343 F.R.D. 460, 466 (S.D.N.Y. 2023) (collecting cases), because Genao is proceeding pro se, the Court has considered his sur-reply, see Khudai v. Akamai Techs., No. 20-CV-3686 (JHR) (JLC), 2023 WL 7174616, at *2 (S.D.N.Y. Nov. 1, 2023). Genao's sur-reply, however, does not raise any new arguments that he did not previously make in his opposition brief.


## LEGAL STANDARD

**\*3** Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion ... is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of demonstrating an entitlement to judgment as a matter of law and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323; Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).

A fact is material when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008) (noting that the Court must view all facts "in the light most favorable" to the non-moving party). However, a court is not required to draw any inference that is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo, 536 F.3d at 145. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

Genao is proceeding pro se and thus the Court must liberally construe his filings to raise the strongest arguments they suggest. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence are insufficient to overcome a motion for summary judgment." Parker v. Fantasia, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (alterations and internal quotation marks omitted) (quoting Houston v. Teamsters Local 210, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014)).


## DISCUSSION

**\*4** To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). Section 1983 creates no substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617-18 (1979).

## A. Genao's Excessive-Force Claim under the Fourteenth Amendment

Genao alleges that Officer Nwosu used unnecessary and excessive force when he relied on a fire extinguisher to stop the fire on December 16, 2020. See Compl. at 5-6. Specifically, Genao alleges that Officer Nwosu sprayed the fire extinguisher at him, causing him to experience difficulty breathing and burning in his chest. Id. Defendants argue that Genao's excessive-force claim against Officer Nwosu should be dismissed because Officer Nwosu "needed to deploy a fire extinguisher to put the fire out, and save [Genao's] life." [6] Defs.' Mem. at 5 (emphasis omitted). Defendants contend that Genao was at most "incidentally sprayed" with the fire extinguisher. Id. For the reasons explained below, I recommend that Defendants' motion be denied as to this claim.

[6]    Genao also asserts an excessive-force claim against Officer Freemantle based on his use of OC Spray. Compl. at 6-7. Defendants are not moving for summary judgment on Genao's excessive-force claim as it relates to Officer Freemantle's use of the OC spray. See Defs.' Mem. at 2 n.1. Genao also brings a claim of deliberate indifference to medical needs as it relates to Officer Freemantle's use of OC spray. Compl. at 7-8. Defendants are moving for summary judgment as to that claim. See Defs.' Mem. at 8 n.2; supra at 13-20.

Because Genao was a pretrial detainee at the time of the fire on December 16th, his excessive-force claim is analyzed under the Fourteenth Amendment. Pridgen v. Iland Jail, No. 22-CV-2294 (ER), 2023 WL 1438375, at *5 (S.D.N.Y. Feb. 1, 2023). "The right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." Id. (citing United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)). A pretrial detainee's excessive-force claim under the Fourteenth Amendment requires a showing that the "force purposely or knowingly used" was "objectively unreasonable." [7] Id. (quoting Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015)) (internal quotation marks omitted).

[7]    Previously, pretrial detainees asserting excessive-force claims had to satisfy a subjective and objective element, akin to what is required to prove a claim under the Eighth Amendment. See United States v. Walsh, 194 F.3d 37, 47-49 (2d Cir. 1999).

A plaintiff had to show that the alleged wrongdoing was "objectively sufficiently serious or harmful enough" to cause a constitutional violation, id. at 50, and that the alleged wrongdoer subjectively "had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct," Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (citations and internal quotation marks omitted). The Supreme Court's decision in Kingsley, however, "altered the test previously used in the Second Circuit for claims arising under the Fourteenth Amendment," eliminating the subjective element. Portillo v. Webb, No. 16-CV-4731 (VEC) (GWG), 2022 WL 2337380, at *5 (S.D.N.Y. June 29, 2022), report and recommendation adopted, 2022 WL 16736980 (S.D.N.Y. Nov. 7, 2022) (citations omitted).

**\*5** "Objective unreasonableness 'turns on the facts and circumstances of each particular case,' and is to be evaluated 'from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.' " Douglas v. City of New York, No. 18-CV-9327 (KPF), 2022 WL 294075, at *6 (S.D.N.Y. Feb. 1, 2022) (quoting Kingsley, 576 U.S. at 397). The Supreme Court in Kingsley articulated certain factors a court should look to when assessing the reasonableness of the force used, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

576 U.S. at 397; accord Portillo, 2022 WL 2337380, at *6; Prigden, 2023 WL 1438375, at *6. "The factfinder must also 'take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate.' " Frost v. New York City Police Dep't, 980 F.3d 231, 252 (2d Cir. 2020) (quoting Kingsley, 576 U.S. at 400).

2024 WL 947439

Of course, an officers' use of a chemical agent, like a fire extinguisher or pepper spray, when required to respond to a fire or a fight is not per se unreasonable. See, e.g., Burke v. Browns, 653 F. App'x 683, 698-99 (11th Cir. 2016) (holding that a correctional officer spraying a fire extinguisher into an inmate's cell after the inmate started a fire "is a response commensurate to the significant threat posed by a prison fire" and thus not "malicious and sadistic"). Instead, a court's review of an officer's use of a chemical agent will depend on the manner in which the chemical agent was used. See Quinones v. Rollison, No. 18-CV-1170 (AJN), 2020 WL 6420181, at *4-5 (S.D.N.Y. Nov. 1, 2020) (explaining that the inquiry is "context specific' ") (citations omitted). For example, courts have found that the use of pepper spray to maintain or restore discipline among inmates does not amount to excessive force "if the force was applied in a good-faith effort." Stinson v. City of New York, No. 18-CV-00027 (LAK) (BCM), 2021 WL 3438284, at *13 (S.D.N.Y. July 6, 2021); see also Berry v. City of New York, No. 12-CV-7819 (RWS), 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014) (finding evidence that officer used pepper spray to break up violent fight between inmates insufficient to raise a genuine dispute about excessive force and thus granting summary judgment to officer); Boomer v. Lanigan, No. 00-CV-5540 (DLC), 2002 WL 31413804, at *5-6 (S.D.N.Y. Oct. 25, 2002) (correction officer did not use excessive force when he sprayed "chemical agent" at pre-trial detainee, after detainee refused to follow repeated orders to remove his arm from food slot in his cell); Beauvoir v. Falco, 345 F. Supp. 3d 350, 369 (S.D.N.Y. 2018) (granting defendants summary judgment in a § 1983 case because the "use of the pepper spray ... was permissible in the context of needing to maintain a baseline of order in the prison system," where "Plaintiff repeatedly resisted multiple officers' orders"). Likewise, use of a fire extinguisher would not amount to excessive force if the officers only inadvertently sprayed the inmate with the fire extinguisher while attempting to end a fire. See Beckford v. Portuondo, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001) (explaining that Eighth Amendment assault claim would fail if plaintiff was "not intentionally spray[ed]" but rather was "inadvertently" sprayed).

**\*6** Resolution of Genao's excessive-force claim, based on Officer Nwosu's use of the fire extinguisher, hinges on the location of the fire. Genao does not dispute that he started a fire in the food slot and that he was inside his cell at the time of the fire. In his deposition, Genao testified that the fire was contained to the food slot. See Genao Dep. at 213-14.

And it is undisputed that Officer Nwosu opened the food slot and extinguished the fire there. See R. 56.1 Statement ¶ 10. Genao testified, however, that the fire was not inside his cell. Genao Dep. at 213-14. And Genao further testified after Officer Nwosu extinguished the fire in the food slot, he then proceeded to spray Genao with the fire extinguisher. Id. at 215. Defendants, however, contend that Genao also started a fire *inside* the cell, separate and apart from the fire in the food slot. Defs.' Mem. at 5. Resolution of this factual dispute precludes summary judgment in Defendants' favor.

As support for their argument that there was a fire inside the cell, Defendants rely on three pieces of evidence. First, Defendants point to video footage showing a mattress that was removed from Genao's cell immediately after the fire was extinguished. Defendants contend that the mattress was "burnt." See Defs.' Reply at 5. Second, Defendants rely on a declaration from Captain McCarthy where she attests that she saw a fire inside Genao's cell. Captain McCarthy also describes areas of the mattress that were burnt. See ECF No. 97-7 at ¶¶ 10-11. Finally, Defendants rely on the incident report (ECF No. 97-2, "Incident Report") and a video report by Captain McCarthy, where she recounts the incident (ECF No. 97, Exhibit E at 06:56-07:20) and states that there was a fire inside Genao's cell. See Defs.' Reply at 5.

As an initial matter, the video footage of the mattress does not conclusively support Defendants' description that the mattress was "burnt." The video shows a mattress that appears to have a green, vinyl-like exterior covering with two adjacent tears in that cover, with one torn piece of the vinyl appearing to have a brown residue; the mattress filling is visible, and it is white. See ECF No. 97, Exhibit D at 05:18-06:50. One cannot say definitively from the image of the mattress on the video that the tears in the green, vinyl-like covering were caused by a fire.

Without the video footage, what remains is the competing testimony of Genao—that there was no fire inside his cell, Genao Dep. at 213-14—and the testimony of Captain McCarthy—that there was a fire inside the cell, ECF No. 97-7 at ¶¶ 10-11. It is undisputed that Officer Nwosu "opened the food slot" to extinguish the fire, see R. 56.1 Statement ¶ 10, which supports Genao's testimony that the fire was contained to the food slot. Whether Captain McCarthy's testimony to the contrary is credible presents a classic factual dispute for resolution by the jury. See Chen-Oster v. Goldman, Sachs & Co., No. 10-CV-6950 (AT) (RWL), 2022 WL 814074, at *27 (S.D.N.Y. Mar. 17, 2022) (denying

summary judgment where there existed a disagreement on material factual issues, thereby "creating a dispute that must be resolved by a jury") (citation omitted); see also Jeanty v. Cty. of Orange, 379 F. Supp.2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created a factual dispute); Rivera v. Madan, No. 10-CV-4136 (PGG), 2013 WL 4860116, at *11 (S.D.N.Y. Sept. 12, 2013) (denying summary judgment because resolution of the claim required "credibility determinations that are the province of a jury") (citations omitted). If a jury resolves that dispute by concluding that the fire was contained in the food slot, then a rational jury could also conclude that Officer Nwosu intentionally—rather than inadvertently in the course of extinguishing a fire in the cell—sprayed Genao with the fire extinguisher. See Beckford, 151 F. Supp. 2d at 216 (summary judgment in defendants' favor on excessive-force claim precluded where there existed material issues of fact as to whether correctional officers sprayed plaintiff in face and chest with fire extinguisher as punishment for misbehavior or inadvertently in the confusion surrounding the fire). I thus recommend that Defendants' motion for summary judgment as to this claim be denied.

### B. Genao's Deliberate-Indifference Claim under the Fourteenth Amendment

**\*7** Genao bases his deliberate-indifference claim on two separate acts. Genao alleges that Captain McCarthy [8] was deliberately indifferent to his medical needs because he "gave his staff direct orders" to rear-handcuff Genao, despite a medical directive stating that Genao could not be rear-handcuffed. See Compl. at 7. Genao also alleges that Officer Freemantle was deliberately indifferent to Genao's medical needs when he sprayed Genao with OC spray. Id. at 7-8. Genao contends that this spraying occurred under the supervision of Captains McCarthy and Cohall. Id. at 8. Genao states that he has asthma, and that Officer Freemantle's use of the OC spray caused him to experience "shortness of breath, coldness in lungs, [and] stabbing pain in [the right lung]." Pl.'s Mem. at 2. Genao also alleges that Officer McCarthy was deliberately indifferent to Genao's medical needs because he required that Genao submit to a "strip search" after Genao had been sprayed with OC spray, which delayed Genao's eventual decontamination. [9] See Compl. at 4; Pl.'s Mem. at 3.

[8]    In his Complaint, Genao alleges that Captain Moise was the supervisory captain for the incident on December 16, 2020, and that he ordered that Genao be rear-handcuffed. See Compl. at 5, 7. After discovery, the parties now agree that Moise was not the supervisory captain for the incident and that the supervisory captain was McCarthy. See R. 56.1 Statement ¶¶ 33-34; see also Genao Dep. at 226.

[9]

To the extent Genao claims in his opposition brief and in his sur-reply that Defendants were deliberately indifferent to his medical needs when they returned him to his cell prior to its decontamination, Pl.'s Mem. at 3; Pl.'s Sur-Reply at 1, the Court does not consider this claim. Genao's briefs are the first time he mentions a deliberate-indifference claim based on a contaminated cell. Genao did not include factual allegations in his complaint to support those grounds for a deliberate-indifference claim. "It is 'inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion' because it fails to 'give defendants fair notice of the nature of plaintiff's claim' and thus undermines the purpose of Federal Rule of Civil Procedure 8(a)." Espinoza v. New York City Dep't of Transp., 304 F. Supp. 3d 374, 384 (S.D.N.Y. 2018) (quoting Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001)). Therefore, because Genao did not set forth in his complaint facts supporting a claim for deliberate indifference as it relates to the timing of the decontamination of his cell, the Court will only consider his deliberate-indifference claim based on the use of OC Spray and rear handcuffing.

As to Genao's deliberate-indifference claim based on the use of rear-handcuffs, Defendants argue that Genao cannot sustain a claim for deliberate indifference because he never requested medical treatment for rear-handcuffing while he was at the clinic for this incident, and because he does not allege or prove any injury as a result of being rear-handcuffed. See Defs.' Mem. at 8-12. And as to the deliberate-indifference claim based on the use of OC spray, Defendants contend that Genao was decontaminated and received medical treatment after the incident, and he has not alleged any specific injury caused by being sprayed with OC spray. See id. at 8 n.2. For the reasons discussed below, I recommend that summary judgment be granted to Defendants as to this claim in its entirety.

Genao's deliberate-indifference claim based on conduct that occurred while he was a pretrial detainee is properly analyzed under the Fourteenth Amendment. See Colon v. City of New York, No. 8-CV-3142 (HB), 2009 WL 1424169, at

*5 (S.D.N.Y. May 21, 2009) (citing Bryant v. Mafucci, 923 F.2d 979, 983 (2d Cir. 1991)). "The standard to be applied is identical to the deliberate indifference standard for prisoners under the Eighth Amendment's prohibition against cruel and unusual punishment." Id. (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983) and Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)); see also Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

**8** Deliberate-indifference claims under the Fourteenth Amendment have two prongs, one objective, the other subjective: (1) that the inmate's "medical condition is objectively a serious one"; and (2) that the official acted with "deliberate indifference" to the inmate's medical needs. Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). To satisfy the objective prong, "the inmate must 'show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.' " Vazquez v. City of New York, No. 21-CV-1573 (PAE) (VF), 2022 WL 17370156, at *6 (S.D.N.Y. Dec. 2, 2022) (quoting Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017)). A plaintiff must allege "a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities.' " Patterson v. Ponte, No. 16-CV-3156 (PAE) (JCF), 2017 WL 1194489, at *5 (S.D.N.Y. Mar. 30, 2017) (quoting Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)), report and recommendation adopted, 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017). "In determining whether a condition is sufficiently serious, courts consider 'whether the condition significantly affects an individual's daily activities,' and 'whether [the condition] causes chronic and substantial pain.' " Bradshaw v. City of New York, 855 F. App'x 6, 10 (2d Cir. 2021) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (alterations in the original)). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.' " Id. (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). Each condition "must be measured by its severity and duration, not the resulting injury." Darnell, 849 F.3d at 32.

Regarding the subjective component, "[i]n Darnell, [the Second Circuit] clarified that deliberate indifference, in the context of a Fourteenth Amendment due process claim can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind." Charles v. Orange County, 925 F.3d 73, 86, (2d Cir. 2019) (citing Darnell, 849 F.3d at 33-34). Therefore, deliberate indifference under the Fourteenth Amendment, "can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety." Id. at 87 (quoting Darnell, 849 F.3d at 35 (emphasis and alterations in the original)). A plaintiff "need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 842 (1970). A plaintiff must show "something more than mere negligence" to establish deliberate indifference in the Fourteenth Amendment context. Charles, 925 F.3d at 87 (quoting Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)).

Beginning with the rear-handcuffing, Genao has not adduced facts to demonstrate that he suffers from a sufficiently serious medical condition. Genao does not articulate any medical condition that he suffers from, nor does he claim that the rear-handcuffing subjected him to any kind of pain. See Pl.s' Mem. at 5. Even a medical condition such as a broken or fractured hand is not considered a serious medical condition, and Genao has not even alleged any such injury here. See Osacio v. Greene, No. 08-CV-0018 (TJM), 2009 WL 3698382, at *5 (N.D.N.Y. Nov. 2, 2009) (finding that broken metacarpal (hand bone) does not constitute serious medical condition and collecting cases discussing the same); Ruiz v. Homerighouse, No. 01-CV-0266 (JTE), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (dismissing deliberate-indifference claim as a matter of law because fractured metacarpal was not sufficiently serious medical condition). Additionally, Genao has not asserted that he was in any pain because of the rear-handcuffing, nor has he put forth any evidence substantiating or documenting the frequency or severity of any such pain. Although "[c]onclusory allegations of pain are insufficient to satisfy the objective prong of a medical indifference claim," Trapani v. Dagostino, No. 18-CV-0805 (DNH) (CFH), 2018 WL 9815971, at *16 (N.D.N.Y. Sept. 12, 2018), Genao did not even complain of hand-related pain when he was evaluated at the clinic. See Genao Dep. at 221-222; Genao's Medical Records at DEF 910, 912-13. Nor did Genao seek medical treatment for being rear-handcuffed. R 56.1

2024 WL 947439

Statement ¶ 23; see also Genao Dep. at 221-222; Genao's Medical Records at DEF 910, 912-13.

**\*9** There is nothing in Genao's medical records detailing the nature of any hand-related injury. At most, there is the medical directive stating "Front cuff only ... No Rear Cuff." See Compl. at 13. But that directive does not list a medical condition or explain why rear-handcuffing could not be used on Genao. Because Genao has failed to adduce any evidence from which a rational factfinder could conclude that he suffered from a sufficiently serious condition to constitute a serious medical condition, he has not satisfied the objective prong of a deliberate-indifference claim.

Even *if* Genao had shown that he had an injury caused by the rear-handcuffing that *was* sufficiently serious, he has also failed to offer evidence that Officer McCarthy acted intentionally or recklessly or failed to act with reasonable care to mitigate the threat to Genao's health even though he knew, or should have known, that the condition posed an excessive risk to Genao's health. Swinson v. City of New York, No. 19-CV-11919 (KPF), 2022 WL 142407, at \*9 (S.D.N.Y. Jan. 14, 2022). Arguing that he should not have been rear-cuffed, Genao relies on the medical directive appended to his Complaint, which indicates that he requires restraint modifications such as: "Front cuff only ... No Rear Cuff." Compl. at 13. Even assuming that Officer McCarthy knew of the medical directive, as already discussed, it is not sufficiently detailed as to the type of hand condition Genao suffered from. Although it indicates "front cut only" and "no rear cuff," it does not explain *why* Genao could not be rear-cuffed. See id. Nor does the medical directive identify any medical condition corresponding to Genao's arm, shoulder, or hand. See id. In short, the medical directive does not contain any information from which Captain McCarthy could have, or should have known, that directing Genao to be rear-cuffed would pose "an *excessive risk* to health or safety." Swinson, 2022 WL 142407, at \*9 (citing Darnell, 849 F.3d at 35) (emphasis added); see also Perkins v. Schriro, No. 11-CV-814 (GBD)(JCF), 2012 WL 5909892, at \*2 (S.D.N.Y. Nov. 21, 2012) (finding corrections officer did not act in a sufficiently culpable manner when he was not made specifically aware of plaintiff's condition or its gravity beyond the fact that the condition was listed on a medical transfer form). Genao has failed to adduce any evidence that Captain McCarthy acted with a " 'sufficiently culpable state of mind,' " Colon, 2009 WL 1424169, at \*5 (quoting Farmer, 511 U.S. at 834), and thus Genao has not adduced any evidence to establish the subjective prong of a deliberate-indifference claim.

Turning to Genao's claim based on the use of OC spray by Officer Freemantle, that claim also fails because Genao points to no evidence to support either the objective or subjective prongs of the deliberate-indifference claim. Genao specifically faults Officer Freemantle, Captain McCarthy, and Captain Cohall for subjecting him to a strip search after being exposed to the OC spray, thereby delaying his eventual decontamination. See Compl. at 8; Pl.'s Mem. at 3. It is undisputed, however, that Genao was taken to the "[s]hower pen" to be decontaminated and then taken to the clinic for further decontamination and treatment within one hour of having been sprayed with OC spray. R. 56.1 Statement ¶¶ 13, 15-16; see also Geno Dep. at 220; Genao's Medical Records at 912-13; Incident Report at 18, 21, 26, 28. Genao's medical records from the clinic confirm that he was "allowed to decontaminate" upon arrival. See Genao's Medical Records at DEF 912. The medical records also indicate that Genao's respiration was "regular" and that he was not suffering from any "serious injury." [10] Id. The fact that Genao was treated within one hour of the exposure to OC spray undermines any claim that Defendants were deliberately indifferent to a serious medical need. See Flemming v. Kemp, No. 09-CV-1185 (TJM) (DRH), 2012 WL 4094196, at \*15 (N.D.N.Y. Aug. 30, 2012) (granting summary judgment and dismissing deliberate-indifference claim based on exposure to chemicals where officers escorted plaintiff directly to a decontamination room, provided him with a shower, and removed his clothing), report and recommendation adopted, 2012 WL 4094009 (N.D.N.Y. Sept. 17, 2012); Blond v. City of Schenectady, No. 10-CV-0598, 2010 WL 4316810 (JTE), at \*5 (N.D.N.Y. Oct. 25, 2010) (denial of ability to rinse eyes for 30 to 60 minutes after being sprayed with chemical agent was not serious medical need).

10    At the clinic, Genao also stated that "he ingested the equivalent of a tablespoon full of the yellow chemical powder from the fire extinguisher" and complained that his stomach was "burning." R. 56.1 Statement ¶¶ 25-26; see also Genao's Medical Records at DEF 911, 912; Genao's Dep. at 221-22.

**\*10** And, even if Genao had shown that he had an injury caused by the OC spray exposure that *was* sufficiently serious, he has nonetheless failed to offer evidence that Officer Freemantle, Captain McCarthy, or Officer Cohall acted intentionally or recklessly failed to act with reasonable care to mitigate the threat to Genao's health even though they knew, or should have known, that the conditions posed an

excessive risk to Genao's health. Swinson v. City of New York, No. 19-CV-11919 (KPF), 2022 WL 142407, at *9 (S.D.N.Y. Jan. 14, 2022). Genao argues that the OC spray should not have been used because the medical directive also indicates that "No Chemical Agents" should be used. Compl. at 13. However, even assuming that Officer Freemantle, Captain McCarthy, and Captain Cohall knew of the medical directive, it is not sufficiently detailed with regard to what kind of condition Genao suffered. Here, too, the directive does not identify any corresponding medical condition related to the prohibition against "Chemical Agents." The medical directive thus does not contain any information from which Officer Freemantle, Captain McCarthy, or Captain Cohall could have, or should have, known that spraying Genao with OC spray would pose "an excessive risk to health or safety." Swinson, 2022 WL 142407, at *9 (citing Darnell, 849 F.3d at 35) (emphasis added); see also Perkins, 2012 WL 5909892, at *2. Because Genao has failed to show that when he was sprayed with the OC spray Officer Freemantle, Captain McCarthy, and Captain Cohall acted with a " 'sufficiently culpable state of mind,' " Colon, 2009 WL 1424169, at *5 (quoting Farmer, 511 U.S. at 834), he fails to satisfy the subjective prong of a deliberate-indifference claim as it relates to the use of OC spray.

In sum, there is no evidence in the record to support either the subjective or objective prongs of Genao's deliberate-indifference claim. I therefore recommend that summary judgment be granted to Defendants on Genao's deliberate-indifference claim in its entirety.

### C. Municipal Liability

Genao alleges that DOCs employees "blatant[ly] abuse and violat[e] inmates' ... rights and services." Compl. at 12. Genao also alleges that the City is aware of the "history" of this "blatant[ ] violation of standard protocols, policy, and procedures." Id. Further, Genao alleges that the City is aware of DOCs employees' "history of conspiring, concealing and falsifying of government documentation," and have "failed to adequately, train, supervise and discipline their employees." Id.

"The language of § 1983 makes clear that 'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.' " Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 WL 4538903, at *4 (S.D.N.Y. Sept. 20, 2018), aff'd, 771 F. App'x 69 (2d Cir. 2019) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).

To succeed on his claim against the City under § 1983 based on acts of the individual defendants, Genao must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Cowan v. City of Mount Vernon, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)).

To successfully establish the existence of a 'policy' or 'custom,' Genao must prove: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted). Merely providing "[p]roof of a single incident of unconstitutional activity" is insufficient to impose municipal liability, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (plurality opinion); see also Cowan, 95 F. Supp. 3d at 637 ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality.") (internal quotation marks omitted); Guerrero v. City of New York, No. 12-CV-2916 (RWS), 2013 WL 673872, at *3 (S.D.N.Y. Feb. 25, 2013) ("[B]oilerplate assertions of a municipal policy or custom ... without offering any accompanying factual support ... are insufficient to state a claim for [municipal] liability.").

**\*11** Defendants argue that Genao's municipal liability claim should be dismissed because he has failed to adduce any evidence to support his allegations. See Defs.' Mem. at 14-16. They are correct. In his Complaint, Genao alleges generally that Defendants' customs and policies violate his and other inmates' constitutional rights. See Compl. at 12. Genao does not point to any evidence in the record to support such an allegation. "The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Dwares v. City of New York, 985 F.2d

94, 100 (2d Cir. 1993) (overruled on other grounds); see also Weir v. City of New York, No. 5-CV-9268 (DFE), 2009 WL 1403702, at *3 (S.D.N.Y. May 19, 2009). As the only support for his municipal liability claim, Genao points to the camera in his cell being inoperable at the time of the incident. See Pl.'s Mem. at 4. But Genao has not adduced any evidence to support an inference that the inoperability of the camera was anything other than a hardware malfunction or was in any way deliberately caused by a city employee. And even if the camera inoperability was caused by the malfeasance of a city employee, Genao "has not provided any evidence that any municipal employee's actions were undertaken in accordance with or pursuant to a policy or custom" of the City. See Sutton v. City of Yonkers, No. 13-CV-801 (GBD) (GWG), 2015 WL 390189, at *6 (S.D.N.Y. Jan. 26, 2015), report and recommendation adopted, 2015 WL 876459 (S.D.N.Y. Mar. 2, 2015).

In short, Genao has not adduced any evidence from which a reasonable factfinder could conclude that the individual Defendants were acting pursuant to a policy or custom of either DOCs or the City. See Brock v. City of New York, No. 15-CV-1832 (VSB), 2018 WL 3579099, at *12 (S.D.N.Y. July 25, 2018) (granting summary judgment on a municipal liability claim where the plaintiff offered "no direct or circumstantial evidence of a municipal policy, custom, or practice") (emphasis added); see also CILP Associates, L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (noting that, when the movant points to a lack of evidence on an element on which the nonmovant would bear the burden of proof at trial, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment"). I therefore recommend that summary judgment be granted to the City on Genao's claim of municipal liability. See Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 222 (2d Cir. 2004) (affirming summary judgment for County on § 1983 claim where plaintiff relied solely on conclusory assertions concerning the existence of a policy or custom).

### D. Conditions of Confinement

Genao alleges that he was subjected to unconstitutional conditions of confinement when he was "deadlocked" in his cell on December 17, 2020, and denied access to food, medication, the "court," recreation, and showers.[11] Compl. at 9. For the reasons explained below, I recommend that Defendants' summary judgment motion be granted.

[11]   When addressing this claim in his opposition briefs, Genao focuses on allegations that he was returned to a cell that was not decontaminated. See Pl.'s Mem. at 6-7; Pl.'s Sur-Reply at 3. Like the deliberate-indifference claim related to decontamination, Genao's briefs are the first time he mentions a conditions-of-confinement claim as it relates to decontamination. Therefore, for the reasons explained above, see supra at 13 n.9, the Court will only consider Genao's conditions-of-confinement claim as it relates to Genao's allegation that he was "deadlocked" and denied access to food, medication, the "court," recreation, and showers.

Because Genao was a pretrial detainee at the time of these allegations, this claim, too, is properly analyzed under the Fourteenth Amendment. See Darnell, 849 F.3d at 29 ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment.") (citations omitted). Claims of unconstitutional conditions of confinement under the Fourteenth Amendment must satisfy both a subjective and objective prong. See id. Under the subjective prong, Genao "must allege 'that the officer acted with at least deliberate indifference to the challenged actions.' " Fullewellen v. City of New York, No. 1:21-CV-7219 (MKV), 2023 WL 2390551, at *5 (S.D.N.Y. Mar. 7, 2023) (quoting Darnell, 849 F.3d at 29). The subjective prong has been "defined objectively" by the Second Circuit, meaning that Genao "must allege facts suggesting that 'the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.' " Id. (quoting Darnell, 849 F.3d at 35). To satisfy the objective prong, Genao must allege conditions that "either alone or in combination, pose an unreasonable risk of serious damage to ... health." Darnell, 849 F.3d at 30.

 *12  Other than alleging that he was "deadlocked" in his cell "the entire 7-3 pm tour," Genao's Complaint is devoid of factual allegations explaining the conditions under which he was confined during that time. See Compl. at 9. Nor has Genao pointed to any evidence in his briefs to support the allegations in the Complaint. And Genao's allegation that he was "deadlocked" in his cell for eight hours is insufficient to satisfy the objective prong of his conditions-

2024 WL 947439

of-confinement claim. Genao does not allege that he was denied access to food, medication, the "court," recreation, or showers outside of the eight-hour window during which he was in his cell. See id. Even if these deprivations occurred, the duration was too short to satisfy the objective component of a conditions-of-confinement claim. See, e.g., Daniels v. Carter, No. 21-CV-8985 (AT) (SLC), 2022 WL 17979915, at *9 (S.D.N.Y. Nov. 22, 2022) (eight-hour deprivation of food is not "objectively, sufficiently serious to give rise to a constitutional violation as a matter of law") (quoting Farmer, 511 U.S. at 834) (internal quotation marks omitted); report and recommendation adopted, 2022 WL 17978908 (S.D.N.Y. Dec. 28, 2022); Diggs v. Marikah, No. 11-CV-6382 (PAE), 2013 WL 227728, at *4 (S.D.N.Y. Jan. 22, 2013) (120-day administrative segregation not sufficient to constitute Eighth Amendment violation); Thomas v. Hopkins, No. 20 CIV. 9709 (NSR), 2022 WL 2758489, at *5 (S.D.N.Y. July 14, 2022) (the denial of a single dose, or even several doses, of a needed medication is insufficient, without more, to establish a violation of the Eighth Amendment); Dillon v. City of N.Y., No. 12-CV-6746 (LAP), 2013 WL 3776252, at *6 (S.D.N.Y. July 18, 2013) ("A deprivation of access to shower and toothpaste for one morning ... plainly do[es] not rise to the level of an objective [constitutional] violation."); Herbert v. Smith, No. 20-CV-06348 (PMH), 2021 WL 3292263, at *6 (S.D.N.Y. Aug. 2, 2021) (" 'Occasional restrictions on recreation ... as a matter of law, do not constitute a 'severe deprivation.' ") (quoting Ponte, 2017 WL 1194489, at *5).

Lastly, as it relates specifically to Genao's allegation that he was denied access to the "court," a claim based on that deprivation also fails. While "[i]t is well-settled that inmates have a constitutional right of reasonable access to the courts ... [p]rison officials are not required to ensure that inmates have unlimited access." McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (citing Ahlers v. Carrillo, No. 94-CV-7945 (DC), 1997 WL 167049, at *3 (S.D.N.Y. Apr. 9, 1997)). Therefore, "not every interference with this right," constitutes "a constitutional violation." Id. Genao does not allege that he was entirely denied access to the courts. Instead, Genao points to a single instance where he was deprived of such access. See Compl. at 9. Further, Genao has failed to allege that this "deprivation actually impaired a legal claim," which he must do to establish a constitutional violation. McCoy, 255 F. Supp. 2d at 260 (citing Shabazz v. Vacco, No. 97-CV-3761 (DC), 1998 WL 901737, at *1 (S.D.N.Y. Dec. 28, 1998)).

Therefore, I recommend that Defendants' motion for summary judgment be granted as to Genao's conditions-of-confinement claim.

### E. 18 U.S.C. §§ 1001 and § 242

Genao seeks to enforce the criminal penalties of 18 U.S.C. § 1001 against Warden Harvey, Cynthia Brann, Commissioner of the City Department of Corrections, Captain Moise, Officer Freemantle, and Captain Cohall, and the criminal penalties of 18 U.S.C. § 242 against Officer Freemantle, Captain Moise, and Officer Nwosu. See Compl. at 14-15.

18 U.S.C. § 1001 criminalizes knowingly and willfully falsifying or misrepresenting material facts "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a)(1)-(2). 18 U.S.C. § 242, on the other hand, criminalizes acting "under the color of [ ] law" to deprive a person "of any rights, privileges, or immunities secured or protected by the Constitution."

Genao acknowledges in his opposition brief that he "cannot assert criminal statutes in a civil proceeding." Pl.'s Mem. at 4. He is correct. Courts "have long recognized that crimes are prosecuted by the government, not by private parties." Hill v. Didio, 191 F. App'x 13, 14-15 (2d Cir. 2006) (summary order) (citation omitted). Further, "[w]here Congress has not explicitly provided for a private right of action under a criminal statute, the Supreme Court have rarely implied one." Vidurek v. Pollen, No. 20-CV-6714 (CS), 2021 WL 4066503, at *11 (S.D.N.Y. Sept. 7, 2021) (citing Chrysler Corp. v. Brown, 441 U.S. 281, 316 (1979)).

**\*13** As it specifically pertains to 18 U.S.C. §§ 1001 and 242, courts have recognized that Congress did not expressly provide a private right of action under those statutes. See Caron v. TD Ameritrade, No. 19-CV-9015 (AJN), 2020 WL 7027593, at *3 (S.D.N.Y. Nov. 30, 2020) (no private right of action under 18 U.S.C. § 1001); Bender v. General Services Admin., No. 05-CV-6459 (GEL), 2006 WL 988241, at * 1 (S.D.N.Y. Apr. 14, 2006) (same); Ng v. HSBC Mortg. Corp., No. 07-CV-5434 (RRM) (VVP), 2010 WL 889256, at *9 (E.D.N.Y. Mar. 10, 2010) (same); Hill, 191 F. App'x at 14 (no private right of action under 18 U.S.C. § 242); Lewis v. City of Newburgh, No. 20-CV-7973 (CS), 2021 WL 6052135, at *9 (S.D.N.Y. Dec. 20, 2021) (same); Vidurek v. Pollen, No. 20-CV-6714 (CS), 2021 WL 4066503, at *11 (S.D.N.Y. Sept. 7, 2021) (same); Jimenez v. Chase Bank, No. 18-CV-3297 (GHW) (SN), 2019 WL 919626, at *3 (S.D.N.Y. Jan. 28,

2019) (same), report and recommendation adopted, 2019 WL 917210 (S.D.N.Y. Feb. 25, 2019); see also Zahl v. Kosovsky, No. 08-CV-8308 (LTS) (THK), 2011 WL 779784, at *10 (S.D.N.Y. Mar. 3, 2011) ("[I]n determining whether a criminal statute implies a private right of action 'the "dispositive question" is whether Congress intended to create a private right of action,' and courts 'are to be "especially reluctant" to imply a private right of action where the statute explicitly provides a different remedy.' ") (quoting Alaji Salahuddin v. Alaji, 232 F.3d 305, 308 (2d Cir. 2000)).

Accordingly, because there is no private right of action under either 18 U.S.C. §§ 1001 or 242, I recommend that these claims be dismissed as well.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendants' motion for summary judgment be **DENIED** as to Genao's excessive-force claim based on Officer Nwosu's use of the fire extinguisher. Because Defendants did not move for summary judgment as to Genao's excessive-force claim as it relates to Officer Freemantle's use of the OC spray, that claim also survives. I recommend that Defendants' motion for summary judgment be **GRANTED** as to the following: deliberate-indifference claim based on rear-handcuffing and the use of the OC spray; municipal liability claim against the City and Commissioner Brann; conditions of confinement claim; and claims under 18 U.S.C. §§ 1001 and 242.

**SO ORDERED.**

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Analisa Torres. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**

**All Citations**

Slip Copy, 2024 WL 947439

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 93 of 140
Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

2018 WL 1578157
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Crystal REVELS, as Administratrix of
the Estate of Michael Revels, Plaintiff,

v.

CORRECTIONAL MEDICAL
CARE, INC., et al., Defendants.

9:17-cv-0088 (MAD/TWD)
|
Signed 03/28/2018

**Attorneys and Law Firms**

LAW OFFICES OF ELMER R. KEACH, III, P.C., ELMER R. KEACH, III, ESQ., MARIA K. DYSON, ESQ., One Pine West Plaza - Suite 109, Albany, New York 12205, Attorneys for Plaintiff.

STEINBERG, SYMER & PLATT, LLP, JONATHAN E. SYMER, ESQ., Steinberg, Symer & Platt, LLP, 27 Garden Street, Poughkeepsie, New York 12601, Attorneys for Defendants Correctional Medical Care, Inc., CBH Medical, P.C., Emre Umar, and Deiah Farley.

THUILLEZ, FORD LAW FIRM, MOLLY C. CASEY, ESQ., 20 Corporate Woods Boulevard - 3rd Floor, Albany, New York 12211-1715, Attorneys for Defendant Russell Fricke.

GOLDBERG SEGALLA, LLP, CHELSEA E. MANOCCHI, ESQ., JONATHAN BERNSTEIN, ESQ., 8 Southwoods Boulevard - Suite 300, Albany, New York 12211-2526, Attorneys for Defendants Schenectady County, Dominic D'Agostino, and Jim Barrett.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

*1 Plaintiff Crystal Revels, as administratrix of the estate of Michael Revels, brought this action alleging federal and state claims against Defendants Correctional Medical Care, Inc. ("CMC"), CBH Medical, P.C. ("CBH"), Emre Umar, Nurse Deiah Farley, John Does 1-3 (collectively, the

"CMC Defendants"), Schenectady County, Sheriff Dominic D'Agostino, Jail Administrator Jim Barrett (collectively, the "County Defendants"), and Doctor Russell Fricke. See Dkt. No. 1.[1] Plaintiff's claims arise out of Mr. Revels's medical care while incarcerated at the Schenectady County Jail. Presently before the Court are three separate motions to dismiss and a motion to strike filed by Defendants. See Dkt. Nos. 27, 28, 30. For the following reasons, the motions are granted in part and denied in part.

[1] John Does 1-3 are unidentified medical staff at the Schenectady County Jail who were responsible for providing medical treatment to Mr. Revels. See Dkt. No. 1 at ¶ 14.

**II. BACKGROUND** [2]

[2] The following facts are based on the allegations in Plaintiff's complaint. See Dkt. No. 1.

**A. The Decedent's Medical Care**

When Michael Revels entered Schenectady County jail on September 9, 2015, he was dealing with a number of health problems. See Dkt. No. 1 at ¶ 15. Six months earlier, Mr. Revels had undergone a surgical procedure to remove a cancerous tumor from his kidney. See id. at ¶ 16. Though the surgery was successful and his cancer was in remission, Mr. Revels required a range of medication to support his kidney function, including diuretics. See id. Additionally, Mr. Revels suffered from chronic heart disease, diabetes, and hypertension, and those conditions required other medication. See id. at ¶ 17. Therefore, Mr. Revels had a complicated medication regimen that required close supervision. See id.

In jail, that medication regimen was frequently disrupted. See id. at ¶ 18. Sometimes Mr. Revels received the wrong medication, other times he received cheaper and less effective medication, and he often received no medication at all. See id. As a result, Mr. Revels began experiencing symptoms including severe bloating, weakness, fatigue, disorientation, incoherency, extreme weight gain, motor impairment, episodes of unconsciousness, episodes of paralysis, and confusion. See id. Defendant Fricke, the doctor at Schenectady County Jail, and Defendant Farley, a registered nurse employed at the jail, were well aware of Mr. Revels's declining health. See id. at ¶ 19.

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 94 of 140
Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 1578157

Shortly after arriving at the jail, Mr. Revels underwent urinalysis as well as a Blood Urine and Nitrogen Test, both of which showed kidney problems. *See id.* During his ten weeks in Schenectady County Jail, Mr. Revels's kidney function was repeatedly tested, and the tests consistently showed dangerously poor kidney function. *See id.* at ¶ 20. Additionally, Mr. Revels showed physical symptoms —including massive weight gain and bloating—indicative of kidney failure. *See id.* Throughout his time in jail, Mr. Revels wrote several sick call slips complaining of his various ailments, and he repeatedly voiced concern about the potential return of his kidney cancer. *See id.* at ¶ 21. Despite Mr. Revels's declining health, Defendant Fricke did not contact Mr. Revels's specialists or refer him to an outside doctor who was qualified to address Mr. Revels's condition. *See id.* at ¶ 22. Instead, Defendant Fricke unilaterally decided to withhold "various medications" from Mr. Revels. *See id.*

**\*2** On November 18, 2015, corrections officers discovered Mr. Revels unconscious on the ground. *See id.* at ¶ 23. For several minutes, the medical staff was unable to rouse him. *See id.* When Mr. Revels finally regained consciousness, he was unable to communicate for "a significant period of time." *See id.* The medical staff described the incident as a "paralytic episode"; it was not the first such episode during Mr. Revels's time in jail. *See id.* Despite Mr. Revels's paralytic episode on November 18, 2015, and despite the many other signs and symptoms of his poor health, he was not hospitalized or referred to a specialist. *See id.* at ¶ 24. Two days later, Mr. Revels was discovered on the floor of his cell—he was weak, wheezing, and suffering from auditory and visual hallucinations. *See id.* Only at that point Mr. Revels sent to the hospital, but his condition had already deteriorated past the point of recovery. *See id.* He was mostly incoherent and on life support until his death on November 25, 2015. *See id.*

At the hospital, Mr. Revels was diagnosed with Hyperkalemia and Respiratory Acidosis. *See id.* at ¶ 25. Hyperkalemia involves excessive potassium levels in the blood and can be caused by failure to appropriately monitor blood thinner and hypotension medications. *See id.* Mr. Revels eventually died from a Myocardial Infarction, which can be caused by Hyperkalemia and Respiratory Acidosis. *See id.* According to Plaintiff, Mr. Revels's death could have been prevented if he had received the appropriate medication, been monitored by a specialist, or been sent to the hospital. *See id.*

**B. CMC and CBH**

CMC is a corporation that provides medical care at numerous county jails, and Defendant Umar is the president of CMC. *See id.* at ¶¶ 6, 8, 27. CMC has "engaged in a well-documented pattern and practice of providing inadequate and unqualified medical providers at the various facilities they manage, as well as inadequate medical and mental health care in general." *See id.* at ¶ 27. The complaint includes pages of troubling allegations regarding CMC's business practices and its track record of providing inadequate care in county jails throughout New York State. *See id.* at ¶¶ 26-42. But based on the allegations in the complaint, it is not clear what role, if any, CMC had at Schenectady County Jail during the time in question.

Plaintiff alleges that CBH is responsible for providing medical at the Schenectady County Jail. *See id.* at ¶ 7.[3] Plaintiff also alleges that, "upon information and belief, CBH Medical, P.C. is owned by Correctional Medical Care, Inc." *See id.* But the complaint includes no other allegations regarding CMC's relationship to CBH or CMC's role at the Schenectady County Jail. Additionally, the complaint does not contain any allegations relating to CBH or its policies, practices, or history of providing medical care.

[3]     Plaintiffs actually allege that CBH "is responsible for providing medical care at the Monroe Correctional Facility." *See* Dkt. No. 1 at ¶ 7. But based on representations made in the parties' briefs, the Court presumes that this was an error, and that Plaintiff's counsel intended to allege that CBH is responsible for providing medical care at the Schenectady County Jail. *See* Dkt. No. 30-2 at 14; Dkt. No. 40 at 9.

**C. Procedural History**
On January 26, 2017, Plaintiff Crystal Revels filed the complaint in this action. Plaintiff alleges three different causes of action: (1) deliberate indifference to a serious medical need in violation of the Fourteenth Amendment as to all Defendants except D'Agostino and Barrett; (2) implementation of municipal policies that violated Mr. Revels's constitutional rights as to Defendants CMC, CBH, Umar, Fricke, Schenectady County, D'Agostino, and Barrett; and (3) conscious pain and suffering and wrongful death under New York law as to all Defendants. *See id.* at ¶¶ 47-63.

Defendants filed three separate motions to dismiss. The County Defendants filed one motion to dismiss. *See* Dkt. No. 27. Defendant Russell Fricke filed a separate motion

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 95 of 140

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

to dismiss. *See* Dkt. No. 28. Finally, the CMC Defendants move to dismiss and move to strike certain allegations in the complaint. *See* Dkt. No. 30.

## III. LEGAL STANDARD

**\*3** A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Sutton ex rel. Rose v. Wachovia Secs., LLC,* 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss, a court may take judicial notice of documents filed in another court).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, 127 S.Ct. 1955 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief,"

*Twombly,* 550 U.S. at 558, 127 S.Ct. 1955, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570, 127 S.Ct. 1955.

## IV. DISCUSSION

### A. Deliberate Indifference

As a pretrial detainee at the time of the incidents addressed in the complaint, Plaintiff's claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). The Supreme Court recently distinguished between Eighth and Fourteenth Amendment excessive force claims, holding that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *See Kingsley v. Hendrickson,* ––– U.S. ––––, 135 S.Ct. 2466, 2470-71, 192 L.Ed.2d 416 (2015).

In *Darnell,* the Second Circuit extended the *Kingsley* standard to a pretrial detainee's allegations related to unconstitutional conditions of confinement. *See Darnell,* 849 F.3d at 35. The court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

Although *Darnell* involved a challenge to conditions of confinement, district courts in this circuit have held that *Kingsley* should also be applied to pretrial detainees' claims of deliberate indifference to serious medical needs. *See Villafane v. Sposato,* No. 16-CV-3674, 2017 WL 4179855, \*19 (E.D.N.Y. Aug. 22, 2017) ("District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs"); *Lloyd v. City of New York,* 246 F.Supp.3d 704, 718 (S.D.N.Y. March 31, 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment"); *see also Torrez v. Semple,* No. 17-CV-1211, 2017 WL 3841686, at \*3 (D. Conn. Sept. 1, 2017) ("[F]or a claim of deliberate indifference to mental health needs or unconstitutional conditions of confinement under the

2018 WL 1578157

Fourteenth Amendment, a pretrial detainee can satisfy the subjective element by showing that the defendants 'knew, or should have known, that the condition posed an excessive risk to health or safety' ") (quoting *Darnell*, 849 F.3d at 35).

**\*4** Under either the Eighth or the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-prong test. *Id.* at \*18. "First, 'the alleged deprivation of adequate medical care must be "sufficiently serious." ' " *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1. Objective Prong [4]

[4] The standard for establishing the objective prong of a deliberate indifference claim was not affected by *Darnell*. *See Feliciano*, 2017 WL 1189747, \*10. Therefore, "the objective prong of a deliberate-indifference claim is the same regardless of whether the inmate is a convicted prisoner or a pretrial detainee." *Id.* The Court notes, however, that the term "objective prong" is somewhat misleading in the context of a Fourteenth Amendment deliberate indifference claim. As the Court explains below, after *Darnell*, both prongs of such a claim are now analyzed under an objective standard.

The objective prong requires "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith v. Carpenter*,

316 F.3d 178, 186 (2d Cir. 2003); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, \*8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

Here, Defendants argue that Mr. Revels was provided medical care, and that Plaintiff fails to allege a deprivation of care that was sufficiently serious. *See* Dkt. No. 27-1 at 17; Dkt. No. 30-2 at 7-11. The Court disagrees. A number of district courts in this circuit have found kidney failure to constitute a sufficiently serious medical condition to satisfy the objective component of a deliberate indifference claim. *See Padilla v. Corr. Care Sols.*, No. 17-CV-1150, 2018 WL 550610, \*4 (N.D.N.Y. Jan. 22, 2018) (D'Agostino, J.); *Rivera v. Fed. Bureau of Prisons*, No. 08-CV-5590, 2009 WL 585828, \*5 (S.D.N.Y. Mar. 5, 2009); *Candelaria v. Greifinger*, No. 96-CV-17, 1998 WL 187383, \*3 (N.D.N.Y. Apr. 15, 1998).

It is well established that the state " 'is not constitutionally obligated ... to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail [him]self of' outside of prison." *Thompson v. Racette*, No. 11-CV-1372, 2012 WL 12884469, \*2 (N.D.N.Y. Aug. 2, 2012) (alterations in original) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). A mere disagreement with a prescribed course of treatment is not sufficient to establish a violation of the Eighth or Fourteenth Amendment. *See Moolenaar v. Champagne*, No. 03-CV-1464, 2006 WL 2795339, \*6 (N.D.N.Y. Sept. 26, 2006). But this is not a case of Plaintiff simply disagreeing with a particular medication or diagnostic technique. Plaintiff alleges that Mr. Revels was recovering from kidney cancer, and that he repeatedly tested positive for kidney problems, showed clear symptoms of kidney failure and other serious medical conditions, and even endured multiple "paralytic episodes." Despite these obvious signs of deteriorating health, medical staff at the jail allegedly failed to provide any treatment other than withholding some or all of Mr. Revels's medications. By the time Mr. Revels was hospitalized, he was past the point of recovery. Plaintiff alleges that the lack of treatment caused Mr. Revels's death. Therefore, Plaintiff alleges a sufficiently serious deprivation of care.

### 2. Mental Element Prong

**\*5** "After *Darnell*, 'deliberate indifference' is now 'defined objectively,' and the 'Due Process Clause can be violated when an official does not have subjective awareness that

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 97 of 140

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm.' " *Lloyd*, 246 F.Supp. at 719 (quoting *Darnell*, 849 F.3d at 35). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment "is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmett*, 2017 WL 2274485, at \*4 (quoting *Darnell*, 849 F.3d at 35).

### 3. Defendants Fricke and Farley

It has long been the rule in this circuit that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Clay v. Kellmurray*, 465 Fed. Appx. 46, 47 (2d Cir. 2012) (quoting *Chance*, 143 F.3d at 703). Even after *Darnell*, it remains the case that "something more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Davis v. McCready*, No. 14-CV-6405, 283 F.Supp.3d 108, ——, ——, 2017 WL 4803918, \*9 (S.D.N.Y. Oct. 23, 2017); *see also Darnell*, 849 F.3d at 36 ("But any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence"). But distinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of expert opinion. *See McCready*, 2017 WL 4803918, at \*9, 283 F.Supp.3d 108. The distinction between the two "depends on the degree of risk associated with the practitioner's conduct." *Id.*

In *Rivera v. Federal Bureau of Prisons*, No. 08-CV-5590, 2009 WL 585828 2009 (S.D.N.Y. Mar. 5, 2009), the court faced allegations very similar to the facts alleged in this case. While incarcerated, the plaintiff took a series of blood tests that indicated declining kidney function, but he received no diagnosis or treatment. *See id.* at 1. Eventually, the plaintiff was transferred to a different prison to receive medical attention for kidney failure and was told that he would need to begin dialyses within two to three years. *See id.* Even under the more demanding subjective test for Eighth Amendment deliberate indifference claims, the court found that the plaintiff had sufficiently alleged that the medical staff at the first prison was deliberately indifferent to his medical needs. *See id.* at \*4; *accord Padilla v. Corr. Care Sols.*, No. 17-CV-1150, 2018 WL 550610, \*4 (N.D.N.Y. Jan. 22, 2018) (D'Agostino, J.).

In this case, Plaintiff alleges that Mr. Revels's kidney function was repeatedly tested while he was in Schenectady County

Jail, and that those tests consistently indicated dangerously poor kidney function. Additionally, Mr. Revels displayed various, troubling symptoms, including severe bloating, weakness, fatigue, disorientation, incoherency, extreme weight gain, motor impairment, episodes of unconsciousness, episodes of paralysis, and confusion. Plaintiff also alleges that Defendants Fricke and Farley were aware of Mr. Revels's declining health because they signed off on his blood tests and because Mr. Revels submitted numerous written complaints. Defendants argue that Plaintiff has not plausibly alleged that Defendants Fricke and Farley knew or should have known of the excessive risk created by their failure to treat Mr. Revels's medical conditions. *See* Dkt. No. 48 at 5. But accepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court cannot find as a matter of law that Defendants Fricke and Farley were not reckless.

### 4. John Doe Defendants

\*6 Plaintiff also brings a claim of deliberate medical indifference against three John Doe Defendants, who Plaintiff identifies only as medical staff at Schenectady County Jail. *See* Dkt. No. 1 at ¶ 14. The John Doe Defendants include the members of the medical staff who found Mr. Revels unconscious on November 18, 2015. The CMC Defendants argue that those members of the medical staff were not deliberately indifferent because they provided "medical attention ... when Mr. Revels was 'roused' after losing consciousness." Dkt. No. 30-2 at 10. But the allegation that the John Doe Defendants merely "roused" Mr. Revels does not prevent the Court from finding that Plaintiff plausibly alleges that the John Doe Defendants acted with objective recklessness. Therefore, the motion to dismiss as to the John Doe Defendants is denied.

### 5. Municipal Liability

A municipality "may not be held liable under Section 1983 unless the challenged action was performed pursuant to a municipal policy or custom." *Powers v. Gipson*, No. 04-CV-6338, 2004 WL 2123490, \*2 (W.D.N.Y. Sept. 14, 2004) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). This is because "[m]unicipalities are not subject to Section 1983 liability solely on the basis of a *respondeat superior* theory." *Id.*, at \*2. As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection—an

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 98 of 140

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

"affirmative link"—between the policy and the deprivation of his constitutional rights.' " *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

"Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." *Powell v. Correc. Med. Care, Inc.*, No. 13-CV-6842, 2014 WL 4229980, *6 (S.D.N.Y. Aug. 15, 2014) (quoting *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990)); *see also Feder v. Sposato*, No. 11-CV-93, 2014 WL 1801137, *6 (E.D.N.Y. May 7, 2014) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, Armor ... [was] 'acting under the color of state law' for purposes of Section 1983").

"A plaintiff may plead a municipal policy or custom by alleging: (1) a formal policy, promulgated or adopted by the entity; or (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted).

Here, Plaintiff alleges that the inadequate care was caused by a policy or custom of CMC. *See* Dkt. No. 1 at ¶ 56. Indeed, the complaint contains pages of allegations regarding CMC's "policy and/or practice of not providing appropriate medical care." *See id.* But Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail. Instead, she alleges that CBH had that responsibility; it is not clear what role, if any, CMC played at the jail. *See id.* at ¶ 7. Although the complaint alleges, upon information and belief, that CBH is owned by CMC, it does not provide any further information regarding the relationship between the two entities. *See id.* Even if CMC does own CBH, that alone is not sufficient to hold CMC liable for CBH's conduct. *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) ("As a general matter ... a corporate relationship alone is not sufficient to bind [a parent corporation for the actions of its subsidiary]" (alteration in original)). Additionally, the complaint only mentions CBH a handful of times, and it does not contain any allegations that could allow the Court to conclude that CBH itself has a custom or practice of providing inadequate care. [5]

5    The CMC Defendants move to strike large chunks of Plaintiff's complaint that are related to the allegations of municipal liability against CMC. *See* Dkt. No. 30-2 at 19-24. Since the Court dismisses the municipal liability claims against CMC and CBH, the motion to strike is denied as moot.

**\*7** Similarly, Plaintiff's § 1983 allegations against the County Defendants rest entirely on CMC's alleged custom or practice of providing inadequate medical care. Since Plaintiff does not allege that CMC was responsible for providing medical care at the Schenectady County Jail, CMC's policies and practices do not provide a sufficient basis for establishing liability as to the County Defendants. Therefore, the County Defendants' motion to dismiss Plaintiff's § 1983 claims is granted.

## B. State Law Claims

### 1. The County Defendants

The County Defendants' move to dismiss Plaintiff's state law claims against the County, D'Agostino, and Barrett. *See* Dkt. No. 27-1 at 7, 12. First, the County Defendants argue that Defendants D'Agostino and Barrett cannot be held liable for the acts or omissions of corrections officers, and that there is no basis for vicarious liability alleged in the complaint. *See id.* at 7 (citing *Barr v. Albany County*, 50 N.Y.2d 247, 257, 428 N.Y.S.2d 665, 406 N.E.2d 481 (1980) ). Second, the County Defendants argue that state law claims against the County must be dismissed because it may not be held vicariously liable for the acts of corrections officers. *See id.* at 12 (citing *De Ratafia v. County of Columbia*, No. 13-CV-174, 2013 WL 5423871, *10 (N.D.N.Y. Sept. 26, 2013) ).

Plaintiff fails to address these arguments in her opposition to the County Defendants' motion to dismiss. Since Plaintiff does not assert any other basis for liability under state law against the County Defendants, Plaintiff's state law claims against the County Defendants are dismissed. *See Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim"); *see also Div. 1181 Amalgamated Transit Union–N.Y. Emps. Pension Fund v. R & C Transit, Inc.*, No. 16-CV-2481, 2018 WL 794572, *4 (E.D.N.Y. Feb. 7, 2018) (collecting cases).

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 99 of 140

Revels v. Correctional Medical Care, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1578157

*2. The CMC Defendants*

The CMC Defendants argue that Plaintiff's state law claims should be dismissed because Plaintiff did not file a certificate of merit along with her complaint as required by C.P.L.R. § 3012-a. *See* Dkt. No. 30-2 at 18. The statute "requires counsel to submit a certificate of merit declaring that he or she has consulted with at least one licensed physician who is knowledgeable regarding the relevant issues in the action, has reviewed the case," and has concluded that there is a reasonable basis for commencement of an action. *Calcagno v. Orthopedic Assoc. of Dutchess Cty., PC*, 148 A.D.3d 1279, 1280 (3d Dep't 2017). However, "the mere failure to timely file [a certificate of merit] does not support dismissal of [an] action," *id.*, and Plaintiff submitted a certificate of merit on November 13, 2017, *see* Dkt. No. 50. Therefore, the CMC Defendants' motion to dismiss Plaintiff's state law claims is denied.

### V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the County Defendants' motion to dismiss (Dkt. No. 27) is **GRANTED** and Defendants Schenectady County, Dominic D'Agostino, and Jim Barrett may be terminated; and the Court further

**ORDERS** that Defendant Fricke's motion to dismiss (Dkt. No. 28) is **DENIED**; and it the Court further

**ORDERS** that the CMC Defendants' motion to dismiss (Dkt. No. 30) is **GRANTED in part** as to the deliberate indifference and municipal liability claims against Correctional Medical Care, Inc., CBH Medical, P.C., and Emre Umar, and the motion is **DENIED in part** as to Plaintiff's state law claims and the deliberate indifference claims against Defendants Deiah Farley, and John Does 1-3; and the Court further

 **\*8  ORDERS** that the CMC Defendants' motion to strike (Dkt. No. 30) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578157

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 100 of 140

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

2017 WL 4329722
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Clark P. RAY, Plaintiff,

v.

Dr. Gaetan ZAMILUS and
Kathleen Gerbing, Defendants.

13 Civ. 2201 (PGG)
|
Signed 09/27/2017

**Attorneys and Law Firms**

Michael Langsdorf Nadler, Sipoura Barzideh, Kimberly
Amanda Francis, Michael Joseph Biondi, Paul, Weiss,
Rifkind, Wharton & Garrison LLP, New York, NY, for
Plaintiff.

Daniel A. Schulze, James Brennan Cooney, Attorney General
of the State of New York, New York, NY, for Defendants.

## MEMORANDUM OPINION & ORDER

Paul G. Gardephe, United States District Judge

 *1  Plaintiff Clark P. Ray is a former inmate at
Otisville Correctional Facility ("Otisville"). The Amended
Complaint alleges that Defendants Dr. Gaetan Zamilus
and Superintendent Kathleen Gerbing acted with deliberate
indifference in failing to provide Ray with necessary medical
treatment over an eleven month period while Ray was
incarcerated at Otisville, (Am, Cmplt. (Dkt. No. 23) ¶¶
41-42) [1]

[1]     Unless otherwise indicated, (1) all cites are to
        the docket in the instant action; and (2) the page
        numbers of documents referenced in this Order
        correspond to the page numbers designated by this
        District's Electronic Case Filing system.

Defendants have moved for summary judgement, contending
that Plaintiff cannot satisfy the objective and subjective
elements of deliberate indifference under the Eighth
Amendment, and that Defendants are entitled to qualified
immunity. (Def. Br. (Dkt. No. 87)) Ray argues that material

issues of fact preclude a grant of summary judgment. (Pltf.
Opp. Br. (Dkt. No. 101))

## BACKGROUND [2]

[2]

    To the extent that this Court relies on facts drawn
    from a party's Local Rule 56.1 statement, it has
    done so because the opposing party has either
    not disputed those facts or has not done so with
    citations to admissible evidence. See Giannullo v.
    City of New York, 322 F.3d 139, 140 (2d Cir.
    2003) ("If the opposing party ... fails to controvert
    a fact so set forth in the moving party's Rule 56.1
    statement, that fact will be deemed admitted.")
    (citations omitted). Where Plaintiff objects to
    Defendants' characterization of cited evidence, and
    has presented an evidentiary basis for doing so,
    the Court relies on Plaintiff's characterization of
    the evidence. See Cifra v. Gen. Elec. Co., 252
    F.3d 205, 216 (2d Cir. 2001) (court must draw all
    rational factual inferences in non-movant's favor
    in deciding summary judgment motion). Unless
    otherwise indicated, the facts cited by the Court are
    undisputed.

### A. The Parties

Ray served two terms of imprisonment in the New York
State Department of Corrections and Community Supervision
("DOC") prison system. (Pltf. R. 56.1 Resp. (Dkt. No 103) ¶¶
1-2) Ray's first term of incarceration ran from June 30, 1998
to January 4, 2011, while his second term ran from October
27, 2011 to May 25, 2013. (Id. ¶¶ 2-3) During his second
term of incarceration, Ray was held at several prisons. In early
2012 he was transferred from Franklin Correctional Facility
to Fishkill Correctional Facility ("Fishkill"). (Id. ¶ 22) On
April 23, 2012, he was transferred from Fishkill to Otisville
Correctional Facility, where he remained until his release on
May 25, 2013. (Id. ¶¶ 3, 62)

Defendant Zamilus is employed by DOC as the acting Facility
Health Services Director at Otisville, and he was the only
doctor assigned to Otisville's medical unit during the relevant
time period (2012-2013). (Id. ¶¶ 5-6) During this time, Dr.
Zamilus worked as a "half-time physician (i.e., two days
per week; seven-and-a-half hours per day) at Otisville and
a half-time physician at Fishkill." (Id. ¶ 5) Otisville held

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 101 of 140

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

approximately 570 inmates in 2012. (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 81)

**\*2** Defendant Gerbing is the Superintendent of Otisville. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 8) Her duties include providing "overall supervision of the facility's staff and inmates, including security, administration, and programs." (Gerbing Decl. (Dkt. No. 88) ¶ 2) Under DOC policy, however, the superintendent is not responsible for directing inmate medical care. (Id. ¶ 5)

### B. Hepatitis C

In October or November of 2000, Ray was diagnosed with Hepatitis C. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 11) It is undisputed that Ray suffered from chronic Hepatitis C during the period between April 23, 2012 and May 25, 2013, while he was incarcerated at Otisville. (Id. ¶¶ 4, 15)

Hepatitis C is a liver disease caused by the Hepatitis C virus ("HCV"), which can cause scarring of the liver known as "fibrosis," (Id. ¶¶ 12, 16; Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:19-25) There are four stages of fibrosis of the liver. Stage four fibrosis is known as "cirrhosis," also known as "liver failure." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:16-17, 162:5-11) "[T]here is much more urgency to treat" patients suffering from advanced fibrosis, because it may be too late to treat a patient once the disease has progressed to cirrhosis. (Id. at 201:4-16, 203:10-21) It is undisputed that Ray's disease had progressed to stage three by the time Ray had arrived at Otisville. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶¶ 4, 15; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 68)

The extent to which Hepatitis C has progressed is a key determinant of whether medical treatment is necessary. Dr. Zamilus and Dr. Carl Koenigsmann—Deputy Commissioner and Chief Medical Officer of DOC—testified that DOC policy as of August 2012 was that those inmates without fibrosis "will not be treated"; those with stage one fibrosis "will be evaluated on an individual basis"; and those with stage two fibrosis or above "will be offered treatment." (Def. R. 56.1 Reply (Dkt No. 108) ¶ 91)

During the relevant time period (2012-2013), the state-of-the-art treatment for Hepatitis C was a drug cocktail made up of Ribavirin, Peginterferon, and Telaprevir. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 26) Peginterferon may cause "[l]ife-threatening or fatal neuropsychiatric reactions[,] including suicidal ideation, homicidal ideation, [and] depression ... with

or without previous psychiatric illness." (Id. ¶ 27) Moreover, a Hepatitis C patient who did not complete the full prescribed course of treatment with Telaprevir faced a significant risk that his disease would become drug-resistant. (Id. ¶¶ 48-49)

### C. Liver Biopsy While at Fishkill

On March 16, 2012—during Ray's incarceration at Fishkill—Dr. Zamilus conducted a pre-operation physical on Ray to assess whether he could undergo a liver biopsy to analyze the status of his Hepatitis C. (Id. ¶ 23) On March 28, 2012, Ray underwent a liver biopsy at Fishkill. (Id. ¶ 25)

The results of Ray's liver biopsy became available on April 5, 2012. The biopsy results indicated that Ray had chronic Hepatitis C, stage three fibrosis. (Def. R. 56.1 Reply (Dkt. No. 108) ¶ 68) A nurse's notes from April 23, 2012 state that Ray was "[r]equesting the results of his biopsy done on 3-28-12 also info about treatment for Hep C," and that a follow-up appointment had been scheduled for May 22, 2012. (Nadler Decl., Ex. 36 (Apr. 23, 2012 Progress Notes) (Dkt. No. 102-39) at 2) The nurse's notes further state, "Told PCP to review results + notify him. Has appointment to F/U PCP + discuss Tx. Chart to PCP to review results." [3] (Id.)

[3]
    Testimony from Dr. Zamilus and Dr. Koenigsmann establishes that "TX" refers to treatment; "F/U" refers to follow up; and "PCP" refers to primary care physician. (See Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 242:5-12; id., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 200:8-12)

**\*3** Ray testified that he was informed at Fishkill that he "was ready for a treatment plan" and that "as soon as [he] arrived [at his] next facility"—Otisville—"it was in [his] file that [he] was ready for a treatment plan to start treatment for chronic Hepatitis C." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 95:11-96:6; see Nadler Decl., Ex. 33 (Mar. 1, 2012 Request and Report of Consultation) (Dkt. No. 102-36) at 2 ("PT meets criteria for Hep C Tx. Please schedule for BA seline liver BX to determine extent of liver damage and consideration for Hep C Tx."))

### D. Medical Treatment at Otisville

Ray was transferred to Otisville on April 23, 2012. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3) Ray claims that he did not receive proper medical care at Otisville during the period

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

between April 23, 2012 and March 5, 2013, when he began multi-drug therapy for his Hepatitis C disease. (Id. ¶¶ 3, 61)

Under DOC Policies on Health Screening of Inmates, when an inmate is transferred to a new facility, he first meets with a facility nurse to undergo a health screening and receive orientation concerning health care services, including the procedures for Sick Call. (Id. ¶ 31; Koenigsmann Decl., Ex. G (Dkt. No. 91-7)) On Ray's first day at Otisville—April 23, 2012 (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 3)—he requested treatment for his Hepatitis C condition. (Id. ¶ 28; Def. R. 56.1 Reply (Dkt No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5)

Ray visited Sick Call at Otisville on July 2, 2012 and July 3, 2012. Progress Notes from the July 2, 2012 Sick Call visit state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex, 35 (Progress Notes) (Dkt. No. 102-38) at 2) The progress notes also report that Ray "would like Tx for Hep C." (Id.) Dr. Zamilus's notes concerning Ray's July 3, 2012 visit state that Ray had "cold symptoms," "fever + chills," and "general malaise." (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2) Ray was held in the infirmary overnight and Dr. Zamilus signed Ray's discharge summary, which indicated that Ray had "no malaise." (Id.; see Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 197; 19-198:1; Nadler Decl., Ex, 8 (Ray Dep.) (Dkt. No. 102-8) at 210:9-13 ("When I went to sick call, on several occasions, I complained of cold and flu-type symptoms, severe abdominal pains, fatigue, vomiting, diarrhea, and feeling like I had been run down by a dump truck."))

On August 21, 2012, Ray had his first scheduled appointment with Dr. Zamilus at Otisville, (Pltf. 56.1 Resp. (Dkt. No. 103) ¶ 33) Dr. Zamilus's notes of this visit reflect the following: "Hep C treatment [was] discussed"; "lab ordered PT/PTT, V[iral] L[oad], Hep B s[urface] [antibody], will do E-form after lab/psych eval[uation]." (Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2; see also Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15 (Zamilus testimony that this is "a note that I saw the patient, follow-up Hep C, I put patient interested in treatment, RX, and I put abdominal negative, so that means I checked the abdomen, he didn't have any complaint, and I put my assessment Hep C treatment discussed, lab order[ed], these are the lab[s] that I ordered, PT/PTT, viral load, VL, and also check Hep B surface antibody, and I added will do e-form after labs slash psych evaluation, eval or evaluation"); id. at 277:19-25 (Zamilus testimony that "PT/PTT" stands

for "[p]rothrombin time, partial prothrombin"); Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 166:18-167:2 (Koenigsmann testimony that in order to treat a patient with Hepatitis C, "you have to have a measurable viral load, meaning that you have an active hepatitis C infection")) That same day, Dr. Zamilus made a referral for Ray to receive a psychiatric evaluation and additional lab work. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶¶ 36, 39)

**\*4** Dr. Zamilus states in his declaration that he "understood that a psychiatric evaluation was part of the clearance required by [DOC] to obtain final approval to start Hepatitis C treatment." (Zamilus Deck (Dkt. No. 93) ¶ 17) Dr. Zamilus further states that

> [i]t was my understanding and belief that I could not start Plaintiff's Hepatitis C treatment without having a definite continuity care plan finalized. Due to the risk that the virus could develop resistance to drug therapy if the course of treatment is not completed, it was critical to successful treatment, and [DOC] policy, to ensure that a plan for continuity of care was in place prior to starting treatment if the inmate could be released before the treatment's completion.

(Id. ¶ 26) The standard course of drug treatment for a Hepatitis C patient in Plaintiff's condition ran forty-eight weeks. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 45)

Dr. Koenigsmann states that he "required the [DOC] Infection Control Unit to consult and advise on situations where there was a potential that an inmate would not finish the entire course of the prescribed triple therapy," due to concerns about drug resistance. (Koenigsmann Deck (Dkt. No. 91) ¶ 11) Ray's conditional release date was in April 2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

DOC's Hepatitis C Primary Care Guidelines (the "Guidelines" or "DOC Guidelines") provide that

> Anti-HCV therapy should be considered in accordance with the following criteria:

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)
2017 WL 4329722

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 103 of 140

....

10. No history of major depression or other major psychiatric illness unless cleared by a psychologist or psychiatrist to receive anti-HCV treatment. A history of suicide attempts is generally regarded as an absolute contraindication of treatment.

....

13. The primary care provider should assess if the inmate will be incarcerated for the duration of the required HCV treatment. If there is a possibility that the inmate will be released prior to completion of treatment[,] then the provider should have the inmate sign the Hepatitis C Continuity Program Acceptance Form.... Upon the patient[']s agreement to participate and comply with the Hepatitis [C] Continuity Program the provider will contact the Regional Infection Control Nurse to initiate the enrollment process into the Continuity Program.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt No. 102-24) at 7-8)

Ray's next appointment with Dr. Zamilus was on November 29, 2012. Ray and Dr. Zamilus again discussed the treatment for Ray's Hepatitis C condition. (Pltf. R. 56.1 Resp. to 56.1 (Dkt. No. 103) ¶ 43) Dr. Zamilus claims that on December 13, 2012, he sent Dr. Koenigsmann a request for Hepatitis C treatment via an e-file form. (Zamilus Decl. (Dkt. No. 93) ¶ 20) Although the record contains a "Hep C Treatment Request" form dated December 13, 2012 that contains Ray's name, the form does not indicate to whom it was sent, or whether any action was taken in response to the request. (Zamilus Decl., Ex. A (Dec. 13, 2012 Hep C Treatment Request) (Dkt No. 93-1) at 5)

Dr. Koenigsmann states in his declaration that on October 24, 2012, he issued a "Revision Notice" to medical staff stating that there was a "new [DOC] Hepatitis C Treatment Request E-Form." (Koenigsmann Decl. (Dkt. No. 91) ¶ 8) Dr. Koenigsmann testified that if Dr. Zamilus submitted the request to him using the new system in December 2012, he would have a record of that submission, but no such record exists. (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 258:16-259:1, 260:4-14) [4]

[4]     Dr. Koenigsmann testified that the transition to the new Outlook e-form system was made in about

August 2012, and that Dr. Zamilus should have been aware of the system switch at least four months before he requested Ray's Hepatitis C treatment. (Id. at 259:2-260:3)

**\*5** On January 23, 2013, Ray filed a grievance complaining that he had not received treatment for his Hepatitis C condition. (Nadler Decl., Ex. 67 (First Grievance) (Dkt. No. 102-70) at 2-13) [5]

[5]     On February 1, 2013, the Inmate Grievance Resolution Committee ("IGRC") issued a split decision concerning Ray's grievance. Some members of the IGRC concluded that Ray's grievance was "outside the purview of the IGRC," while others recommended that Ray be given "immediate medical treatment for his chronic illness, due to the serious nature of [his] disease, which cause[s] permanent liver damage." The IGRC recommended that Ray's grievance be "sen[t] to Superintendent [Gerbing] for review." (Nadler Decl., Ex. 68 (IGRC Split Decision) (Dkt. No. 102-71) at 2)
On February 6, 2013, Superintendent Gerbing denied Ray's grievance, agreeing that it was outside the purview of the IGRC:
This grievance has been investigated and responded to by the Facility Health Services Director of the facility, Dr. Zamilus. Per Dr. Zamilus, the grievant was last seen 11/29/12 regarding his Hepatitis C. On December 13, 2012 a request to begin Hepatitis C treatment was submitted to the Medical Director in Albany. The medical department is currently waiting for a response.
All actions are outside the purview of the IGRC. The medical department has done their part in putting in the request to begin treatment. However, they are waiting for approval from Albany prior to beginning such treatment.
(Nadler Decl., Ex. 58 (Gerbing Grievance Response) (Dkt. No. 102-61) at 2)

In a January 31, 2013 e-mail to Dr. Koenigsmann, Dr. Zamilus reported that Ray had filed a grievance complaining that his Hepatitis C treatment was being delayed. (Koenigsmann Decl., Ex. D (E-Mail Exchange) (Dkt. No. 91-4) at 1) In his email, Dr. Zamilus asks, "Can you tell me where are we on the application, Eform for his hep c. I sent it around early December." (Id.)

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 104 of 140

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)
2017 WL 4329722

Later that day, Dr. Koenigsmann replied:

> I have no approval listed under this
> pt. If not approved I would have
> sent you a response asking for more
> info etc[.], I have no record of any
> e mail sent to you regarding this pt.
> I recommend that you send me the
> Outlook treatment request again. We
> are not using the sysm e mail requests
> any longer as is noted in the Hep C
> tx practice guideline addendum. If you
> are unclear what request to use please
> contact me.

(Id.) [6]

[6]    Dr. Koenigsmann states in his declaration that
        "[o]n December 13, 2012, according to Plaintiff's
        medical records, Dr. Zamilus filled out and sent to
        me a request for Hepatitis C treatment for Plaintiff
        via the new e-file form.... However, on January 31,
        2013, since I could not locate the initial e-form
        request sent by Dr. Zamilus on December 13, 2012,
        I instructed Dr. Zamilus to re-send the treatment
        request form." (Koenigsmann Decl. (Dkt. No. 91)
        ¶ 9)

That same day, Dr. Zamilus submitted an email request to Dr.
Koenigsmann for "HEPC Treatment" for Ray. (Nadler Decl.,
Ex. 50 (Jan. 31, 2013 E-Mail Request) (Dkt. No. 102-53) at
2-4) Dr. Koenigsmann approved the request later that day.
(Nadler Decl. Ex, 42 (Jan. 31, 2013 E-Mail Response) (Dkt.
No. 102-45) at 2) At his deposition, Dr. Koenigsmann testified
that he generally approved Hepatitis C treatment requests
within "twenty minutes to a half an hour." (Nadler Decl. Ex.
5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 253:11-19)

*6  In approving Ray's treatment on January 31, 2013, Dr.
Koenigsmann informed Dr. Zamilus that Ray's conditional
release date was scheduled for April 2013—before the
48-week Hepatitis C treatment would be completed. Dr.
Koenigsmann "recommend[ed] referral to the continuity
program," and suggested that Dr. Zamilus "contact the
Regional Infection Control Nurse." (Nadler Decl. Ex. 42 (Jan.

31, 2013 E-Mail Response) (Dkt. No. 102-45) at 2; see Pltf.
R. 56.1 Resp. (Dkt. No. 103) ¶ 47)

Ray's psychological evaluation—which Dr. Zamilus had
requested on August 21, 2012—occurred on February 5,
2013. (Pltf. R. 56.1 Resp. (Dkt. No. 103) 51)

On February 7, 2013, Nurse Becky Reddish met with Ray to
explain the Continuity of Care Program. (Id. ¶ 53) Ray told
Nurse Reddish where he expected to be living after he was
released. Nurse Reddish determined that the closest medical
provider that could continue Ray's Hepatitis C treatment was
located approximately 150 miles away. (Id. ¶ 54)

Accordingly, on February 22, 2013, Ray signed a waiver to
stay in prison beyond his conditional release date. (Nadler
Decl., Ex. 60 (Ray Waiver) (Dkt. No. 102-63) at 5) The next
day, Ray signed an addendum to his waiver stating:

> It should be made clear that my waiver
> of my April 7, 2013, conditional
> release date was done solely to receive
> treatment for my hepatitis C. Without
> the agreement from Health Services
> to treat my hepatitis C, I would not
> have any reason or desire to waive my
> conditional release. Finally, it should
> be mentioned that although I have
> been required to sign a waiver of my
> conditional release date, my treatment
> for hepatitis C has not yet begun.

(Id. at 3)

On April 21, 2013, Ray filed a second grievance seeking
to be released from prison and to rescind his waiver of
his conditional release date. (Nadler Decl., Ex. 59 (Second
Grievance) (Dkt. No. 102-62) at 2-4) In his second grievance,
Ray states:

> On February 14, 2013, I, Clark P. Ray (Grievant), was
> informed by Dr. Gaetan Zamilus, Health Service Director,
> that to receive treatment for my hepatitis C (HCY) infection
> I would have to agree to remain incarcerated beyond my
> conditional release date of April 7, 2013.

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

On February 22, 2013 I was informed by Ms. Reddish of Disease Control, that to begin treatment for my HCV infection I must sign a waiver of my conditional release date.

On February 22, 2013 I was given a waiver of my conditional release date to sign and return for distribution. I signed the waiver and gave it to Mr. Richard Colon, Offender Rehabilitation Coordinator ...

On February 24, 2013, I served Mr. Richard Colon with an Addendum to the Conditional Release Waiver signed February 22, 2013....

I have repeatedly asked the Health Service Department, to place me in the continuity program, My request began September of 2012....

(Id. at 3)

Dr. Zamilus testified that Ray signed a conditional release waiver "[b]ecause ... we could not start treatment until he agreed to stay for the treatment." (Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 314:3-5) Dr. Koenigsmann states in his declaration that "[f]rom approximately February 7, 2013, to February 28, 2013, the [DOC] Infection Control Unit and I were considering whether Plaintiff should begin his Hepatitis C treatment without having a definite continuity of care plan in place. Dr. Zamilus did not participate in my conversations with Ellen Turner and Becky Reddish of the [DOC] Infection Control Unit, and did not participate in the decision of whether Plaintiff should begin treatment." (Koenigsmann Decl. (Dkt. No. 91) ¶ 12)

*7 On March 5, 2013, Ray began the triple drug therapy treatment for Hepatitis C. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 61) On May 25, 2013, Ray was released from Otisville, with continuity of care in place in Albany. (Id. ¶ 62) Ray completed his treatment on September 18, 2013. (Id. ¶ 64) Although the standard course of therapy with the three-drug protocol runs forty-eight weeks, Ray's treatment was terminated much earlier—at about twenty-eight weeks. Ray's treatment was ended early, because his system was found to contain no active Hepatitis C infection. (Id. ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24-319:5; Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2)) As of August 21, 2015, Ray remained virus-free. (Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2)

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

Summary judgment will be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." De Los Santos v. HYS Livery Serv., Inc., No. 12 Civ. 8124 (LTS) (JCF), 2014 WL 1979924, at *2 (S.D.N.Y. May 14, 2014); see Fed. R. Civ. P. 56(a). A fact is considered material "if it 'might affect the outcome of the suit under the governing law,' and an issue of fact is a genuine one where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986)).

The Second Circuit has instructed that "[t]he party against whom summary judgment is sought ... 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted)); see De Los Santos, 2014 WL 1979924, at *2.

## II. STANDARD FOR EIGHTH AMENDMENT CLAIMS

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A prisoner must satisfy two requirements—one objective and one subjective in order to prevail on such a 'deliberate indifference' claim." Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). First, the prisoner must prove that the alleged deprivation of medical treatment is—in objective terms—"sufficiently serious," that is, the prisoner must prove that his medical need was "a condition of urgency, one that may produce death, degeneration, or extreme pain." See id. (citing Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996))). Second, the prisoner must prove that the charged official acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). "This requires that

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

the prisoner prove that the charged official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' Johnson, 412 F.3d at 403 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Deliberate indifference exists when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2002) (citing cases).

**8** "It is well-established that Hepatitis C qualifies as a serious medical condition for purposes of an Eighth Amendment analysis." Pabon v. Wright, No. 99 Civ. 2196 (WHP), 2004 WL 628784, at *1 (S.D.N.Y. Mar. 29, 2004), aff'd, 459 F.3d 241 (2d Cir. 2006). Where a plaintiff "suffered from a delay in treatment, rather than a complete lack of treatment, [however,] the objective element must be satisfied by harm that resulted from the delay." Graham v. Wright, No. 01 Civ. 9613 (NRB), 2004 WL 1794503, at *5 n.7 (S.D.N.Y. Aug. 10, 2004), aff'd, 136 Fed.Appx. 418 (2d Cir. 2005) (citing Smith, 316 F.3d at 186).

Courts (and juries) may "consider the absence of adverse medical effects in evaluating the objective sufficiency of [an] Eighth Amendment claim." Smith, 316 F.3d at 187 ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.") (citing cases). "Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Id.

Proof of actual physical harm is not required, however. "[A]n Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and ... actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." Id. at 188 (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)

(the potential future health risk caused by exposure to second hand smoke may form the basis for relief under the Eighth Amendment)). " '[A]lthough demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm.' " DiChiara v. Wright, No. 06 Civ. 6123 (KAM) (LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting Smith, 316 F.3d at 188).

## III. ANALYSIS

Defendants argue that (1) Ray cannot satisfy either the objective or subjective elements of his deliberate indifference claim against Dr. Zamilus; (2) Superintendent Gerbing had no personal involvement, because she "never participated in Plaintiff's Hepatitis C treatment or supervised Dr. Zamilus' treatment of Plaintiff's Hepatitis C"; and (3) both Defendants are entitled to qualified immunity, (Def. Br. (Dkt. No. 87) at 1.7-26)

Ray argues, however, that for an "eleven month span, the minimal attention that Dr. Zamilus provided to Mr. Ray was 'so woefully inadequate as to amount to no treatment at all." ' (Pltf. Opp. Br. (Dkt. No. 101) at 23 (quoting Johnson, 234 F. Supp. 2d at 360)) As to Superintendent Gerbing, Ray argues that she "was personally involved in the denial of Mr. Ray's medical care through her role in rejecting his grievance" (id. at 28-29), and that she "is responsible for the violation of Mr. Ray's Eighth Amendment rights because she was 'aware of the [under] staffing problem [at Otisville] but fail[ed] to take corrective action.' " (Id. at 31) (quoting Greason v. Kemp, 891 F.2d 829, 838 (11th Cir. 1990)) Ray also asserts that "[n]either Defendant has established an affirmative defense of qualified immunity." (Id. at 32)

### A. Delay of Treatment v. Denial of Treatment

"Eighth Amendment cases regarding inadequate medical care generally fall into two categories: denial of treatment and delay in treatment [and ...] the analyses are subtly different." Ippolito v. Goord, No. 05 Civ. 6683 (MAT), 2012 WL 4210125, at *9 (W.D.N.Y. Sept. 19, 2012).

**9** In the Amended Complaint—filed while Ray was proceeding pro se, Ray asserts a claim for "delay in treatment" under the Eighth Amendment. (See Am. Cmplt. (Dkt. No. 23) 11, 44) In opposing Defendants' motion for summary judgment, however, Ray—now represented by counsel—argues that he was "denied treatment for his advanced Hepatitis C from April 2012 through March 2013" and that

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 107 of 140

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)
2017 WL 4329722

"Defendants incorrectly classify this action [as] a 'delay of treatment' case in order to heighten Mr. Ray's burden." (Pltf. Opp. Br. (Dkt. No. 101) at 21)

There is evidence before the Court showing that (1) Ray requested treatment for his Hepatitis C when he arrived at Otisville on April 23, 2012 (Pltf R. 56.1 Resp. (Dkt. No. 103) ¶¶ 3, 28; Def. R. 56.1 Reply (Dkt. No. 108) ¶ 85; Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 133:24-135:15, 156:9-157:5); (2) Ray began treatment on March 5, 2013, while incarcerated at Otisville (Pltf. R. 56.1 Resp. (Dkt. No. 103) ¶ 61); (3) Ray was released from Otisville on May 25, 2013, with continuity of care in place (id. ¶ 62); (4) as of May 30, 2013, there was no evidence of the Hepatitis C virus in Ray's system (id. ¶ 63); (5) Ray completed his treatment on September 18, 2013 (id. ¶ 64); and (6) there continues to be no evidence of the Hepatitis C virus in Ray's system. (Id.)

Given this record, this Court concludes that this case involves a delay in treatment, rather than a denial of treatment. See, e.g., Graham, 2004 WL 1794503, at *5 (plaintiff was diagnosed with Hepatitis C on March 12, 2001 but his drug therapy did not begin until February 26, 2003; court addressed Eight Amendment claim as a "delay in treatment" case); DiChiara, 2011 WL 1303867, at *7 (plaintiff contended that defendant had provided no treatment for his Hepatitis C condition for one year; court addressed Eight Amendment claim as a "delay in treatment" case).

### B. Ray Has Not Offered Sufficient Evidence to Satisfy the Objective Prong of an Eighth Amendment Deliberate Indifference Claim

Defendants argue that Ray "does not meet the objective component [of his deliberate indifference claim] because the undisputed facts show that the alleged delay did not exacerbate his condition or worsen his prognosis for effective treatment." (Def. Br. (Dkt. No. 87) at 18) Ray argues, however, that summary judgment is precluded because "[d]uring the eleven months that Mr. Ray was denied treatment, he not only suffered from severe abdominal pain, but also nausea, diarrhea, cold- and flu-like symptoms, and intense fatigue." (Pltf. Opp. Br. (Dkt. No. 101) at 22)

As noted above, in order to establish an Eighth Amendment violation for deliberate indifference, plaintiff must satisfy both an objective and a subjective element. See Smith, 316 F.3d at 183. To satisfy the objective prong of an Eighth Amendment claim, a plaintiff's injury must be sufficiently serious. See id. at 184 (holding that " '[b]ecause society

does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care") (quoting Hudson v. McMillan, 503 U.S. 1, 9 (1992)).

Moreover, where an inmate alleges a delay in treatment—rather than an absolute denial of treatment—"it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." Id. at 185 (quoting Chance, 143 F.3d at 702) (emphasis in Smith). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a 'substantial risk of injury.' " Graham, 2004 WL 1794503, at *4 (quoting Smith, 316 F.3d at 186). "Conversely, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." Id. (citing Smith, 316 F.3d at 186).

**\*10** In sum, "the case law clearly establishes that the delay in treatment does not become a constitutional violation merely because the underlying medical condition, here, Hepatitis C, is indisputably a serious one." DiChiara, 2011 WL 1303867, at *7. "The court must instead look to 'all relevant facts and circumstances' when determining whether a delay in treatment is 'objectively serious' for Eighth Amendment purposes." Id. (quoting Smith, 316 F.3d at 187). In determining whether a delay in treatment is "objectively serious" for Eighth Amendment purposes, courts and juries are "entitled to consider the absence of adverse medical effects" associated with the delay in treatment. Smith, 316 F.3d at 187.

Although the Second Circuit has "never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony," Hathaway, 37 F.3d at 68, multiple district courts in this Circuit, and at least four Circuit courts, have concluded that a plaintiff who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment. See, e.g., Bennett v. Erie Cty. Holding Ctr. Med. Dep't, No. 03 Civ. 6393 (P), 2006 WL 897817, at *9 (W.D.N.Y. Mar. 31, 2006) (granting summary judgment where "[plaintiff] has not shown that the surgery

Case 9:21-cv-00172-MAD-MJK   Document 79   Filed 08/07/24   Page 108 of 140

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

should have been performed sooner ... or that substantial harm resulted from the delay.... He has simply offered no persuasive medical evidence that surgery should have been conducted during the period of time that he was incarcerated ... or that his offset jaw resulted from the failure to perform such surgery during that time frame."); R.T. v. Gross, 298 F. Supp. 2d 289, 296-97 (N.D.N.Y. 2003) (granting summary judgment "[b]ecause Plaintiff has not submitted any verifiable evidence indicating that a failure to treat his condition adversely affected his prognosis"); Llorente v. Rozeff, No. 99 Civ. 1799, 2001 WL 474261, at *4 (N.D.N.Y. Apr. 12, 2001) (granting summary judgment where plaintiff "acknowledges that he has not identified any expert who will testify that his injury was aggravated as a result of the claimed delay in medical treatment ... and admits that no medical records exist which supports that a delay in medical care resulted in aggravation of his injury"); see also Smith, 316 F.3d at 186 (citing Hill v. Dekalb Reg'l Youth Pet. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994) for the proposition that the "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay"); Williams v. Liefer, 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm.... That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."); Surber v. Dixie County Jail, 206 Fed. Appx. 931, 933 (11th Cir. 2006) (same); Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (same); Napier v. Madison Cty., Ky., 238 F.3d 739, 742 (6th Cir. 2001) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed").

**\*11** Numerous courts have considered whether a delay in providing treatment for Hepatitis C rises to the level of an Eighth Amendment violation, Where such claims have survived summary judgment, they generally have been supported by medical evidence demonstrating that the delay in treatment either made the eventual treatment less effective, or presented a risk that treatment would be less effective. See, e.g., Parks v. Blanchette, 144 F. Supp. 3d 282, 314 (D. Conn. 2015) (finding that plaintiff "introduced evidence sufficient to raise a genuine issue of material fact as to whether the delay in receiving Hepatitis C treatment was

sufficiently serious" where plaintiff's expert "has indicated that a delay in treatment for Hepatitis C decreases its effectiveness"); Ippolito, 2012 WL 4210125, at *11-12 (where treatment for Hepatitis C had been delayed for seven to nine years, and plaintiff had offered expert testimony that early treatment presented a better chance of arresting the disease's progression, plaintiff had offered evidence sufficient to raise a triable question of fact on the objective prong); DiChiara, 2011 WL 1303867, at *7-8 (finding that "the evidence proffered was sufficient to raise a question of fact regarding the seriousness of the delay in treatment" where "plaintiff ... presented the affidavit and testimony of his expert, Dr. Klion, which ... supports plaintiff's position that the delay in treatment was serious"). [7]

[7]    The DiChiara court relied on extensive medical evidence in finding "a question of fact about whether the delay in treating his HCV was 'objectively serious' ": Plaintiff's expert, "Dr. Klion[,] stated that treatment should be initiated '[o]nce diagnosis of hepatitis C is established and there is evidence of progressive disease' because treatment at that stage 'has the best chance of arresting the disease'.... Further, Dr. Klion stated that 'treatment with interferon, which is one of the drugs used in treating hepatitis C, protects the liver from further damage by slowing scarring and is therefore beneficial even to patients who end up being non-responders." DiChiara, 2011 WL 1303867, at *8.

Moreover, the record demonstrated that "prior to the delay in treatment, plaintiff possessed only one of the negative predictors to treatment, his genotype, and not the other, the high viral load. It was only after the delay that his viral load increased ... and that his chances of succeeding in the treatment decreased even further." Id. at *7. In DiChiara, unlike here, plaintiff also failed to clear the virus to undetectable amounts during his first 48-week course of treatment. See id. "Plaintiff was left with two options after this: leave the infection untreated, risking cirrhosis of the liver, cancer, or death, or go through a second round of treatment, enduring the number of side effects associated with the antiviral therapy." Id.

[A]lthough Dr. Klion could not quantify how the success in treatment would be affected by a delay, it was his expert opinion that early treatment presented a better chance of arresting

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 109 of 140

progression of the disease and protecting the liver. While plaintiff was ultimately successful in clearing the virus after he was released from prison, he has still presented sufficient evidence to raise a disputed question of material fact for the jury whether the delay in treatment had an adverse medical effect of decreasing his chance of clearing the virus and was sufficiently serious, even if he cannot show a physical injury.

Id. at *8.

Conversely, where a plaintiff has not offered medical evidence demonstrating disease progression or a worse prognosis, defendants have been granted summary judgment. See, e.g., Byng v. Wright, No. 09 Civ. 9924 (PKC) (JCF), 2012 WL 967430, at *10 (S.D.N.Y. Mar. 20, 2012) (finding that plaintiff's "allegation [of a delay in treatment of his Hepatitis C] ... fails under both prongs of the deliberate indifference standard," because he "comes forward with no evidence that he sustained a serious adverse health effect between his September 27[, 2007] visit with Dr. Mamis and his October 23[, 2007] consultation with Dr. Rush"); Motta v. Wright, No. 9:06 Civ. 1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) (three and a half year delay in Hepatitis C treatment; "[t]he court ... found] that plaintiff ha[d] not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis [because t]here [wa]s no evidence that the delay was 'substantially serious' "; plaintiff had not offered evidence that "drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006," and thus had "not raised a genuine issue regarding the objective prong of the test"); Farid v. Ellen, No. 01 Civ. 8292 (PKC), 2006 WL 59517, at * 10-11 (S.D.N.Y, Jan. 11, 2006), aff'd, 593 F.3d 233 (2d Cir. 2010) (granting summary judgment in Hepatitis C delay in treatment case, where "[d]espite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"; "no reasonable jury could conclude that the alleged delay in plaintiff's medical treatment caused any harm to him that would be actionable under the Eighth Amendment"); Graham, 2004 WL 1794503, at *5 (granting summary judgment in delay in treatment Hepatitis C case where evidence showed that plaintiff had "no more than a five percent chance" of responding to the medication had it been administered earlier).

**\*12** Here, Plaintiff has not introduced "verifying medical evidence" that his Hepatitis C condition worsened as a result

of the delay in treatment, or that he faced a worse prognosis as a result of the delay in treatment. Indeed, the undisputed evidence shows that once Ray received treatment, the virus was quickly eradicated, and he remains virus-free. (Pltf. Resp. to 56.1 (Dkt. No. 103) ¶ 45 (citing Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 316:24-319:5; Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-26) at 12; Nadler Decl., Ex. 53 (Aug. 21, 2015 Follow-Up Appointment) at 2))

As to medical evidence, Ray offers only Dr. Koenigsmann's testimony that "there is much more urgency to treat" patients suffering from advanced fibrosis, because it may be "too late" to treat a patient "once a patient has cirrhosis." (Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 201:4-16, 203:10-21, 204:10-16) But Dr. Koenigsmann did not speak to the issue of whether Ray's Hepatitis C condition worsened— or whether he faced a risk of it worsening—as a result of the delay in treatment.

Instead of offering "verifying medical evidence," Ray relies on his own subjective account of symptoms he experienced during the eleven month delay in treatment. At his deposition, Ray testified that—between April 2012 and March 2013— he experienced "vomiting," "diarrhea," "cold and flu-type symptoms," "a fog of major fatigue" such that he "barely [could] function," "abdominal pain like a sword" and that he felt as if he had been "run over by a truck." (Nadler Decl., Ex. 8 (Ray Dep.) (Dkt. No. 102-8) at 140:16-141:24, 232:12-234:7) Ray contends that all of these symptoms are associated with Hepatitis C. (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32)

DOC's Hepatitis C Primary Care Practice Guidelines indicate that the following "symptoms and consequences" are associated with a Hepatitis C infection:

> Approximately 20% of persons exposed to the virus develop symptoms which may include jaundice (yellowing of the skin and whites of the eyes), fatigue, dark colored urine, stomach pain, loss of appetite and nausea. After the initial infection, 15-25 percent will recover and 75-85 percent will become chronically infected (life-long infection). Approximately 70

Ray v. Zamilus, Not Reported in Fed. Supp. (2017)

2017 WL 4329722

Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 110 of 140

percent of persons chronically infected may develop liver disease, sometimes decades after initial infection.

(Nadler Decl., Ex. 23 (DOC Guidelines) (Dkt. No. 102-25) at 10)

When asked at his deposition "what are the symptoms of ... liver disease," Dr. Koenigsmann testified:

> You can develop ascites, which is fluid collections in the abdomen. You can have protein imbalances where you develop frank congestive heart failure, leg edema. You can have, I presume, to some degree fatigue. You can get problems with your— a substance called bilirubin as the liver fails and that can cause pigment changes, you turn yellow, you can have a lot of itching from that, and ultimately chronic hepatitis C can cause the development of liver cancer, which has a whole host of other symptoms and problems.

(Nadler Decl., Ex. 5 (Koenigsmann Dep.) (Dkt. No. 102-5) at 161:1-12) Dr. Koenigsmann further testified that symptoms could also include excess fluid in the abdomen that could result in abdominal pain. (Id. at 163:18-23) Nurse Shylo Goin Tavares testified that late-stage symptoms of HCV could also include "an enlarged liver, you could have pain in your liver area, which is your right upper quadrant of your abdomen." (Nadler Dec., Ex. 3 (Tavares Dep.) (Dkt. No. 102-3) at 18:12-20)

**\*13** There is no evidence that Ray suffered jaundice, itching, heart failure, leg edema, dark colored urine, or liver cancer during the eleven-month delay in treatment.[8] There is evidence that Ray made Sick Call visits to Otisville's infirmary on July 2 and 3, 2012 because of a cold. According to an Admission and Discharge Summary entered on July 3, 2012 by Zamilus, at that time Ray suffered from "cold symptoms," "fever + chills," and "general malaise." (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No, 102-27) at 2)

Ambulatory Health Record Progress Notes entered on July 3, 2012 state "cold Sx" "general malaise"; skin—cold + clammy" "fatigue" "fever/chills," (Nadler Decl., Ex. 34 (Progress Notes) (Dkt. No. 102-37) at 2) Notes entered on "7-2-1 [2]" state that Ray was "coughing up green stuff" and "snotting up a lot." (Nadler Decl., Ex, 35 (Progress Notes) (Dkt. No. 102-38) at 2) Ray was treated by Dr. Zamilus, and by July 4, Ray was "feel[ing] much better." Doctor Zamilus's discharge sheet states that, by July 4, 2012, Ray had "no malaise," (Nadler Decl., Ex. 24 (Progress Notes) (Dkt. No. 102-27) at 2-4) In any event, there is no evidence that cold and flu-like symptoms are associated with a delay in receiving treatment for Hepatitis C.

8     Ray has submitted a letter he wrote to his mother on August 23, 2012, in which he states that "there is [b]lood in my urine." (Nadler Decl., Ex. 25 (Ray Letter) (Dkt. No. 102-28) at 4) This letter constitutes inadmissible hearsay and cannot be considered at summary judgment. See Fed. R. Civ. P. 56(c) (requiring parties to "produce admissible evidence to support [factual assertions]"); Presbyterian Church Of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (" 'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment' ") (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)); Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("When deciding a motion for summary judgment, a federal district court may consider only admissible evidence").

Ray now alleges, however, that he was suffering from abdominal pain during the eleven-month period of delay, and he argues that this is a symptom that is associated with Hepatitis C. (Pltf. Opp. Br. (Dkt. No. 101) at 16, 24-25, 32) While the parties have produced extensive records concerning Ray's infirmary visits drying the eleven-month period of delay—including visits on July 2 and 3, 2012, August 21, 2012, and November 29, 2012—there is no indication in these records that Ray ever complained about stomach pain. To the contrary, Dr. Zamilus's notes for Ray's August 21, 2012 visit indicate that Dr. Zamilus explicitly asked Ray whether he was experiencing abdominal discomfort, and Ray indicated that he "didn't have any complaint."[9] (Nadler Decl., Ex. 10 (Zamilus Dep.) (Dkt. No. 102-10) at 222:6-15, 223:2-23; see Nadler Decl., Ex. 40 (Aug. 21, 2012 Progress Note) (Dkt. No. 102-43) at 2 (Dr. Zamilus circled "negative" for "ABD"—

**Ray v. Zamilus, Not Reported in Fed. Supp. (2017)**
Case 9:21-cv-00172-MAD-MJK    Document 79    Filed 08/07/24    Page 111 of 140
2017 WL 4329722

abdomen)) The Court concludes that Ray has not offered evidence sufficient to demonstrate that he suffered abdominal pain that was caused by the delay in initiating treatment for his Hepatitis C condition.

9       While there are no medical records before the Court indicating that Ray complained about abdominal pain during the eleven-month period of delay in treatment, there is evidence that Ray complained about stomach pain on September 25, 2015, more than two years after his treatment for Hepatitis C had been completed. (Cooney Decl., Ex. A (Sept. 25, 2015 Doctor's Visit) (Dkt. No. 107-1) at 2-3)

More generally, the Court finds that Ray has not offered evidence sufficient to demonstrate that the alleged eleven-month delay in his Hepatitis C treatment (1) caused his Hepatitis C condition to worsen; (2) presented a risk that the eventual treatment would not be successful or otherwise caused him to have a worse prognosis; or (3) caused any adverse medical effect. Because Ray has not offered evidence sufficient to create a material issue of fact as to the objective prong of the Eighth Amendment inquiry, Defendants are entitled to summary judgment.

## CONCLUSION

**\*14**  For the reasons stated above, Defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion (Dkt. No. 86) and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4329722

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Hunter v. City of New York,   S.D.N.Y.,   September 28, 2015

2006 WL 2372250
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Heriberto PALACIO, Plaintiff,
v.
Jorge OCASIO, et al., Defendants.

No. 02Civ.6726(PAC)(JCF).
|
Aug. 11, 2006.

**Attorneys and Law Firms**

Mr. Heriberto Palacio, Coxsackie Correctional Facility, Coxsackie, New York, pro se.

*MEMORANDUM DECISION AND ORDER*

CROTTY, J.

 **\*1** *Pro se* plaintiff Heriberto Palacio ("Palacio" or "Plaintiff"), currently incarcerated at the Coxsackie Correctional Facility, brings this civil rights action pursuant to 42 U.S.C. § 1983 [1] for compensatory and punitive damages and equitable relief in connection with claims of deliberate indifference by the defendants. [2] Palacio alleges that Defendants improperly classified him as a centrally monitored case ("CMC"), failed to protect him from inmate-on-inmate assaults on two occasions, and denied him adequate medical care. Palacio also claims that Defendants failed to comply with discovery requests and asks that the Court permit further discovery. Defendants now move for summary judgment. For the reasons set forth below, the Court grants Defendants' motion and denies Plaintiff's request for further discovery.

[1]   Title 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

[2]   Palacio's claims all relate to his detention five to six years ago at the Manhattan Detention Center ("MDC") and the Queens Detention Center ("QDC") during the period from on or about April 28, 2000 to March 28, 2001 and are asserted against numerous New York City Department of Correction ("DOC") officials and personnel. According to the docket report, defendants include the City of New York, MDC Warden Richard Pagan, MDC Superintendent Jorge Ocasio, QDC Warden Mark Farsi, MDC Correction Officer ("CO") Orlando Thomas, QDC Doctor S. Edano, CO Captain McMillan, Michael Hess and numerous John/Jane Doe CO and correction official defendants (collectively "Defendants"). The Court notes that Palacio has four other actions on file in the Southern District of New York.

BACKGROUND

I. The Complaint [3]

[3]   The Court follows this Circuit's mandate to construe *pro se* complaints "liberally [and to] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994).

Palacio makes four distinct claims under 42 U.S.C. § 1983 that Defendants violated his right to due process as protected by the Eighth Amendment.

First, Palacio alleges that Defendants the City of New York and Department of Correction ("DOC") officials John/Jane Does violated his right to due process by classifying him as a CMC. (Compl.¶¶ 4-6.) Palacio claims that he tried to challenge his classification but that his appeal was denied, again in violation of constitutional rights. (*Id.* ¶¶ 6, 8, 33.) Since CMC prisoners are housed together, separate from the general prison population, and since some CMC prisoners are gang members or have prior convictions, both with histories of "penological violence," Palacio maintains that his CMC status was assigned with deliberate indifference to his safety. (*Id.* ¶ 20.)

Second, Palacio alleges that Defendant Correction Officer ("CO") Thomas ("Thomas") and several other Defendant John/Jane Doe COs were deliberately indifferent in that they failed to protect Palacio from an inmate-on-inmate assault on December 16, 2000 at the Manhattan Detention Center ("MDC"). (*Id.* ¶¶ 17-27.) According to Palacio's Complaint, Defendant CO Jane Doe left open the cell doors of MDC's 6 South Tier "for hours" during which time Defendant Thomas "abandon[ed] his post, leaving the entire 6 South population unmonitored and unsecured." (*Id.* ¶ 21.) Palacio claims that he was subsequently attacked in his cell by two inmates, one of whom-Palacio claims it was Benjamin Lowman [4] ("Lowman")-slashed Palacio with a razor. (*Id.* ¶¶ 22-27.) Palacio was transferred to the Queens Detention Center after this incident to separate him from his assailants. (*Id.* ¶ 32.)

[4]     Lowman is alternately spelled as "Loehman" and "Lowmann" in the record.

Third, Palacio alleges that Defendants-he does not specify whom-were deliberately indifferent in failing to protect him from a second inmate-on-inmate assault on January 26, 2001 in the Queen's Detention Center's ("QDC") infirmary. (*Id.* ¶¶ 34, 36-37.) According to the Complaint, Defendant CO Captain McMillan ("McMillan") sent Palacio to the infirmary unescorted where Lowman again assaulted him, this time punching him in the jaw. (*Id.*) Palacio claims that this second assault occurred in spite of Defendant John/Jane Doe correction officials' alleged promise to protect Palacio from Lowman "in the form of a separation order." (*Id.* ¶¶ 28-30.) Palacio also appears to claim that John/Jane Doe correction officials were deliberately indifferent to his safety in allowing him and Lowman to be transferred to the same prison in spite of this alleged separation order.

**\*2** Fourth, Palacio alleges that, after the January 26 assault, Defendants McMillan, Dr. S. Edano ("Edano") and the City of New York acted with deliberate indifference by delaying medical treatment, misdiagnosing his injury and providing inadequate medication. (*Id.* ¶¶ 39-54.) Palacio maintains that, after the assault, "the Captain from the Plaintiff's housing area"-apparently McMillan-refused to provide him with medical attention "for several hours" despite the "plethora of blood streaming from his gums and intense pain and numbness." (*Id.* ¶¶ 39-40.) Palacio claims that, when he was finally treated, Edano failed to diagnose what was later revealed to be a broken jaw and prescribed only aspirin. (*Id.* ¶¶ 42-43, 50-51.) Consequently, Palacio alleges that he

"complained for weeks about the pain to no avail," and that, when the fracture was finally detected by a New York State Department of Corrections doctor, "it was too late to properly treat the injury. (*Id.* ¶¶ 44, 50-53.)

## II. Statement of the Facts

Unless otherwise noted, the following facts are undisputed. [5]

[5]     The facts are taken from the Defendants' Statement Pursuant to Local Rule 56.1 ("Local Rule 56.1 Statement") (Docket No. 63); exhibits attached to the June 20, 2005 Declaration of Phillip Kim ("Kim Decl."); the February 23, 2005 Deposition of Palacio ("Palacio Dep."); and Plaintiff's Opposition to Defendant's Motion for Summary Judgment. The Court notes that Plaintiff failed to submit any affidavits in opposition to Defendants' summary judgment motion. The Rules of Civil Procedure provide that affidavits submitted in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Furthermore, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id.*

### A. The Parties

Plaintiff, a pretrial detainee during all relevant times (Local Rule 56.1 Statement ¶ 5), is a state prisoner and has been incarcerated at the Coxsackie Correctional Facility since at least May 17, 2006 to the present (Docket No. 83). Prior to that, Plaintiff was incarcerated at MDC from on or about April 10, 2000 and was then transferred to QDC in December of 2000 or January of 2001. (Compl.¶¶ 4, 32.) Plaintiff was transferred again on or about February 2, 2001 to the North Infirmary Command ("NIC") at Rikers Island. (Compl. ¶ 46; Kim Decl. Ex. C.) On or about March 29, 2001, Plaintiff was moved to an unspecified New York State correctional facility and then moved to the Auburn Correctional Facility sometime before June 5, 2003. (Compl. ¶ 50; Docket no. 16 .)

Defendants include the City of New York, MDC Warden Richard Pagan, MDC Superintendent Jorge Ocasio, QDC Warden Mark Farsi, MDC CO Orlando Thomas, CO Captain McMillan, QDC Dr. S. Edano, Michael Hess and numerous John/Jane Doe defendants. [6]

> [6] Neither the Plaintiff nor Defendants provide further information about the Defendants, such as the time periods that they worked in these capacities. The "Doe" defendants refer to several unnamed COs involved in the December 16, 2000 assault, the unnamed correction officials who allegedly instituted the order of separation and the unnamed correction officials who transferred both Lowman and Palacio to the same prison.

B. Procedural History of this Action

Palacio's Complaint was filed on August 22, 2002 and the action was assigned to Magistrate Judge James C. Francis of this District. (Docket No. 2.) Palacio had previously submitted an application to the Court for appointment of counsel, which was denied. (Docket No. 12.) Palacio filed his Amended Complaint on October 21, 2002 (Docket No. 5) [7] and the case was reassigned to Judge Kimba M. Wood of this District. (Docket No. 7.) Judge Wood asked that the case be referred to a magistrate judge, and Magistrate Judge Francis was so designated. (Docket No. 9.) Defendants filed their Answer on June 16, 2003. (Docket No. 19.)

> [7] Chief Judge Michael Mukasey instructed Palacio on the importance of identifying "Doe" defendants when he issued his August 22, 2002 Order giving Palacio leave to file an amended complaint. Specifically, Chief Judge Mukasey wrote:
>
> Plaintiff is advised that the naming of John Doe defendants does *not* toll the statute of limitations period governing actions under § 1983, and that plaintiff shall be responsible for ascertaining the true identity of any 'John Doe' defendants and amending his complaint to identify any 'John Does' before the statute of limitation expires.
>
> (Docket No. 3 at 7 n. 2)

On November 26, 2003, the Court ordered Defendants to comply with Plaintiff's request for production of documents and set December 19, 2003 as a deadline. (Docket No. 26.) On February 11, 2003, Plaintiff submitted an omnibus motion in which he claimed that Defendants had not produced "one-tenth" of the documents requested and asked that the

Court again order Defendants to comply. (Docket No. 27.) Magistrate Judge Francis denied the order "without prejudice to being renewed if accompanied by copies of the discovery demands and responses at issue." (*Id.*)

**\*3** On April 26, 2004, Plaintiff submitted an omnibus motion requesting that time to complete discovery be enlarged and that Defendants be compelled to identify the John/Jane Doe defendants. (Docket No. 31.) On May 7, 2004, the Court denied the motion, noting that "Defendants have produced the relevant incident reports from which plaintiff can himself identify the alleged wrongdoers." [8] (Docket No. 32.) On June 2, 2004, the Court denied as untimely Plaintiff's motion for reconsideration of the May 7, 2004 order as well as his request for permission to depose the Defendants and certain witnesses. [9] (Docket No. 35.)

> [8] Magistrate Judge Francis appears to be referring to the DOC investigative materials generated as a result of the inmate-on-inmate assaults and Palacio's medical treatment. (Kim Decl. Ex. G.)

> [9] Specifically, Palacio sought to depose individuals he identified as COs Thomas, Wright, L. Rosado, J. Romero, R. Lopez, K. Thomas, Captain McMillan, Warden Richard Pagan, Dr. S. Edano, the "Doe" defendants and unidentified prisoner witnesses.

On July 10, 2004, the Plaintiff submitted a request for a conference to resolve discovery issues and again requested permission to depose the Defendants and certain witnesses. (Docket No. 39.) Then, on July 12, 2004, the Plaintiff filed a motion for reconsideration of the June 2, 2004 order. (Docket No. 38.) The Court denied these motions "without prejudice to renewal after [D]efendants have responded to [Plaintiff's] new demands and after [Plaintiff] has been deposed." [10] (Docket No. 36.)

> [10] By this point, Defendants claimed to have provided Plaintiff with "documentation concerning the CMC classification, plaintiff's injury to inmate investigations concerning the incidents with Mr. Lowman and Mr. Elliot, along with Department of Correction directives." (Docket No. 36.) Specifically, it appears that Defendants produced the DOC directive on CMCs; several blank template forms used for CMC designation; a January 4, 1999 memorandum on CMCs from Commissioner Kerik (Kim Decl. Ex. A); the DOC

record of Palacio's CMC Due Process Hearing; Palacio's DOC CMC Information Sheet; two forms reviewing Palacio's CMC status (Kim Decl. Ex. C); the Daily News articles regarding Palacio (Kim Decl. Ex. D); multiple grievance forms filed by Palacio, none of which are relevant to these claims; (Kim Decl. Ex. F); numerous investigative reports regarding the December assault individually filed by CO Captains Dobson and Ranieri, COs Thomas, Johnson, Breeze, Hernandez and Wright, CO Supervisor Catherine Gabbin, MDC Deputy Warden Thomas S. Cossean, and MDC Warden Richard Pagan; "Voluntary Inmate Statement" forms regarding the December assault (all of the inmates solicited declined to make a statement); and several investigative reports regarding the January assault and subsequent medical treatment individually filed by CO Captain McMillan, a CO Supervisor (the name is illegible), CO Jasmine Romero and Dr. S. Edano.

> Defendants did acknowledge that the Plaintiff had made some "new discovery requests" in his most recent motion with which they would comply. (*Id.*) It is unclear what these requests were, however.

On September 23, 2004, Plaintiff again submitted a motion to compel Defendants to provide "all of the discovery demanded heretofore." (Docket No. 41.) The Court again denied the motion "without prejudice to being renewed accompanied by copies of the discovery requests and responses at issue." (*Id.*) Palacio then submitted a second motion for the enlargement of time to complete discovery in which he alleged that "respondents have not provided most of the discovery demanded by this plaintiff." (Docket No. 42.) Magistrate Judge Francis again denied the order. (*Id.*)

On February 23, 2005, Plaintiff was deposed. (Docket No. 52.) On May 4, 2005, Plaintiff submitted a motion to compel production of his deposition transcript and "the discovery sought heretofore by this Plaintiff." (Docket No. 58.) The Court ordered Defendants to provide Palacio with a copy of his deposition transcript but denied Plaintiff's other request since "[Palacio] has not proffered copies of the discovery demands to which he refers, nor of any response by [D]efendants." (*Id.*)

On June 21, 2005, Defendants filed their motion for summary judgment. (Docket No. 60.) This action was reassigned to this Court on September 9, 2005. (Docket No. 75.) On September 30, 2005, Plaintiff filed his motion in opposition

to Defendants' motion for summary judgment. (Docket No. 76.) In it, Plaintiff alleged that "he has been precluded from obtaining evidence ... by the [Defendants'] failure and refusal to provide ... the discovery ... requested heretofore." (*Id.* at 9.) The Plaintiff also wrote that "a hearing on discovery issues needs to be conducted, [and] this Plaintiff needs to be given the opportunity to depose the witnesses he has sought to depose heretofore." (*Id.* at 25.)

**C. Plaintiff's CMC Classification**

**\*4** Plaintiff was classified as a CMC on or about April 28, 2000 and designated for maximum security housing. (Local Rule 56.1 Statement ¶ 7.) "It is the policy of the New York City Department of Correction to establish and maintain procedures to effect central monitoring of selected inmates so that the agency is continually aware of the housing, transport and case status of such inmates." (Kim Decl. Ex. A.) Inmates are selected for such monitoring based on their "notoriety" and "interest in the inmate on the part of other law enforcement agencies," among other factors. (*Id.*) Once they are classified as a CMC, inmates receive a "Notice of C.M .C. Designation" within seventy-two hours. (*Id.*) CMC inmates can then appeal their classification by writing to the Deputy Chief of Security Operations or the Chief of Department who, in turn, must respond with a written determination within fifteen business days. (*Id.*) The Deputy Chief of Security Operations also conducts a twenty-eight day or "monthly" review of all CMCs. (*Id.*)

On April 27 and 28 of 2000, the New York Daily News published stories in which it reported that Palacio was a possible suspect in the disappearance of his girlfriend. (Kim Decl. Ex. D.) According to the DOC's Record of Due Process Hearing on December 22, 2000, Palacio was classified as a CMC because his "girlfriend is missing and there has been extensive news media coverage." (Kim Decl. Ex. C .) On this same form, Palacio stated: "There is no evidence against me. I would like to be taken out of [CMC maximum security]. I've been punished enough." (*Id.*) The hearing officer ordered that Palacio remain classified as a CMC. (*Id.*) Palacio, however, disputes that an actual hearing occurred. (Palacio Dep. at 166:2-12.) [11]

[11]   According to Palacio,

> This wasn't a hearing. What happened was that they sent around a captain or an officer, one person, they pulled a bunch of us out of the housing area, showed us a paper and asked us to sign it, and that

was it. There was supposed to be, according to my understanding, a hearing after this. This was not the hearing itself. I was not given a hearing. That's why I said I do not waive my right to be present at my hearing. The hearing was supposed to be subsequent to this paper, this document. And that's what I was informed. That interview by that one person, I don't remember if it was an officer or a captain, that wasn't the hearing itself."

(Palacio Dep. at 166:2-12.)

Palacio challenged his CMC classification on numerous occasions. (*Id.* at 74:23-85:10.) He testified that he first complained to COs (*Id.* at 75:15-24) and then began to file formal written grievances "approximately, ... twice a week" in "basically every [correctional] facility [he was] housed in." (*Id.* at 76:8-22.) [12] Palacio testified that he also wrote a letter in or about December of 2000 to the MDC superintendent [13] in which he appealed his classification. [14] (*Id.* at 78:5-79:22.)

[12]    The Defendants note that there is no record of grievances filed by Palacio concerning his CMC classification. (Local Rule 56.1 Statement ¶ 13.)

[13]    Palacio believed this individual was Richard Pagan. (Palacio Dep. 79:3-6.)

[14]    The Defendants note that there is no record of a letter sent by Palacio to any Defendant regarding his CMC classification. (Local Rule 56.1 Statement ¶ 13.)

On February 1, 2001, Palacio's CMC designation was reviewed at QDC and continued for the same reasons as before. (Kim Decl. Ex. C ("Subject is a suspect in a case that his girlfriend is missing [sic]. The case is receiving extensive news and media coverage.").) One day later, on February 2, 2001, Palacio's CMC designation was reviewed again, this time at NIC (after he was apparently transferred), and it was again continued. (Kim Decl. Ex. C.)

D. December 16, 2000 Inmate-on-Inmate Assault

On December 16, 2000, Palacio was slashed with a razor and suffered injuries to his back and head during an inmate-on-inmate assault at MDC. (Local Rule 56.1 Statement ¶ 15.) Just before the time of the assault, CO Thomas, who was assigned to the 9 South Post where Palacio was housed, observed Palacio walking toward fellow inmate Mark Elliot's ("Elliot")

cell. (*Id.* ¶ 15; Kim Decl. Ex. G.) CO Thomas then observed Plaintiff and Elliot in a physical altercation and ordered them to stop fighting. (Local Rule 56.1 Statement ¶¶ 16-17; Kim Decl. Ex. G.) When Palacio and Elliot refused to comply, CO Thomas sounded an alarm summoning additional COs, and the fighting stopped. (Local Rule 56.1 Statement ¶ 18; Kim Decl. Ex. G.) No other inmates were identified as being involved in the altercation by either COs or other inmates. (Local Rule 56.1 Statement ¶ 19; Kim Decl. Ex. G.)

**\*5** Palacio disputes CO Thomas's account of the December 16, 2000 assault. (Palacio Dep. 91:13-118:2.) In fact, Palacio contends that CO Thomas was not at his assigned post when the assault occurred. (*Id.* at 91:15-92:1.) According to Palacio, he did not approach Elliot's cell, but rather was hit on the back of his head while watching television in the recreation area. (*Id.* at 88:8-13.) Palacio was then dragged to a cell where he was "cut with a razor" and then beaten and stomped while he attempted to fight his way out. (*Id.* at 94:13-21.) Palacio also contends that "approximately six inmates," as opposed to just one, took part in his assault. (*Id.* at 88:5-6; 97:3-7.) [15] He claims that a fellow inmate and Defendants Corrections Officials John Does later told him that Lowman was one of those involved. (*Id.* at 114:19-115:18; Compl. ¶ 29.)

[15]    Palacio stated that he "was involved in a situation where [he] was jumped by approximately six inmates." (Palacio Dep. at 88:5-6.) He further testified:
I believe that there were other people waiting in the cell for the ambush. And I know for a fact, because the way I was positioned when they dragged me in the cell that at least one or two more people came from outside and joined in the attack.
(*Id.* at 97:3-7.)

Both parties agree that Palacio had no relationship with Elliot prior to the assault. (Local Rule 56.1 Statement ¶ 22; Palacio Dep. at 110:9-12.) Palacio also testified that, though he may have had reason to fear Elliot since Elliot may have robbed another inmate a week before, he never informed any Defendant of this fear. (Local Rule 56.1 Statement ¶ 23; Palacio Dep. at 110:13-17.)

E. January 26, 2001 Inmate-on-Inmate Assault

Palacio testified that, at approximately noon on January 26, 2001, he was sent to QDC's health clinic for "sick call." [16]

(Palacio Dep. at 123:15-125:17.) Lowman was also at the clinic at that time and "got into [Palacio's] face" the moment Palacio arrived. (*Id.* at 128:10-15.) The CO stationed at the clinic ordered the two inmates to separate, at which point Palacio turned to leave. (*Id.* at 133:16-21.) Palacio testified that Lowman then struck him in the right side of his "mandible" from behind. (*Id.* at 121:3-15; 133:20-21.)

16    In their summary judgment filings, the parties argue at some length over whether Palacio was escorted to the clinic. This Court notes that Palacio testified: "I believe an officer took me up." (Palacio Dep. at 125:5.)

Palacio testified that prior to the January 26, 2001 assault but after the December 16, 2000 assault, two John Doe correction officials met with Plaintiff. (*Id.* at 115:7-18; 120:12-121:6.) According to Palacio, these officials took photographs of Palacio's injuries from the December 16, 2000 assault and informed him that Lowman had been one of his attackers. (*Id.* at 115:7-18.) Palacio testified that they then told him that they would enter a separation order against both Lowman and Elliot. (*Id.* at 120:13-22.) [17] As previously indicated, Palacio was transferred to the Queens Detention Center on December 17, 2000.

17    According to Palacio,
      [T]he two gentlemen that came and interviewed me in the New York City Department of Correction told me that they knew that [Lowman] was one of the assailants. He was a gang member. They are familiar with him. And they told me they were going to put a separation order, an order for separation, which I believe they did because when I came back, when I was going to trial for the gun case, I heard that the personnel mentioned the orders on several occasions; they mentioned that there was a separation order, that I could not be around him or Elliot. So they knew that me and this guy had a problem and when I walked into the infirmary, he was there.
      (Palacio Dep. at 120:13-22.)

F. Medical Treatment after the January 26, 2001 Assault [18]

18    Plaintiff has not brought a claim regarding the medical treatment he received after the December 16, 2000 assault.

After the January 26, 2001 assault, Palacio was sent back to his housing area. (*Id* at 136:5-7.) He testified that he was permitted to return to the clinic to receive treatment for his injured jaw "a couple hours later." (*Id.* at 136:10-11.) According to DOC documentation, Palacio first complained about his injured jaw to Defendant CO Captain McMillan at "approximately 1445 hrs." (Kim Decl. Ex. G.) Defendant Edano then treated Palacio at "1635 hrs." (*Id.*)

*6 Palacio testified that he told Edano that he thought his jaw was broken. (Palacio Dep. at 136:12.) In his "Injury to Inmate Report," Edano noted that "[Palacio] is alert, awake, not in distress. Able to talk without difficulty. Has some discomfort on opening mouth, but range normal. No discoloration/laceration." (Kim Decl. Ex. G.) Palacio disputes that he was able to talk without difficulty and disagrees with the characterization of his discomfort on opening his mouth. (Palacio Dep. 170:13-17.) Edano treated Palacio's injury with Motrin. (Kim Decl. Ex. G.)

Palacio testified that, after January 26, 2001, he returned to sick call "numerous times" and continued to receive Motrin. (Palacio Dep. 137:19-21.) After being transferred to NIC on or about February 2, 2001, Palacio claims that a "City doctor" [19] x-rayed his jaw and failed to find a fracture. (*Id.* at 138:1-6.) Palacio testified that he remained in pain at this point and had difficulty chewing. [20] (*Id.* at 138:7-18.)

19    This individual is not named as a Defendant.

20    Palacio testified: "I couldn't chew on the right side for like two months. It was really bad." (Palacio Dep. 138:15-16.)

Palacio testified that, on or about March 28 or 29 of 2001, he was transferred into New York State custody and received a "very comprehensive and thorough [medical] examination." (*Id.* at 138:25-139:2.) According to Palacio, a state doctor x-rayed him as a part of this examination and discovered that Palacio's jaw was broken. (*Id.* at 139:3-20.) The doctor informed him that his jaw had already started healing and that it was "too late to do anything." (*Id.* at 139:24-140:2.) Other than his own assertion, Palacio does not submit the x-ray, a doctor's statement, or the relevant medical records.

DISCUSSION

I. Standard of Review

A motion for summary shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, summary judgment should only be granted if "the nonmoving party 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.' " *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (citation omitted). The Court "resolve[s] all ambiguities, and credit[s] all rational factual inferences, in favor of the plaintiff ." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (citation omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citation omitted). The Court should, thus, grant summary judgment only "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*7** "When considering motions to dismiss the claims of plaintiffs proceeding pro se, courts in this Circuit are instructed to construe the pleadings liberally," and "[t]his is especially true when dealing with civil rights complaints" like the one at the bar. *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001) (citations omitted). Thus, "[a]lthough the same summary judgment rules are applicable when a party is proceeding pro se, 'special latitude' is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are worded inartfully." *Cherry v. Edwards,* No. 01 Civ. 7886, 2005 WL 107095, at \*7 (S.D.N.Y. Jan. 18, 2005) (citations omitted). Nevertheless, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Odom v. Keane,* No. 95 Civ. 9941, 1997 U.S. Dist. LEXIS 14077, at \*8 (S.D.N.Y. Sept. 15 1997) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995)). A nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001) (citation omitted), or create a genuine issue of material fact by presenting contradictory or unsupported statements. *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978) ("The party opposing the motion must set forth 'concrete particulars' ... [;][i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion." (citations omitted)).

While Palacio contradicts much of what Defendants prove, it is always done on his "say so," without affidavit, documentary support, or other proof.

## II. Plaintiff's Claims Against Unnamed Defendants are Time-Barred

As a preliminary matter, this Court finds Palacio's claims against the "Doe" Defendants[21] are time-barred. The applicable limitations period for an action under 42 U.S.C. § 1983 is three years. *See Owens v. Okure,* 488 U.S. 235, 251 (1989). Further, this Circuit has held that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Barrow v. Westhersfield Police Dep't,* 66 F.3d 466, 468 (2d Cir.1995) (citing *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)); *accord Basile v. City of Albany,* No. 96-7880, 1997 U.S.App. LEXIS 2347, at \* \*2-3 (2d Cir. Feb. 10, 1997) (affirming the dismissal of a pro se plaintiff's claims for failing to properly amend his complaint to identify the "Doe" defendants during the three-year limitations period). As such, Palacio's claims against the "Doe" Defendants expired, at the very latest, on March 28, 2004, three years after Plaintiff was transferred out of DOC to State custody.

[21]     This refers to all unnamed Defendants, including the John/Jane Doe COs from the December 16, 2000 assault, the John Doe correction officials who allegedly instituted a separation order and the John/Jane Doe correction officials allegedly responsible for transferring Palacio and Lowman to the same prison.

Plaintiff asserts that his claims against the "Doe" Defendants can be maintained under "the relation back theory." (Pl. Mot. Opp'n Mot. Summ. J. at 25). Plaintiff appears to be referring to Rule 15(c)(3) of the Federal Rules of Civil Procedure, which allows Plaintiff to amend his complaint to change the name of

the party sued if the claim "relates back" to the claim initially pleaded. Specifically,

**\*8** [a]n amendment to a pleading that attempts to bring in a new party will "relate back" to the date of the original pleading when (1) the claim arises out of the same conduct originally pleaded and (2) within (ordinarily) 120 days of the original filing date, "the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party."

*Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996) (quoting Fed.R.Civ.P. 15(c)(3)). This Circuit has held that "Rule 15(c)[ (3) ] does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities ." *Barrow,* 66 F.3d at 469. Furthermore, when the "[plaintiff] [is] informed by the court-within the limitations period ... that he need[s] to name the individual [defendants] ... [he][is] not 'mistaken' for purposes of rule 15(c)." *Id.* at 466; *cf. Soto,* 80 F.3d at 37 (granting pro se plaintiff leave to amend complaint under Rule 15(c)(3) where plaintiff was not informed that he needed to name defendants).

Palacio's claims against the "Doe" Defendants cannot be amended under Rule 15(c)(3). Palacio did not name the "Doe" Defendants during the limitations period because he did not know their identities and not because of a "mistake." As in *Barrow,* Plaintiff was informed in August 2002-almost two full years before the statute of limitations would expire-that his failure to identify the "Doe" Defendants before the claims expired would bar his suit. [22] Furthermore, it is unclear how Palacio could properly amend the Complaint since he still has not identified the "Doe" Defendants. [23]

[22]    *See supra* note 7.

[23]    Since Plaintiff has received materials in discovery (including the incident reports) from which he could identify the "Doe" Defendants (Docket No. 32), it would be inappropriate to allow at this late date the substitution of actual names for the John Does, *Walters v. N.Y. City Health Hosp. Corp.,* 02 Civ. 751, 2006 U.S. Dist. LEXIS 14959, at \*9-10 (S.D.N.Y. Mar. 30, 2006).

Since Palacio failed to identify the "Doe" Defendants during the limitations period and since he cannot amend his complaint under Rule 15(c)(3), this Court dismisses all of his claims against the "Doe" Defendants.

## III. Centrally Monitored Case Claim

### A. CMC Classification

In evaluating whether Palacio's classification as a CMC violated his due process rights, the Court must first determine whether his prior non-CMC status was "a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and internal quotation marks omitted); *accord Mack v. Artuz,* No. 01 Civ. 11832, 2002 U.S. Dist. LEXIS 24216, at \*21 (S.D.N.Y. Dec. 19, 2002). If Palacio had such an interest, the Court "must then consider whether the government deprived [him] of that interest without due process." *Narumanchi v. Bd. of Trs. of the Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988).

This Circuit has rejected the view that federal prisoners have a property or liberty interest in their non-CMC status protected by the Due Process Clause. *Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980) (holding that "a prisoner's interest in avoiding CMC classification does not entitle [the prisoner] to due process protections"). Since the federal CMC designation is similar to New York State's CMC designation "in all material respects," *Majid v.. Malone,* No. 95 Civ. 2545, 1996 U.S. Dist. LEXIS 3515, at \*8 (S.D.N.Y. Mar. 23, 1996), courts in this District have found that "New York State CMC designation is not a deprivation of a liberty interest triggering due process considerations." *Mack,* 2002 U.S. Dist. LEXIS 24216, at \*23; *accord Adams v. Galletta,* No. 96 Civ. 3750, 1999 U.S. Dist. LEXIS 16082, at \*13 (S.D.N.Y. Oct. 19, 1999) (holding that a New York State CMC designation for a pretrial detainee is not a deprivation of liberty interest); *Majid,* 1996 U.S. Dist. LEXIS 3515, at \*3 (same). This Court concurs with these findings. As such, Palacio's due process claim regarding his initial classification as a CMC must be dismissed. [24]

[24]    The conditions of pretrial detention are constitutional unless they amount to punishment of the detainee. *See Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979). However, "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell,* 441 U.S. at 537. This Circuit has held that "the

transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself." *Covino v. Vt. Dep't of Corr.,* 933 F.2d 128, 129 (2d Cir.1991) (internal quotations omitted); *accord McFadden v. Solfaro,* No. 95 Civ 1148, 1998 U.S. Dist. LEXIS 5765, at \*16 (S.D.N.Y. Apr. 23, 1998) (finding that assignment of pretrial detainee to segregated housing based on his security classification did not violate Due Process Clause). As such, the conditions of Palacio's CMC classification were constitutional.

### B. CMC Review and Appeals Process

**\*9** Palacio also appears to claim that the manner in which his CMC status was reviewed and Defendants' failure to respond to his alleged letter of appeal also violate his due process rights. Whether the CMC review and appeals processes have due process implications is a question that the Second Circuit appears not to have considered, but this Court joins other District Courts in determining that the DOC directive outlining the CMC review and appeals process does not create a liberty interest. *See, e.g., Adams,* 1999 U.S. Dist. LEXIS 16082, at \*18 ("[I]f the [CMC] designation is not the deprivation of a liberty interest, then the prison authorities were not constitutionally required to afford due process in imposing it."); *Korkala v. N.Y. City Dept. of Corr.,* No. 84 Civ. 5740, 1986 U.S. Dist. LEXIS 20820, at \*16 (S.D.N.Y. Sept. 4, 1986) (holding that "the State's adoption of a procedural rubric does not create a liberty interest"). Palacio's due process claim regarding the review and appeals of his CMC classification is dismissed.[25]

[25]     In light of this determination, the Court does not evaluate the manner in which Defendants reviewed Palacio's CMC status and responded to his alleged letter of appeal.

### III. Inmate-on-Inmate Assaults

The Supreme Court has held that prison officials have a duty to protect prisoners from violent attacks by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). However, "the standard for prisoner failure to protect claims brought under 42 U.S .C. § 1983 is quite high." *Rivera v. New York,* No. 96 Civ. 7697, 1999 U.S. Dist. LEXIS 129, at \*22 (S.D.N.Y. Jan. 6, 1999) (internal quotations omitted). Mere negligence in failing to protect the inmate will not support a constitutional claim. *See Davidson v.. Cannon,* 474 U.S.

344, 347 (1986) (holding "where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required"). Prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). "To succeed on such a claim, the prisoner must establish both that a substantial risk to his safety actually existed and that the offending prison officials knew of and consciously disregarded that risk." *Baines v. City of New York,* No. 01 Civ. 2645, 2004 U.S. Dist. LEXIS 1461, at \* \*18-19 (S.D.N.Y. Feb. 5, 2004) (citing *Farmer,* 511 U.S. at 834, 837-39). The standard for demonstrating a defendant's awareness of the risk is high. *See Hines v. Lacy,* No. 98-2961, 1999 U.S.App. LEXIS 20206, at \*8 (2d Cir.1999) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")

### A. The December 16, 2000 Inmate-on-Inmate Assault

Viewing the facts in a light most favorable to the Plaintiff, there may be a question of material fact as to whether Elliot posed a "substantial risk," since there is an allegation that Elliot robbed another inmate shortly before the December 16, 2000 incident. But nothing in the record suggests that Defendants either inferred that a substantial risk to Palacio existed from these facts, or consciously disregarded it. Therefore, Palacio's claims arising out of the December 16, 2000 assault are dismissed. *See Baines,* 2004 U.S. Dist LEXIS 1461, at \*22 (summary judgment proper where there is no evidence that any of the individual defendants had any knowledge that plaintiff faced a substantial risk of harm).

### B. The January 26, 2001 Inmate-on-Inmate Assault

**\*10** Viewing the facts in a light most favorable to the Plaintiff, there may be a question of material fact on whether Defendant CO Captain McMillan was aware that Lowman posed a substantial risk to Palacio's safety. According to Palacio's testimony, shortly after the December assault, the two John Doe correction officials[26] allegedly met with Palacio and promised that they would institute a separation order to protect him from Lowman. Palacio testified that some COs mentioned the alleged separation order when transporting him to trial. The record does not foreclose the possibility that CO Captain McMillan was one of these officers.

26          As discussed above, Palacio's claims against all
            "Doe" Defendants have been dismissed as time-
            barred.

Even if CO Captain McMillan possibly may have been
aware of the risk that Lowman posed to Palacio, there is
nothing to suggest her deliberate indifference to that risk.
First, there is no evidence that CO Captain McMillan had
any control over the series of events that led to Palacio and
Lowman being transferred to the same health clinic. Second,
there is no evidence to suggest that she was negligent, let
alone deliberately indifferent, in sending Palacio to "sick
call," a process which Palacio himself apparently initiated.
Notably the CO on duty at "sick call" quickly separated
Palacio and Lowman and, as a result, only a single punch
was thrown. Therefore, this Court dismisses Palacio's claim
against CO Captain McMillan arising out of the January 26,
2001 assault. [27]

27          As noted previously, the Court has construed
            Palacio's complaint as making claims against only
            the two John Doe correction officials and CO
            Captain McMillan in regard to this assault. The
            Court notes, however, that there is no evidence
            from the record that anyone acted with deliberate
            indifference to Palacio during the January 26, 2001
            assault.

IV. Medical Claim

The Supreme Court has held that "deliberate indifference
to a prisoner's serious illness or injury states a cause of
action under [42 U.S.C. § 1983]." *Estelle v. Gamble,* 429
U.S. 97, 105 (1976) ("[D]eliberate indifference to serious
medical needs of prisoners constitutes the unnecessary
and wanton infliction of pain, proscribed by the Eighth
Amendment." (internal quotations and citation omitted)).
The Second Circuit has articulated a two-prong test to
evaluate such claims. The Plaintiff first must demonstrate as
a threshold matter "the objective seriousness of his medical
condition, i.e., that he was suffering from a condition of
urgency, [or] one that may produce death, degeneration, or
extreme pain." *Williams v. Wright,* 162 Fed. Appx. 69, 70
(2d Cir.2006) (internal quotations omitted). The Plaintiff must
then show that the Defendants acted "with a sufficiently
culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550,
553 (2d Cir.1996). This subjective culpability prong "entails
something more than mere negligence ... [but] something less
than acts or omissions for the very purpose of causing harm

or with knowledge that harm will result ." *Farmer,* 511 U.S.
at 835.

A. Objective Seriousness of Palacio's Medical Condition
In this Circuit, "[t]here is no settled, precise metric to guide
a court in its estimation of the seriousness of a prisoner's
medical condition." *Brock v. Wright,* 315 F.3d 158, 162 (2d
Cir.2003). To aid district courts in making this determination,
this Circuit has articulated a "non-exhaustive list" of relevant
factors: "(1) whether a reasonable doctor or patient would
perceive the medical need in question as important and
worthy of comment or treatment, (2) whether the medical
condition significantly affects daily activities, and (3) the
existence of chronic and substantial pain." *Id.* at 162 (internal
quotations omitted). The Court assumes, without deciding,
that Palacio's broken jaw resulting from the January 26, 2001
assault constituted a serious medical condition. [28] *See, e.g.,
Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A
serious medical condition exists where the failure to treat a
prisoner's condition could result in further significant injury
or the unnecessary and wanton infliction of pain." (internal
quotations omitted)); *Brock,* 315 F.3d at 163-164 (finding
that a scar that caused chronic "annoying" or "extreme"
pain might constitute a serious medical condition); *Carter v.
Fagin,* 363 F.Supp.2d 661, 663 (S.D.N.Y.2005) (finding that
a jaw condition that caused "great pain" constituted a serious
medical condition); *but see Malsh v. Austin,* 901 F.Supp. 757,
763 (S.D.N.Y.1995) (noting that some courts have found that
"a mild concussion and broken jaw" do not constitute serious
medical conditions).

28          There is no evidence, other than Palacio's
            statement, that his jaw was in fact broken. He has
            submitted no affidavit or other evidence that a state
            doctor determined Palacio's jaw was broken.

B. Subjective Culpability of Defendants

1. Delay of Medical Treatment

**\*11** The Supreme Court has held that "intentionally denying
or delaying access to medical care" for a serious medical
condition can constitute deliberate indifference. *Estelle,* 429
U.S. at 104-105. This Circuit, however, has "reserved such
a classification for cases in which, for example, officials
deliberately delayed care as a form of punishment, ignored
a life-threatening and fast-degenerating condition for three
days, or delayed major surgery for over two years." *Demata
v. N.Y. State Corr. Dep't of Health Servs.,* No. 99-0066,

2006 WL 2372250

1999 U.S.App. LEXIS 22955, at *5 (2d Cir. Sept. 17, 1999) (internal quotations and citations omitted).

In the instant case, the delay of treatment was, at most, a little more than two hours. Furthermore, nothing in the record suggests that Palacio suffered from a life-threatening or fast-degenerating condition or that prison officials deliberately delayed his treatment as a form of punishment. Therefore, this Court finds that the delay does not rise to the level of deliberate indifference and Palacio's claim on this basis is dismissed.

### 2. Failure to Diagnose Broken Jaw

It is well settled that the negligent failure to diagnose a serious medical condition does not create a cause of action under 42 U.S.C. § 1983. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (holding that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim"); *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000) ("Mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)). Furthermore, the Supreme Court has held that a doctor's choice of diagnostic techniques does not support a constitutional claim. *See Estelle,* 429 U.S. at 107.[29]

[29]    Specifically, the Supreme Court has held:
[T]he question whether an x-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice.
*Estelle,* 429 U.S. at 107.

Defendant Edano's decision not to x-ray Palacio's jaw and his failure to diagnose the fracture do not support a claim under 42 U.S .C. § 1983. Viewed in a light most favorable to the Plaintiff, the record does not suggest that Edano evinced a culpable recklessness in the manner in which he diagnosed Palacio's injury. At most, the facts might support a claim of

medical malpractice. Therefore, Palacio's claim on this basis is dismissed.

### 3. Choice of Treatment

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* The case law regarding adequacy of treatment "draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence." *Nelson v. Rodas,* No. 01 Civ. 7887, 2002 U.S. Dist. LEXIS 17359, at *55 (S.D.N.Y. Sept. 17, 2002). In certain instances, however, a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment plan. *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974) (finding that a prison doctor's decision not to reattach a prisoner's severed ear but instead to stitch up the wound constituted deliberate indifference). *But see Reyes v. Gardener,* 93 Fed. Appx. 283, 284-285 (2d Cir.2004) (finding no deliberate indifference where doctors conservatively prescribed Tylenol, Motrin and, eventually, Demerol to treat pain caused by Plaintiff's sickle cell condition).

**\*12** The facts in the instant case are far more analogous to *Reyes* than to *Williams.* Here, as in *Reyes,* Plaintiff claims that he received inadequate medication to treat his pain. Such a disagreement over the proper treatment does not support a constitutional claim. Furthermore, even if Edano committed medical negligence, he did not show the requisite "culpable recklessness," as exhibited by the doctor in *Williams v. Vincent.* Therefore, Palacio's claims on this basis are dismissed.

### V. Inadequate Discovery Claim

Summary Judgment may be inappropriate prior to an adequate opportunity for discovery. *See Meloff v. N.Y. Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995); *Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d Cir.1995) (reversing summary judgment entered before any discovery had taken place). Under Rule 56(f) of the Federal Rules of Civil Procedure, courts may permit further discovery prior to ruling on a summary judgment motion in the interests of justice.[30] *Bank of Am. Nat'l Trust and Savings Ass'n v. Envases Venezolanos,*

*S.A.,* 740 F.Supp. 260, 269 (S.D.N.Y.1990), *aff'd* 923 F.2d 843 (2d Cir.1990). In this Circuit, a party claiming that he or she has been denied adequate discovery

30    Fed.R.Civ.P. 56(f) provides:
      Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

must make a four-part showing before further discovery should be granted prior to resolving a pending summary judgment motion: (1) the party must specify the nature of the uncompleted discovery; (2) the party must demonstrate how the facts sought are reasonably expected to create a genuine issue of fact; (3) the party must explain what efforts he has made to obtain those facts; and (4) the party must explain why those efforts were unsuccessful.

*Hutchinson v. Pangburn,* No. 95 Civ. 5449, 1998 U.S. Dist. LEXIS 4082, at * *25-26 (S.D.N.Y. Mar. 31, 1998) (citing *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994)). A plaintiff's unsupported allegations do not pass this four-part test, however. *See Carney v. United States Dep't of Justice,* 19 F.3d 807, 813 (2d Cir.1994) (holding that the district court did not err in denying pro se plaintiff discovery pursuant to Rule 56(f) because plaintiff's allegations were "grounded in mere speculation").

A plaintiff must also comply with the appropriate procedural guidelines when making a claim of inadequate discovery. This Circuit had held that "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners,* 34 F.3d at 1137 (noting that even "a reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit"). However, "the Court must afford 'special solicitude' to pro se litigants confronted with summary judgment motions." *Sereika v. Patel,* 411 F.Supp.2d 397, 404 (S.D.N.Y.2006) (quoting *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988)) (nonetheless denying pro se plaintiff's request for further discovery partially because he did not submit a Rule 56(f) affidavit).

*13 Construed liberally, Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment requests that this Court allow Palacio the opportunity to conduct further discovery. Specifically, Palacio requests permission to depose the Defendants and certain witnesses 31 and appears to ask the Court to compel production of "the discovery requested heretofore." These requests were not made through a Rule 56(f) affidavit as required. The Court can deny Palacio's request on this basis alone.

31    Officers Thomas, Wright, L. Rosado, J. Romero, R. Lopez, K. Thomas, Captain McMillan, Warden Richard Pagan, Doctor S. Edano, the "Doe" Defendants and unidentified prisoner witnesses. (Docket No. 35.)

The Court also finds that Palacio's request for further discovery does not pass this Circuit's four-part test. First, his request that the court compel production of "the discovery requested heretofore" does not adequately "specify the nature of the uncompleted discovery." 32 *Hutchinson,* 1998 U.S. Dist. LEXIS 4082, at *26. Second, his request for permission to depose specific witnesses does not "demonstrate how the facts sought are reasonably expected to create a genuine issue of fact." *Id.,* 1998 U.S. Dist. LEXIS 4082, at *26. Plaintiff claims that deposing Defendants and certain witnesses will allow him to show (1) that he filed multiple grievances regarding his CMC classification, or alternatively that the DOC's grievance system is flawed (Pl. Mot. Opp'n Defs.' Mot. Summ. J. ¶ 13); (2) that CO Thomas's account of the December 16, 2000 inmate-on-inmate assault is inaccurate (*Id.* ¶¶ 15, 17, 18, 20); (3) that Lowman was involved in the December 16, 2000 assault and then, in spite of a separation order, assaulted Palacio again on January 26, 2001 (*Id.* ¶ 28). This Court already viewed these disputed facts in the light most favorable to the Plaintiff in its analysis above. This Court nonetheless found that all of Plaintiff's claims fail as a matter of law. Therefore, Plaintiff's request for further discovery is denied.

32    The Court notes that, in denying three similarly broad requests, Magistrate Judge Francis instructed Palacio to submit the "discovery requests and responses at issue." (See Docket Nos. 27, 41, 58.)

CONCLUSION

Defendants' motion for summary judgment is granted. 33 The Clerk of the Court is requested to close out this case.

2006 WL 2372250

33  Having dismissed all of Palacio's claims on substantive grounds, this Court does not consider the issues of exhaustion of administrative remedies, liability of supervising officers, qualified immunity or municipal liability.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2372250

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Pearson v. Callahan,  U.S.,  January 21, 2009

2007 WL 894218
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Eugene JONES, Plaintiff,

v.

Sergeant FURMAN, C.O. Carpender, C.O. Bly, C.O.
Losito, C.O. John Doe # 1, C.O. John Doe # 2, C.O. John
Doe # 3, C.O. John Doe # 4, Nurse John Doe, Nurse
J. Brink, R. Murphy, C.O., Lanasa, C.O., D. Hersh,
Nurse, and T. Lanasa, Correctional Officer, Defendants.

No. 02-CV-939F.
|
March 21, 2007.

**Attorneys and Law Firms**

Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York,
Stephen F. Gawlik, Assistant Attorney General, of Counsel,
Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

**JURISDICTION**

*1  On May 7, 2003, the parties to this action consented
pursuant to 28 U.S.C. § 636(c) to proceed before the
undersigned. The matter is presently before the court on
Defendants' motion for summary judgment (Doc. No. 58),
filed February 18, 2005.

**BACKGROUND**

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro se,*
commenced this civil rights action on December 27,
2002, alleging that while incarcerated at Southport
Correctional Facility ("Southport"), Defendants Sergeant

Furman ("Sgt.Furman"), C.O. Carpenter [1] ("Carpenter"),
C.O. Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does
1 through 4 and Nurse Jane Doe (together, "the Doe
Defendants"), and Nurse J. Brink ("Brink"), subjected
Plaintiff to excessive force, cruel and unusual punishment and
acted with deliberate indifference to Plaintiff's medical needs,
in violation of the Eighth Amendment. On March 27, 2003,
an answer was filed by Defendants Sgt. Furman, Carpenter,
Bly, Losito and Brink. On October 21, 2003, Plaintiff filed an
Amended Complaint (Doc. No. 21) ("Amended Complaint"),
asserting essentially the same claims against the original
named Defendants, and naming new Defendants, including
C.O. Lanasa ("Lanasa"), C.O. R. Murphy ("Murphy"), and
Nurse D. Hersh ("Hersh") in place of the Doe Defendants.
Answers to the Amended Complaint were filed on November
13, 2003, by Defendants Sgt. Furman, Bly, Brink, Carpenter,
and Losito (Doc. No. 22), and on October 14, 2004, by
Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

[1]     Plaintiff incorrectly spells Carpenter's name as
        "Carpender".

On February 18, 2005, Defendant filed the instant
motion seeking summary judgment ("Defendants' motion").
Defendants also filed, on February 18, 2005, papers in
support of the motion a Memorandum of Law (Doc. No.
59) ("Defendants' Memorandum"), a Statement of Facts
Not in Dispute (Doc. No. 60) (Defendants' Statement of
Facts"), and the Declarations of Defendants Brink (Doc. No.
61) ("Brink Declaration"), Furman (Doc. No. 62) ("Furman
Declaration"), Lanasa (Doc. No. 63) ("Lanasa Declaration"),
Murphy (Doc. No. 64) ("Murphy Declaration"), Hersh, a/
k/a Weed (Doc. No. 65) ("Weed Declaration"), Carpenter
(Doc. No. 66) ("Carpenter Declaration"), Bly (Doc. No.
67) ("Bly Declaration"), and Losito (Doc. No. 68) ("Losito
Declaration").

In opposition to summary judgment, Plaintiff filed on June
8, 2005, a Memorandum of Law (Doc. No. 72) ("Plaintiff's
Memorandum"), a Statement of Disputed Factual Issues and
Questions (Doc. No. 73) ("Plaintiff's Statement of Facts"),
and the Declaration of Plaintiff (Doc. No. 74) ("Plaintiff's
Declaration"), attached to which are exhibits A though X
("Plaintiff's Exh(s). ----"). In further support of summary
judgment, Defendants filed on June 16, 2005 the Reply
Declaration of Assistant Attorney General Stephen F. Gawlik
("Gawlik") (Doc. No. 75) ("Gawlik Declaration"). Oral
argument was deemed unnecessary.

Jones v. Furman, Not Reported in F.Supp.2d (2007)

2007 WL 894218

Based on the following, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

### FACTS [2]

[2]      Taken from the pleadings and motion papers filed in this action.

**\*2** Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

### The April 26, 2002 Incident

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." *Id.* Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. *Id.* According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. *Id.*

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear, lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. *Id.*

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." *Id.* Plaintiff never saw the nurse on April 26, 2002. *Id.* Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. *Id.* at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." *Id.*

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

**\*3** According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. *Id.* The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

3          Nurse Peters is not a party to this action.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

**\*4** According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed sheets,

letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook, 4 Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

4          Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon 5 who

2007 WL 894218

noted that Plaintiff complained of a rash and dryness on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

5        Nurse W hedon is not a party to this action.

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive psychiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [6] on June 23, 2002. *Id.*

6        The record does not specify whether such "physicians" included a psychiatrist.

### DISCUSSION

**1. Summary Judgment**

 **\*5**  Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable

inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

 **\*6**  Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v.. Oliver,* 510 U.S.

2007 WL 894218

266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8. [7]

[7]     Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.

### 2. Eighth Amendment

Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

#### A. Excessive Force

**\*7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

*\*8* The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are devoid of any evidence that Plaintiff was injured in the April 26,

2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes that a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim

is not only material, but also sufficient to preclude summary judgment.

**\*9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

**B. Deliberate Indifference to Serious Medical Need**

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the

Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner; *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

**\*10** As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiff's Eighth Amendment deliberate indifference to serious medical needs

2007 WL 894218

claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")). [8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶

14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

[8]     Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

**\*11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

### C. Conditions of Confinement

Defendants argue in support of summary judgment that the alleged unsanitary condition of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that Plaintiff, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

2007 WL 894218

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

> both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

**\*12** As to the subjective element, the Supreme Court has held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

> harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See Hutto v. Finney,* 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

### 3. Deprivation of Property

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs.

Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

**\*13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due Process claim based on the June 4, 2002 incident.

### 4. Qualified Immunity

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U .S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,* 106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,* 821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or "if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right." *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

**\*14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified

immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or fundamentally similar to situation in question, but that state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 894218

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4685104
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael GARCIA, Plaintiff,
v.
R. FURNIA, Sgt.; Clinton Corr. Facility; and Does,
Corr. Officials, Clinton Corr. Facility, Defendants.

No. 9:12–CV–0924 (GTS/ATB).
|
Signed Sept. 19, 2014.

**Attorneys and Law Firms**

Michael Garcia, Seneca County Sheriff's Office, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adrienne J. Kerwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Michael Garcia ("Plaintiff") against the above-captioned individuals ("Defendants"), are Defendants' unopposed motion for partial summary judgment, and United States Magistrate Judge Andrew T. Baxter's Report–Recommendation recommending that Defendants' motion be granted. (Dkt.Nos.30, 35.) Plaintiff has not filed an Objection to the Report–Recommendation (despite the extension of the deadline by which to do so). (*See generally* Docket Sheet.) After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report–Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (Dkt. No. 35.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 35) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 30) is **GRANTED:** and it is further

**ORDERED** that Plaintiff's Eighth Amendment claim that he was denied adequate medical care by Defendants is **DISMISSED:** and it is further

**ORDERED** that Pro Bono Counsel be appointed for the Plaintiff for purposes of trial only; any appeal shall remain the responsibility of the plaintiff alone unless a motion for appointment of counsel for an appeal is granted; and it is further

**ORDERED** that upon assignment of Pro Bono Counsel, a final pretrial conference with counsel will be scheduled in this action, at which time the Court will schedule a jury trial for Plaintiff's Eighth Amendment claims of excessive force against Defendant Furnia. Counsel are directed to appear at the final pretrial conference with settlement authority from the parties.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c). Presently before the court is defendant Furnia's partial motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 30). Plaintiff has not responded to this motion. [1] For the following reasons, this court will recommend that defendant's partial motion for summary judgment be granted, and that plaintiff's claim, that he was denied adequate medical care by defendant Furnia and any other unidentified John Doe defendants, be dismissed.

1    Because plaintiff has failed to respond, the court may deem plaintiff to have admitted the factual statements in defendant's Rule 7.1 Statement, may deem defendant's factual statements as true, and may deem that plaintiff has conceded the defendant's arguments. Plaintiff was warned of these consequences, both by defense counsel and by this court. (Dkt. No. 30–1, Dkt. No. 32 at

2). However, the court notes that it has reviewed and accepted the allegations in plaintiff's complaint in deciding whether genuine issues of material fact exist that would prevent granting defendant's partial motion for summary judgment.

Plaintiff has also moved for appointment of counsel, apparently in anticipation of trial on the surviving claim(s). (Dkt. No. 34). The court will deny that motion, subject to reconsideration after Judge Suddaby has rendered a decision with respect to the recommendations herein.

### I. *Facts*[2]

[2]
    The court described the factual and procedural background in detail in its March 21, 2013 Order and Report and Recommendation. (Dkt. No. 17). The court will, therefore, assume the parties' familiarity with the background and will only summarize it here as necessary to address the pending motion.

**\*2**  Plaintiff brings this pro se civil rights complaint under § 1983 based on events arising out of his confinement at Clinton Correctional Facility ("Clinton"). Plaintiff alleges that defendant Furnia and other unnamed correctional officers "physically assaulted and brutally beat[ ]" him on June 9, 2011. Following the alleged assault, plaintiff was placed in the shower area, defendant Furnia left, and plaintiff was later escorted to his cell by other officers. (Dkt. No. 30–2, Ex. A ("Pl.Dep.") at 64–66, 70–74). He appears to assert that he was denied requested medical assistance immediately after the alleged attack on June 9, 2011, by defendant Furnia and the other officers involved in the incident, and that he was subsequently denied requested medical attention by other, unidentified correctional officers for four days after the alleged attack. (Compl. 4, 5, 7, 10–11; Pl. Dep. 67–70).

Plaintiff claims that as a result of the assault, he "sustained multiple abrasions to his body and blotted blood stains to his forehead area," along with abrasions to his right eye. (Compl. at 6). In his deposition, he described his injuries as including "body soreness, a black eye, blurriness in one eye, a loose tooth, and scrapes and minor contusions from the officers' watches." (Pl. Dep. at 66, 76, 77–78, 80). The morning after the alleged assault, plaintiff complained to a nurse about body soreness and blurriness in one eye. (Pl. Dep. at 66). The nurse provided plaintiff with ibuprofen and cream to clean his cuts later that day. (Pl. Dep. at 67–68, 79). On June 13, 2011, plaintiff was examined by a nurse after

disciplinary hearing officer Kelly saw his injuries. (Compl.5, 12, 13). Between June 9th and June 13th, plaintiff claims that he requested medical attention, but was denied. (Pl. Dep. at 68–70). According to plaintiff, the medication provided by the nurse helped, but his eye was still blurry and his tooth was loose. (Pl. Dep. at 75).

At the time he was seen by the nurse on June 13th, plaintiff complained of pain in his back, chest and face, a headache, eye blurriness,[3] a "wobbly" knee and a sore throat. (Pl. Dep. at 83–86). The inmate injury report from this examination notes superficial scratches, bruises and abrasions. (Dkt. No. 31 at 2). The photographs taken during the examination confirm these minor scrapes and bruises. (Dkt. No. 31 at 3–12). After this visit, plaintiff claims that he again requested medical attention but was denied. (Pl. Dep. at 87, 96–97). Plaintiff asserts that the body pain lasted for about three and one-half to four weeks, and that he still has blurry vision and headaches. (Pl.Dep.98–99).

[3]
    Plaintiff explained in his deposition that his eyeglasses were knocked off by defendant Furnia during the alleged assault and that his current medical provider has prescribed and ordered the plaintiff eyeglasses to correct his eye blurriness. (Pl. Dep. at 50, 99–100).

Plaintiff brings this action against Sergeant Furnia and unidentified John Doe defendants, alleging that he was subjected to excessive force and denied adequate medical care for his injuries. Defendant Furnia has moved for partial summary judgment, requesting that plaintiff's medical care claim be dismissed.

### II. *Summary Judgment*

**\*3**  Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

2014 WL 4685104

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Die bold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### III. *Denial of Medical Care*

#### A. Applicable Law

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id* . at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need

is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong* 143 F.3d at 702).

**\*4** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or nonexistent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

#### B. Application

Plaintiff claims that the officers, including defendant Furnia, who assaulted him denied him medical care immediately after the incident. Plaintiff also appears to assert that other unnamed individuals denied him medical care in the days following the alleged assault. As noted above, the only named defendant is Sergeant Furnia. Despite being given multiple warnings (*See* Dkt. No. 9, at 2; Dkt. No. 17 at 7 n. 3, 8–9), plaintiff has not identified any of the John Doe defendants, and discovery is now closed. [4] However, the court finds that plaintiff cannot prove that he had a serious medical need, and the medical care claim would be dismissed against any defendant.

[4]    It is also unclear whether the John Doe defendants are associated with plaintiff's excessive force claim, medical care claim, or both.

As described above, plaintiff testified that he suffered the following injuries: (1) body soreness; (2) a black eye; (3) scrapes and minor contusions; (4) a headache; (5) a loose tooth; (6) a "wobbly" knee; and (7) blurriness in one eye.

2014 WL 4685104

These types of minor, temporary injuries have been held not to constitute serious medical needs as a matter of law.

For example, in *Bradley v. Rell,* 703 F.Supp.2d 109 (N.D.N.Y.2010), the court held that plaintiff's allegations that he suffered a headache and blurry vision, swelling and bruising around his head, and an abrasion to his right lower leg, extreme headaches, and psychological problems, were insufficient for a rational fact finder to conclude that his injuries were sufficiently serious to constitute a serious medical need. *Id.* at 121–22 (collecting cases); *see also Lewis v. Havernack,* No. 12–CV–31 (GLS/DEP), 2013 WL 1294606, at *9 (N.D.N.Y. Jan 23, 2013) (Rep'tRec.) (holding that injuries to plaintiff's upper cheeks and lower eyelid resulting from being punched just once are "minor injuries, which are not sufficiently serious to state a deliberate indifference claim under the Eighth Amendment) (collecting cases), *adopted,* 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013); *Sledge v. Fein,* 11 Civ. 7450, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) (noting that courts have "held that terrible and extreme headaches and swelling do not satisfy the objective component of an Eighth Amendment claim"); *Latouche v. Tompkins,* No. 09–CV–308 (NAM/RFT), 2011 WL 1103022, at *14 (N.D.N.Y. Mar. 4, 2011) (Rep't–Rec.) (finding that a 4–5 centimeter bruise, a 2–3 centimeter cut, and a scratch on plaintiff's face and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), *adopted,* 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); *Dallio v. Hebert,* 678 F.Supp.2d 35, 44–45 (N.D.N.Y.2009) (holding that two black eyes, bruising in kidney area, kick marks and open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain") (collecting cases); *Jones v. Furman,* No. 02–CV–939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (explaining that soreness, pain in and a lump behind ear, lump on back of head, abrasions on nose and knuckle, and bruising to back, ribs and legs do not constitute a serious medical condition); *Hickey v. City of New York,* 01–CV–6506, 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and bruises do not constitute sufficiently serious medical needs); *Rodriguez v. Mercado,* 00–CV–8588, 2002 WL1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (finding that bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness did not constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment).

**\*5** Plaintiff was treated with pain medication and cream to apply to his cuts the day after the alleged assault, and was examined by a nurse three days after the incident. No reasonable fact finder could conclude, given the undisputed medical evidence in this case, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to support a constitutional medical care claim. *See, e.g ., Brooks v. Rock,* No. 9:11–CV–1171 (GLS/ATB), 2014 WL 1292232, at *16 (N.D.N.Y. Mar. 28, 2014) (no reasonable fact finder could find that plaintiff established the objective element of a deliberate indifference claim as to a defendant who did not allow plaintiff to obtain immediate medical treatment after she allegedly kicked open a bathroom door that struck the inmate in the head; the two-day delay before plaintiff saw the medical staff about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain; *Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at *2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" resulting from the delay in treatment).

The court finds that plaintiff cannot demonstrate that he suffered from "a medical condition that significantly affect[ed his] daily activities;" or that he suffered from "chronic and substantial pain." *Chance,* 143 F.3d at 702 (citation omitted). Plaintiff's injuries were simply not conditions "of urgency, [ ] that may produce death, degeneration or extreme pain," and were not serious medical needs. *Hathaway,* 99 F.3d at 553. Given the medical treatment made available to plaintiff in the days following the alleged assault, the defendant's failure to take plaintiff for immediate medical attention did not expose plaintiff to a serious risk of harm. *Smith v. Carpenter,* 316 F.3d at 185.

Because plaintiff could not satisfy the objective element of the deliberate indifference standard, the court need not address whether defendant knew that plaintiff faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take

2014 WL 4685104

reasonable measures to abate it." However, given the lack of a serious injury, and the treatment that plaintiff did receive, it is unlikely that defendant Furnia [5] (or any of the unnamed Doe defendants) could possibly have acted with subjective recklessness.

[5]     Plaintiff admits that defendant Furnia directed that plaintiff be placed in the shower area to receive medical attention before returning to his cell. (Pl. Dep. at 64–65, 70–74).

Plaintiff's injuries do not rise to the level of a serious medical need and the brief delay in his treatment involved no risk of serious harm to him. The court will, therefore, recommend granting defendant's partial motion for summary judgment with respect to plaintiff's medical care claim.

## IV. APPOINTMENT OF COUNSEL

 *6  Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. The threshold consideration in ruling on such an application is a showing of some likelihood that the action has merit. *Cooper v. A. Sargenti Co.,* 877 F.2d 170, 172–74 (2d Cir.1989). Depending on the merits of the matter, the court should then consider: The indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination. *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

In his motion, plaintiff expresses concern that a trial will likely involve conflicting testimony and counsel would be able to assist in the presentation of evidence and cross examining witnesses. After District Judge Suddaby has ruled on this report-recommendation, the court will reconsider plaintiff's request for counsel prior to the trial in this matter. Pending Judge Suddaby's decision, plaintiff's motion for appointment of counsel is denied without prejudice. The only matter requiring plaintiff's attention prior to a trial is preparing and filing any objections to this Report–Recommendation. The issues in this case are relatively simple, and the plaintiff has demonstrated his ability to represent his interests in connection with the pretrial proceedings by, for example, filing objections to the prior Report–Recommendation of this court recommending dismissal of some, but not all of plaintiff's original claims (Dkt. No. 18). Thus, the court is confident that plaintiff can adequately address any objections he has to this Report–Recommendation without the benefit of counsel.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's partial motion for summary judgment (Dkt. No. 30) be **GRANTED** and that plaintiff's claim that he was denied adequate medical care by defendant Furnia and other unidentified John Doe defendants be **DISMISSED;** and it is further

**ORDERED,** that plaintiff's motion to appoint counsel is denied without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

 *7  Dated: August 1, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4685104

---

**End of Document**                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.